**PCL CONSTRUCTION SERVICES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Nos. 95–666C, 96–442C.**

United States Court of Federal Claims.

Sept. 20, 2000.

---

Herbert L. Fenster, McKenna & Cuneo, L.L.P., Denver, Colorado, attorney of record for the plaintiff. Thomas A. Lemmer and Kim E. Laakso, of counsel.

Brian S. Smith, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were David M. Cohen, Director, Kirk T. Manhardt, Assistant Director, attorneys of record for the defendant.

## OPINION

HORN, Judge.

This case involves a dispute over a government contract for the construction of a Visitor Center and Parking Structure at the Hoover Dam on the Nevada side of the Colorado River. The plaintiff, PCL Construction Services, Inc. (PCL) filed two complaints (Case Nos. 95–666C and 96–442C) against the United States, arising from the alleged actions of the United Stated Bureau of Reclamation (USBR). PCL seeks recovery of over $31 million under "breach of contract" and "illegal contract" theories in Case No. 95–666C, and over $1.3 million under "breach of contract," "improper termination for default," and "illegal assessment of liquidated damages" in Case No. 96–442C. On October 4, 1995, PCL filed a "preliminary complaint" premised upon a contracting officer's final decision denying PCL's July 27, 1995 certified claim for $31,040,071.00 based upon alleged breach of contract and illegality of contract. This complaint was assigned Case No. 95–666C. This complaint was amended on April 1, 1996, following discovery. The plaintiff's counts in Case No. 95–666C assert breach of contract premised upon fraud in the inducement and misrepresentation by the government (Counts I, II and IV), breach of contract premised upon superior knowledge by the government (Counts III and VI), breach of contract arising from a breach of warranty by the government (Count V), breach of contract stemming from hindrance and delay by the government (Count VII), cardinal change (Count VIII), and illegal contract (Count IX).[1] Shortly after the amend-

---

1. This court previously addressed and granted summary judgment in the government's favor on Count X, PCL's other "illegal contract" claim that alleged the contract was illegal due to viola-

ed complaint in case no. 95–666C was filed, PCL filed a second complaint on July 23, 1996, which was assigned Case No. 96–442C, and indicated that the complaint was related to the complaint filed in Case No. 95–666C. The complaint in this second action was premised upon (1) a contracting officer's final decision denying PCL's November 22, 1995 certified claim for $1,351,838.00 seeking monies retained by USBR, (2) a March 11, 1996 letter from the contracting officer terminating PCL for default based upon an alleged breach of the contract by PCL, and (3) a March 26, 1996 letter from the contracting officer assessing liquidated damages against PCL in the amount of $1,285,000.00.

PCL's first complaint asserts that the government breached an implied contract of good faith and fair dealing by "inducing" PCL to enter into the contract for construction of the Hoover Dam Visitor Center and Parking Structure. PCL also contends that USBR "breached warranties" and the express contract between the parties by imposing a cardinal change upon PCL, hindering PCL's efforts and by "maladministration" of the contract. PCL concludes that these purported breaches warrant one or more of the following: breach of contract damages, reformation of PCL's contract, the award of a *quantum meruit/quantum valebant* recovery (apparently over and above the $36,564,417.00 that PCL has already been paid.) The plaintiff also complains that USBR's withholding of the retainage after "substantial completion and acceptance of the contract" was improper and thus the termination for default was improper.

The defendant responds that PCL's case has no merit. The defendant argues "that PCL's contract was not 'severely defective,' PCL agreed in its contract that it would encounter the very same kinds of events that PCL did, in fact, encounter, and that PCL has not proven any causal relationship between [the] Government's actions and PCL's extended contract performance period." The defendant summarizes its position in this action as follows:

tions of 31 U.S.C. §§ 1341, 1342, and 1502, statutes which are directed at precluding the award of government contracts in excess of, or in advance of, appropriations and forbid the accep-

We do not dispute that the pre-design subsurface investigation did not permit Reclamation to depict the actual subsurface rock conditions with absolute precision, that the design process was not without error, that the contract drawings were imperfect, that the project involved a number of changes and redesigns during contract performance (captured in 144 contract modifications), that the Government responded to a significant number of RFIs [Requests For Information] during the job, that the Government's response to RFIs was [not] as fast as PCL requested in every instance, and that PCL's contract completion was delayed, to some extent, by Government-directed changes. None of these situations, in whole or in part, constitute a "cardinal change" or any other "breach" of PCL's contract and, in fact, all of these situations are provided for in the terms of the contract. In short, PCL signed a contract that contains a changes clause, and a differing site conditions clause, among others, yet now claims "breach of contract" because a series of differing site conditions and changes occurred—not one of which was extraordinary.

PCL's second complaint in Case No. 96–442C, filed July 23, 1996, alleges breach of contract, based upon failure to pay and improper assessment of liquidated damages; improper termination for default; the illegal assessment of liquidated damages; and improper retention of funds by the government. It also requests the conversion of the termination for default to a termination for convenience, based upon the improper termination.

PCL contends that "[t]he USBR's refusal to return the retainage to PCL after issuing a Certificate of Substantial Completion and accepting PCL's work is contrary to the purpose for retainage, legal authority, and the intent of the parties." In addition, PCL argues that termination for default was improper because "[t]he USBR not only

tance of voluntary services. *See PCL Constr. Servs., Inc. v. United States,* 41 Fed.Cl. 242, 264 (1998).

granted substantial completion to PCL on May 11, 1995, but it also began beneficial occupation of the facilities at that time and beneficial occupation continues to this day, establishing that no major deficiencies could exist." The plaintiff also contends that the contracting officer did not exercise "reasoned and independent discretion when considering and applying the regulatory provisions." PCL contends that the assessment of liquidated damages against it was improper because the contracting officer "failed to determine responsibility for delays before assessing the liquidated damages" and "failed to issue a final decision when she assessed liquidated damages."

In response, the government contends that the termination for default was justified because "PCL clearly and unequivocally defaulted upon the contract," and because the government has the authority to terminate for default upon a contractor's refusal to complete any separable parts of the contract such as the uncompleted deficiency list and contract completion requirements. In regard to the assessment of liquidated damages, USBR states that it had informed "PCL that continued withholding of funds was necessary for protection of the Governments [sic] interests in accrued liquidated damages, outstanding required submittals, and credits due the Government for changes and/or reductions in the work." The government argues that PCL is liable for uncompleted contract work which includes the deficiencies that PCL failed to correct when PCL abandoned the project and which account for the retained monies and liquidated damages assessment.

## FACTS

The Hoover Dam Visitor Center and Parking Structure are located on the north side of the Colorado River at Black Canyon, immediately west and downstream of the Hoover Dam. The mountain ranges in the damsite area generally trend north-south and are sparsely vegetated and deeply incised by steep ravines and canyons. The rocks in Black Canyon at Hoover Dam have undergone intense structural deformation. This deformation includes low- and high-angle faulting, rotation and tilting of structural blocks, and angular unconformities within and between units. The Visitor Center and Parking Structure are built into the north side of the Black Canyon, which has grade changes above the surface in excess of seven hundred feet, including changes in elevation over relatively small distances from the base of the dam to the top of the hill above the Parking Structure.

The Parking Structure is located in a box canyon off the main canyon in which the Hoover Dam lies. The box canyon has three sides, with the open side to the south towards the Colorado River. The open side is bounded by U.S. Highway 93. The three enclosed sides of the canyon are nearly vertical rock cliffs. The site for the Parking Structure was underlain by rock and fill. The Parking Structure is a five-level structure, more or less rectangular in plan, with the long axis perpendicular to the orientation of Black Canyon. The south half of the Parking Structure is located over a very deep ravine that, in part, was filled and leveled at the time of the dam's construction. The fill consisted of manmade materials plus natural elements such as large boulders and rock fragments. The manmade materials include debris left over from the dam construction such as wire, nails, metal pipe, and concrete batch plant debris, as well as asphalt. The Parking Structure is comprised of two structures divided into two approximately equal halves which are structurally separated by an expansion joint. The back, or north, portion has three levels, levels 3A, 4A and 5A; the front, or south, portion has five levels, levels 1–5; and a vehicle ramp that connects the front and back.

The Visitor Center is perched atop a small rock outcropping that is located between U.S. Highway 93 to the north and the sheer canyon walls of the Black Canyon carved by the Colorado River to the south. The Visitor Center is composed of a multi-level area that houses the Visitor Center facilities and an elevator shaft to the east that runs from the top of the rock on which the Visitor Center is situated down approximately 500 feet to the base of the dam.

U.S. Highway 93 is an important link between Nevada and Arizona and carries significant automotive and commercial traffic; therefore, it was required to remain at least partially open throughout construction. The only access into and out of the Visitor Center and Parking Structure site was at the triangular bridge area at the west end of the site on Highway 93. From the triangular bridge, the Parking Structure site was accessed by continuing north along what was known as the narrow "hoist house road" on the west side of the Parking Structure site. The Visitor Center site was accessed by a narrow road that began at the triangular bridge area and proceeded east to the east abutment of the roadway realignment bridge. PCL had to excavate under Highway 93 and construct an access ramp in order to finally reach the Visitor Center site to haul away the fill excavated from the site.

Part of the construction of the project also included bridgework on Highway 93. In addition, numerous high voltage electrical transmission cables run above the Visitor Center and Parking Structure. During construction, equipment and personnel were required to maintain minimum clearances from the power cables for safety reasons. Care was required not to undermine the various towers supporting the cables. Care also was required to ensure that the structures below the power lines did not become charged with static electricity emanating from the power lines.

During construction, access to both the Visitor Center and Parking Structure was extremely limited because of the geography of the area, especially the steep cliffs and the bisection of the construction site by Highway 93. The restrictive access required extensive coordination to permit the unrestricted flow of construction materials, manpower, and equipment. Throughout the course of trial, it became evident that the site was complex and difficult for both design and construction purposes.

In the 1980s, the government determined that USBR would improve the visitor facilities at Hoover Dam.[2] On February 24, 1986, The Promontory Partnership (TPP) entered into Contract No. 6–CA–30–03070 with USBR to design a new Visitor Center and Parking Structure at the Hoover Dam, Nevada.[3] TPP's original proposal for the design of the Visitor Center and Parking Structure facilities included topographical survey work. In 1986, when TPP's contract with USBR was negotiated, the estimated construction cost for the facilities was $17.5 million. Design activity performed by TPP and its subcontractors for the Visitor Center and Parking Structure facilities ceased in 1988 and resumed in 1990.

TPP's civil engineering firm, URS/John Bloom Associates (URS),[4] stated during the negotiations of its contract with TPP that it had "drastically reduced" its proposal for "Final Design" and "[b]ased on [URS's] understanding ... that USBR has recent 2 ft. contour maps of this area, [URS] eliminated such items as site surveys." URS further stated that it understood "that civil engineering control [would] be available from this mapping and from USBR work associated with the highway straightening project."

On March 7, 1986, Harding Lawson Associates (HLA) entered into a contract with

2. The USBR, a bureau within the United States Department of Interior, has the mission to assist both federal and non-federal entities in developing and conserving the nation's water resources for municipal and industrial, agricultural, hydro electrical power, recreational, and other uses by means of constructing and operating environmentally and economically sound water projects.

3. TPP was a partnership between the firms of Spencer Associates and Barry Howard Limited. Spencer Associates handled the planning and architectural aspects of the partnership, while Barry Howard was the exhibit design and interpretive arm. TPP was responsible for designing the Visitor Center and Parking Structure during construction. Harry Rodda was an architect, principal and part owner of Spencer Associates. Spencer partnered with Barry Howard Limited to form TPP. Hugh Kennedy was the project manager at TPP and Linda Ludden Poncini was a project architect for TPP.

4. URS Affiliated Companies, an engineering firm, provided structural and civil engineering services to TPP for the design of the Visitor Center and Parking Structure. Key personnel from URS were Lloyd Lee, the project manager for URS, and Steve Brokken, a senior engineer and project manager.

URS to perform geotechnical investigations for the Visitor Center and Parking Structure construction project. Except through the subcontractor HLA, TPP and URS performed no borings, seismic tests or other subsurface investigations that involved penetration of the surface on the Visitor Center and Parking Structure site. In addition, other than six borings taken in May 1991 (and the investigations performed by TPP and its subcontractors), USBR performed no borings, seismic tests or other subsurface investigations that involved penetration of the surface on the Visitor Center and Parking Structure site after 1984.

HLA's geological investigations were performed prior to the selection of a final design concept for the Visitor Center and Parking Structure. In May 1991, employees from USBR's Arizona Project Office took six test borings on the site of the Parking Structure, at the location of structural support caissons to be located on the project gridlines of J3, J5, J7, F3, F5 and F7.[5] North of the "7 Line" for the Parking Structure project gridline, there were no borings, seismic tests or other subsurface investigations that involved penetration of the surface on the Parking Structure site, with the sole exception of a boring at the approximate grid location of H9.7. After 1985, USBR, TPP and its subcontractors, did not perform any borings, seismic tests or other subsurface investigations that involved penetration of the surface at the area of the escalators that were intended to provide access to the Visitor Center site.

HLA issued a geotechnical report that specifically indicated that top of rock was not encountered in two of the three holes it drilled at the Parking Structure site. Mr. Lee explained that "the geotechnical report was a foundation study for their design, and not intended to identify materials that would be encountered in all areas." Thus, Mr. Lee, according to his own words, had estimated the location of rock throughout the site when designing the foundations. Despite the un-

certainty regarding the location, depth, and competency of the subsurface rock, the Bureau, URS, and TPP "agreed to accept the [HLA] geotechnical report as final with the additional rock bolting information as a supplement...." Even though they knew that HLA had not located rock during its investigation, TPP and USBR determined that the HLA report was "sufficient for the design and the construction" of the Visitor Center and Parking Structure. TPP and USBR decided "to allow bidders to draw their own conclusions about the subsurface materials...." USBR's Denver office suggested that the HLA geology report:

> [D]oes not locate the top of rock below the parking structure. Rough survey information of the rock surface below the visitor center is available from another source. However, exact dimensions of members that depend on the elevations of rock foundations will need to be measured in the field.

There also was a recognition that the failure to locate the rock could lead to additional cost for foundations because caissons might have to be longer or redesigned.

In May 1991, USBR decided to take additional borings. Jack Delp, the USBR Construction Division Chief, opted to use a USBR drill rig that became available in May to do the borings. Mr. Delp obtained $20,000.00 to fund the borings, which limited the effort to just six borings. Because of the limited number of borings that could be undertaken, USBR had to decide where to take the borings to maximize their impact. The Bureau decided to take borings in locations representing the deepest caisson sites. Thus, grid locations at the gridline intersections of J3, J5, J7, F3, F5 and F7 were chosen. The USBR drilled the six borings on May 3, 1991. Four of USBR's borings did hit bedrock, and the other two did not.

Mr. Brokken of URS concluded that the six USBR borings established that the ravine

---

5. Locations on the site of the Hoover Dam Parking Structure were identified according to a grid of numbered and lettered lines. Grid lines running from east to west began with Line 0.3 at the front of the Parking Structure site near Highway 93, and continued to the north at Line 20 at the back of the site. Lines running north-south began with Line A along the easternmost edge of the Parking Structure, and ended with Line L along the westernmost edge of the Parking Structure.

assumed to lie under the middle of the front part of the Parking Structure was skewed more to the west than had been expected and that the ravine was deeper than expected. Because the ravine was deeper, it was also possible that the ravine ran farther north up from the front of the Parking Structure towards the back of the Parking Structure than had been expected. The USBR required the designer to revise the drawings to incorporate the new information from USBR's own borings.

On June 14, 1991 USBR advertised Solicitation No. 1–SI–30–09050/DC–7853, the Invitation for Bids for the construction of the Visitor Center and Parking Structure at the Hoover Dam, that, in addition to the Visitor Center and Parking Structure, included a roadway bridge for part of U.S. Highway 93, and other related facilities. The Invitation for Bids, reviewed and approved by USBR, included drawings and specifications for the construction of these Hoover Dam facilities. The drawings and the specifications were prepared by USBR, TPP and TPP's subcontractors. USBR explicitly disclosed in the contract documents and at the prebid conference the difficulties encountered and the limitations of HLA's investigation, even using the term "marginal results" with respect to some of HLA's work. In addition, USBR supplemented HLA's investigation with the results of the additional six borings, and notified prospective contractors that "fill depth and fill composition has large vertical and lateral variations." Moreover, USBR specifically included in the contract provisions that the contractor, in this case PCL, was to perform the final investigation to assist the Bureau in determining the exact elevations of the initial top of rock and the final elevation of "competent" rock for the Parking Structure, and that both the exploratory drilling and the caisson construction under the contract would be affected, depending on the method of drilling or excavation employed.[6]

The government's Invitation for Bids required prospective contractors to prepare bids on the basis that the awarded contract would require the contractor to construct the Hoover Dam Visitor Center and Parking Structure facilities in accordance with the drawings and specifications included in the Invitation for Bids, as amended. The parties have stipulated that "[t]here were no patent defects" and "no patent omissions in the drawings and specifications at the time of bidding and Contract award."

In the Invitation for Bids, USBR solicited bids for a firm fixed price contract with lump sum pricing for bid schedule items 1 and 2, and unit pricing times estimated quantities for bid schedule items 3 through 14. On July 9, 1991, USBR conducted a prebid conference, that was attended by USBR, TPP, TPP's subcontractors, prospective bidders, and prospective construction subcontractors.

The USBR issued nine amendments to the Invitation for Bids between June 19, 1991 and August 7, 1991. The Invitation for Bids as originally issued provided that bids would be opened on July 30, 1991; however, as finally amended, the date for opening bids was extended to August 13, 1991. The date for receipt of the bids was likewise August 13, 1991. A total of ten bidders submitted bids in response to the Invitation for Bids. PCL and the other bidders were able to bid upon the bid package, and assemble bids that were not significantly different from each other, without significant clarification from USBR.

PCL's bid was made on Standard Form 1442 (rev 4–85), Solicitation No./Specification No. 1–SI–30–09050/DC–7853—Visitor Center and Parking Structure, Hoover Dam, Hoover Visitor Facilities, Boulder Canyon Project, Nevada. PCL's bid in the amount of $33,854,000.00 was dated August 13, 1991 and signed by Donald Briggs, Vice President of PCL out of the Tempe, Arizona office of PCL. PCL's bid acknowledged the nine

---

6. As will be discussed in greater depth below, the contract and prebid conference made apparent to all parties involved that geologic investigations were "marginal," that a result of this difficulty was USBR's and the designers' decision to "estimate" the rock conditions shown on the drawings, that the rock contours depicted on the

drawings were not guaranteed to be precisely accurate, that it would be the contractor's job to determine the exact rock depths for the caissons, and that there were contractual mechanisms to compensate the contractor for additional costs incurred.

amendments to the solicitation. PCL's bid was responsive to the solicitation and was the low bid. The USBR considered the construction price reflected in PCL's bid to be "a reasonable offer."

On September 5, 1991, USBR awarded Contract No. 1–CC–30–09050 to PCL for the construction of the Visitor Center and Parking Structure, Hoover Dam, Hoover Visitor Facilities. The price of the contract awarded to PCL was $33,854,000.00, reflecting a firm fixed price contract with lump sum pricing for bid schedule items 1 and 2, and unit pricing times estimated quantities for bid schedule items 3 through 14. PCL's contract with USBR provided for price adjustments for those items of the bid schedule subject to unit prices in accordance with contract clause I.4.2. The contract encompassed a fixed completion date for Part 1 and Part 2 based upon site availability on or before November 1, 1991.[7] Pursuant to the terms of the contract as awarded, PCL was required to construct the Visitor Center and Parking Structure in accordance with the drawings and specifications.

The construction of the Hoover Dam Visitor Center and Parking Structure involved a total of 465 contract drawings provided to PCL by USBR. The drawings and specifications contained depictions of existing, approximate and estimated rock locations and rock depths at the construction sites. During the Invitation for Bids stage and after the issuance of the contract to PCL, USBR noted specific concerns about the drawings and specifications. For example, by letter dated October 10, 1991, USBR identified forty-four contract drawings marked with a label stating "not suitable for construction." In addition, on September 27, 1991, USBR issued structural calculation comments on the Hoover Dam Visitor Center and Parking Structure designs, and consequently some of the drawings and specifications were changed. PCL notified USBR of alleged deficiencies in the drawings and specifications for which PCL claimed to have incurred additional costs via the submittal of Change Request Extras (CRXs).

The USBR issued a Notice to Proceed to PCL on October 21, 1991, that was acknowledged by PCL on October 22, 1991. PCL proposed and USBR agreed to and participated in a formal system for PCL to issue RFI regarding the contract drawings and specifications in written form, and for USBR to respond in writing. RFI were numbered for tracking purposes. PCL issued 1,244 items which it identified as RFI during its performance of the contract. Nine of these 1,244 RFI were canceled.

### Parking Structure Backslope Excavation

The contract stated that PCL was to excavate the slope at the northern end of the Hoover Dam Parking Structure north of grid line 10, known as the "backslope," to a slope of one-quarter to one. During excavation of the backslope, it became evident that the fill material which comprised the area could not be excavated to a stable slope of one-quarter to one, therefore greater excavation was required by PCL to create a broader slope. PCL alleges that this was a major change that impacted its performance.

After PCL mobilized to the job site, preparatory activities were required to be approved and in place prior to beginning the excavation. These activities included approval of a traffic control plan, survey plan, excavation plan, and blasting plans. PCL's excavation subcontractor, PCL Civil, provided the government with an excavation plan for both the Visitor Center and Parking Structure. The contract specified that the "Contractor shall not proceed with any excavation prior to plan approval from the Contracting Offi-

---

7. Site availability was contingent upon completion of two other phases of the Hoover Dam Visitor Center and Parking Structure facilities development that were not part of PCL's contract, specifically, elevator shafts in and near the location of the proposed Visitor Center and a U.S. Highway 93 roadway realignment bridge. In June 1990, Frontier–Kemper Constructors, Inc. and USBR entered into a contract, Contract No. 0–CC–30–08240, for the "Elevator Shaft & Appurtenant Structures" for the Hoover Dam Visitor Center and Parking Structure. Prior to the award of PCL's Contract, Frehner Construction Company contracted with USBR to construct the roadway realignment bridge for U.S. Highway 93 adjacent to the area where a triangular bridge was to be constructed for access to the Parking Structure under PCL's contract.

cer." The approved excavation plan indicated the work sequence to be performed by PCL Civil to complete the excavation work. The sequence indicated that the excavation would be carried out after scaling of upper areas, starting at the highest elevations, and working downward until final grade was obtained. Based upon PCL's excavation plan, the backslope area would be excavated and cleared during the third phase of the plan, after phases one and two, which represented the first cuts to be made at the parking structure site.

At a meeting on December 3, 1991, PCL notified USBR of this differing site condition, that the loose material found by PCL at the backslope could not be excavated to a stable one quarter to one slope as required by the Contract because the material would not hold a slope of that angle, and PCL requested direction as to how to proceed. At the meeting, USBR instructed PCL to excavate the slope to the "natural angle of repose of the existing material." After PCL had identified a change in excavation material in the rear of the structure during coordination meetings, on January 2, 1992, RFI S–31 was issued to request direction on how to proceed with the work. When the Bureau responded at a January 21, 1992 meeting, PCL was still in the first phase of the approved excavation plan. On February 17, 1992, PCL requested further clarification of the term "natural angle of repose" in USBR's response. USBR supplemented its RFI response and directed PCL to excavate the backslope area to a slope of three to one, or until they encountered rock, whichever came first.

By March 1992, PCL Construction Services, Inc. (PCL), management understood that its subcontractor, PCL Civil, was approximately two months behind schedule in excavating. PCL advised its subcontractor that this delay in schedule was not acceptable. In essence, PCL's progress was behind schedule starting early in the project.

At this time, March 1992, PCL still had not reached that point in the planned excavation sequence at which the backslope material needed to be brought down with the other excavation. In general, PCL was experiencing grave difficulties and delays in schedule with its excavation operation, caused, in PCL's opinion, by "numerous mistakes," "misfires," "flagrant deviations from the contract documents," and degrees of management that resembled an "amateur show," (PCL's own terms) on the part of PCL and its subcontractors, all of which made PCL's top management feel that its "credibility" was being questioned by USBR.[8]

Once PCL's excavation reached the phase in PCL's excavation plan at which the backslope area was the next excavation in sequence, a meeting was held on March 12, 1992, between representatives from PCL, PCL Civil, and USBR. PCL's superintendent, Rex Owenby, PCL Civil's superintendent, Tom O'Donnell, and USBR field engineers, Don Bittle and Don Bader met to discuss the backslope work. The decision reached during the meeting was that "at this point in time the backslope material needs to come down with the rest of the excavation."

PCL's project manager, Silas Eudy, responded to a March 13, 1992 letter providing direction on the backslope from USBR and giving notice that the additional work would be considered a change to the contract. Mr. Eudy's letter stated that "[t]he associated cost proposal and time impact evaluation will be submitted to the Bureau as required, once the total scope of this revision can be defined." PCL's man-hours and actual quantity of extra material would be calculated, and the impacts to the construction schedule would be determined in order to determine the extent of change. Mr. Eudy further stated "[o]nce again we would like to thank the Bureau for their timely response to our concerns on this matter."

---

8. On April 1, 1992, Mr. Briggs, PCL's Vice President/District Manager for PCL Construction wrote in an interoffice memo to Norm Jenrock,

This is nothing less than sloppy. The Owner we are working for is obviously concerned about our competence, as this is just one of many errors our blasting and excavation forces have made.

Please address this lack of and poor supervision with our people who are responsible for this and make the necessary adjustments. We cannot let our credibility erode any further.

The backslope fill material was then removed down to the existing rock material, some of which was outside the original excavation rock line. PCL attempted to track costs associated with this change under CRX 11. The backslope material began to be excavated beginning in the middle part of March 1992 and the task was completed "towards the middle of April." The actual excavation and removal work took place sporadically during this month period. The Bureau's Don Bader, testified that if PCL had chosen to do so, he believed that plaintiff could have removed all of the backslope material within a couple of weeks.

PCL submitted direct cost proposals for the backslope change under CRX 11 on October 14, 1992, and December 9, 1992, almost seven months after the physical work was performed. Modification 38 to cover the changes was issued on June 23, 1993, providing for provisional payment. The actual amount of time PCL spent removing the backslope material consistent with modification 38 was not established until modification 54, issued on January 20, 1994.

PCL submitted its completed time impact evaluation on September 27, 1993, fully one year after PCL Civil left the jobsite.[9] A negotiation meeting with PCL managers, Charles Stadler and Mr. Eudy, was held on or before October 1, 1993 to address PCL's time impact evaluation. Negotiations were broken off and the meeting ended when Mr. Stadler and Mr. Eudy abruptly walked out. The Contracting Officer, Warren Shouldis, expressed his displeasure to James Bennett and Charles Houston (President and Vice President of PCL Construction Services,

Inc.) stating "he felt it was a setup. PCL came to the meeting with no intentions of negotiating. [Mr. Shouldis] had made an offer, and PCL's personnel closed their books and left the meeting." Negotiations were again held on November 10, 1993.

Modification 54 was finally executed on January 20, 1994, for the direct costs associated with CRX 11 for backslope work performed between March 17, 1992 and April 14 or 15, 1992, a period of slightly under 30 calendar days. The CRX did not include a time impact evaluation, as reserved by the release clause, which required a critical path schedule delay analysis. That analysis was never provided.[10] The total amount of direct costs paid to PCL for the backslope modification was $299,316.00.

### Caisson Excavation and Construction

On November 7, 1991, PCL entered into a subcontract agreement with Anderson Drilling, Inc., to excavate and construct the caissons for the foundations of the Parking Structure and the triangular bridge structure connecting the realigned Highway 93 to the Parking Structure. Also in November 1991, PCL awarded a subcontract to Boyles Bros. Drilling Company to undertake the required exploratory drilling at the caisson locations pursuant to the drawings and specifications. Although TPP did not know where rock was, they attempted to "solve" the problem in the deep fill at the front of the Parking Structure by designing a foundation system that could accommodate not knowing the rock location. The designers, TPP, decided to use caissons that could be lengthened or shortened.[11] Because the caissons needed to be founded on

9. Although PCL has claimed to have submitted a time impact evaluation for CRX 11 to recover costs and impacts resulting from the backslope change, Mr. Eudy testified at trial that CRX 11 only included PCL Civil's impacts and McCaw's, the subcontractor. Ultimately, the following dialogue occurred with Mr. Eudy at trial: "Q: All right. Well, PCL Services did not seek time-related costs via the time-impact evaluation submitted with CRX–11, right? A: That's correct."

10. PCL's submittal to the government stated:

This proposal is based solely on the usual cost elements such as labor, material, and markups, and does not include any amount for changes in the sequence of work, delays, disruptions,

rescheduling, extended overhead, acceleration, and/or impact cost. The right is expressly reserved to make claim for any and all of these, and related items cost, prior to any final settlement of this contract.

11. At trial, Harry Rodda of Spencer Associates, focused on how the design for the caissons would resolve the problem of not knowing the exact location of the subsurface rock. Mr. Rodda testified that the drawings and specifications were developed under the assumption that the contractor would go out in the field and determine what was there, and then the foundations would be redesigned in accordance with what was found.

competent rock, which would be determined during construction, TPP was not concerned with their lack of knowledge regarding the rock line. Under the contract, the risk was to be shifted to the contractor, who could make a claim when the caisson lengths were adjusted during construction. TPP did not perceive the lack of knowledge regarding the rock line, or where rock was in the rest of the site, as a problem for design.

PCL devoted a large amount of time at trial, and a large number of pages in its post-trial brief, to arguing about inaccuracies in the drawings caused by the so-called severely defective geologic investigation, which, according to PCL, was below industry standards, such as the filled ravines in the front half of the Parking Structure. In fact, PCL uses the characterization "fictitious foundation designs." The fact is, however, that PCL never presented a differing site condition claim for the front half of the parking structure, and PCL's caisson drilling subcontractor never presented a claim for additional compensation. This assessment is also accompanied by testimony from PCL's own geotechnical expert Dr. Gary S. Brierley, who, although he took issue with the Bureau's subsurface investigations for the back of the parking structure, essentially north of the 10–Line, testified that USBR had performed a "minimally acceptable subsurface investigation for that [south] portion of the building." Dr. Brierley also stated that the work done "represents an acceptable package deal for the subsurface investigations for the caissons in that portion of the structure," and that the standard of care was complied with by USBR for the front half of the Parking Structure.[12]

### L–Line Drag Tie Foundation

The drawings and specifications depicted a lateral structural support, or "drag tie," to be constructed at the L-line of the Parking Structure.[13] The drag tie was originally intended to anchor into rock at the approximate location of L–10. The USBR redesigned the drag tie to anchor into rock west of the L-line, between lines 9 and 10. The original L-line drag tie extended from the corner of the parking structure at the L–9 lines and extended towards the back of the parking structure along the L-line, approximately seventy feet to a point behind the 10–Line near the west transmission tower. When designing the drag tie, URS did not know precisely where the rock was located in that area of the Parking Structure, so the contract drawings allowed for an indeterminate length for the drag tie. In other words, PCL knew or should have known that there would be some changes in the construction of the drag tie depending upon the site conditions found at the location of the drag tie.

As the excavation around the transmission tower proceeded, it became apparent that the subsurface rock in the area of the drag tie was not configured as originally estimated. For this reason, USBR began to generate a revision of the drag tie to accommodate the exact location of the rock. While PCL was completing excavating and shoring around the transmission tower during the latter part of June and July 1992, USBR redesigned the drag tie, eliminating some caissons and other structural members in the process.

On July 2, 1992, unilateral modification 12 directed PCL to construct the revised drag tie. Modification 12 included limitations on cost and time and requested PCL to submit a written cost proposal within thirty calendar days. PCL acknowledged receipt of modification 12 by letter dated July 9, 1992, established CRX 44, requested that the time limitation for submittal of the cost proposal be waived, and stated that PCL did not agree with the time and cost limitations.

---

12. In addition, Thomas Caruso's expert report and testimony by others at trial indicated that "[a] comparison of the bid versus actual lineal feet of caisson installed reveals some variances from individual estimated quantities, which results in an overall variance of approximately 280 linear feet *less* than what was originally estimated and scheduled to install." (Emphasis in original.)

13. A "drag tie" is a structural element which takes the lateral forces exerted upon a building and directs them back into the ground, thereby preventing a structure from sliding or moving horizontally.

During a coordination meeting on July 14, 1992, PCL informed USBR that there was a problem with the redesign because there was not enough room to drill large rock anchors. This was resolved the next day, by allowing PCL to substitute smaller anchors.

The government effectively presented evidence at trial to demonstrate that the redesign of the drag tie actually benefitted PCL because it allowed continued access to the back of the parking structure in lieu of having to drill and place caissons and the drag tie as had been originally designed. PCL completed all work associated with the revised drag tie by September 4, 1992.

PCL elected to split the drag tie change into three CRXs: CRX 44.0 for PCL Civil's excavation, CRX 44.1 for concrete, and CRX 44.2 for rebar. The initial cost proposal for CRX 44.0 was submitted on December 2, 1992, for CRX 44.1 on January 12, 1993, and for CRX 44.2 on December 2, 1992. Not one of these submittals included a time impact evaluation to justify any additional time. PCL revised its cost proposals, reducing the previous proposals for CRX 44.0 and 44.1, by letters dated March 12, 1993 and February 15, 1993, respectively.

After the drag tie issue was bilaterally resolved in modification 33, USBR permitted PCL to revise its cost proposals two more times. Bilateral modification 85, executed on June 27, 1994, finally resolved the issue, compensating PCL for all costs associated with the drag tie changes, with a reservation for PCL to later submit a time impact evaluation for delay costs (which was never submitted.) The total amount of direct costs paid to PCL for the drag tie modification was $49,338.00. During trial, it was demonstrated that the increase in direct costs for the drag tie was attributable to the increased quantity of concrete and reinforcing steel (and the necessary labor to draw and place that concrete and rebar.)

### *West Transmission Tower Retainment*

The electrical transmission tower at the west side of the Parking Structure site was supported by spread footings on fill material. Construction of the Parking Structure required excavation in areas surrounding this tower; therefore, the contract specifications required a "retained excavation" for which the choice of means and methods for performing the retained excavation was allocated entirely to PCL. PCL suggests that the contract was changed during the course of construction in that this retained excavation for the west transmission tower was originally intended to be temporary and then was modified by USBR to be permanent. However, the contract language does not indicate a temporary retainment, and the exhibits referenced by PCL do not support its allegation that the contract required a "temporary shoring system" [14] or was changed.

PCL claims that "PCL's shoring [15] design could not be used as initially submitted, because of a latent defect in the Contract drawings: The proximity of the west transmission tower to the [parking structure] as it was to be constructed was such that there was no room for the required shoring at the west transmission tower." This statement is not accurate because the required permanent shoring was, in fact, installed by PCL.[16] Moreover, with regard to the proximity of the west transmission tower to the parking structure, PCL was responsible for all layouts, was responsible for verification of contract data with field conditions, was required to verify all existing conditions and dimensions, and was required, prior to any construction and as a part of the building layout procedures, to check and verify all dimensions for accuracy, closing and clarity, and was required to report any discrepancies to

---

14. PCL does not reference the contract and instead attempts to support its articulation of what the contract "required" by citing a URS letter which discusses the several retained excavation options considered by PCL and PCL Civil, and does not make a distinction between original contract requirements and allegedly new permanent retaining walls.

15. In their factual allegations, plaintiff once again referred to temporary shoring.

16. In addition, PCL alleges without benefit of support in the record that there was a "latent defect" in the contract drawings. PCL's attempt to support the existence of a latent defect with Mr. Bader's testimony does not succeed.

USBR. PCL alleges a "mis-siting" of the west transmission tower. These allegations are misleading because the proximity issue was due to PCL's initial design placement for the retained excavation, when PCL failed to verify existing conditions and dimensions, as required by the contract.

The contract also required that PCL submit its retained excavation plan at least sixty days prior to installation. PCL did not submit its retained excavation plan until March 16, 1992. As a result of PCL Civil's necessitated re-designs, due to their mistake of not addressing the requirement for permanent shorings, several resubmittals were made prior to USBR approval of the retained excavation plan on June 19, 1992.

PCL actually appears to have begun the retained excavation in accord with the permanent shoring requirements of the contract on June 17, 1992. On July 2, 1992, PCL was directed by change order to proceed with the construction of the revised drag tie on the L–Line. PCL did not complete the retained excavation until July 22, 1992. The caisson and cap at L–9 were not placed until July 24, 1992. Once the unchanged retained excavation and the unchanged L–9 caisson were completed, PCL then constructed the revised Drag Tie on L–Line between August 24 and September 4, 1992.

PCL's baseline schedule indicates that the retained excavation work at the west transmission tower was not critical, with sixty-four days of total float on the government's review of PCL's design, and thirty-seven to forty-five working days float on the excavation activities. PCL's one-hundred-twenty day schedule indicates that PCL would submit its retained excavation plan by the end of November 1991. However, as described above, PCL did not submit its initial, and rejected, plan until March 16, 1992. The March 16, 1992 date is significant for the allegations that PCL raises in regard to construction efforts on the drag tie at the L–Line. PCL could not proceed with efforts at the drag tie until the retained excavation shoring was completed. Therefore, since PCL did not present any submittals for the retained excavation until March 16, 1992, and these were not approved because of mistakes by PCL as to the permanency requirement, mandating additional submittals, there was limited impact because of the need to redesign the drag tie. The redesign was provided to PCL on July 2, 1992. PCL did not complete the retained excavation work until July 22, 1992.

Ultimately, PCL never provided notice during the project that it considered any part of the retained excavation work to constitute a change, delay or anything else for which the government was responsible. Furthermore, PCL did not initiate a CRX for this issue. The "west side tower shoring" issue is not addressed in PCL's REA, or in any of PCL's expert reports. Moreover, PCL never submitted a time impact evaluation for this item, as was required by the contract for any change or delay situation.

### Level 2A/3A Transition Area and Footings

PCL states that by May 18, 1992, "PCL discovered that the actual configuration and location of the rock in the transition area was not as depicted in the Contract documents." PCL identifies thirteen column footings in the Kellogg Chart that were changed at level 3A, apparently in support of its claim of "major changes" to PCL's contract. In fact, more than fifty column footings were required at Level 3A. Thus, just over one-quarter of the column footings at Level 3A were changed in any way, leaving approximately three-fourths of the column footings at Level 3A completely unchanged.

Moreover, Mr. Bader testified that, although there were changes to particular footings, most areas of Level 3A were not impacted by the footing changes at all. PCL nonetheless claims that "[m]ost Level 3A footings were redesigned individually to fit existing conditions and because of deficiencies in the designs." It is apparent to the court after reviewing the evidence that the footing changes which did occur were a result of differing site conditions, and not a result of "deficiencies in the designs." In an area where the rock line was identified as "approx" and the bedrock was estimated, the contractor was informed of this fact in the contract drawings and in the geotechnical reporting. Furthermore, the contract re-

quired additional exploratory drilling, for which reason PCL should have expected that the precise location of bedrock was not known and that there was the distinct possibility of some differing site conditions.

PCL also attempts to deny any responsibility for the changes related to the construction of the 11–Line shear wall footings under parking structure Level 3A. Notwithstanding that the government made a change involving the 11–Line footings, PCL is responsible for some of the costs associated with the changes in the transition area because PCL over excavated.

PCL also asserts that in June of 1992, "[t]he USBR recognized the critical nature of the problems with the 3A transition and 2A/3A footings and their potential impact to the construction schedule." Yet PCL did not submit what would become its conditionally approved baseline schedule until September 2, 1992. The defendant demonstrated at trial that in PCL's construction schedule, the Level 2A column footings and associated work below parking structure Level 3A had approximately a calendar month of float. PCL appears to discount its own job progress difficulties and contributions to performance delay when suggesting that USBR was lagging in delivering redesign drawings. For example, the catastrophic collapse of the false work under the initial Level 3A suspended deck placement was a delay to the Level 3A work which was caused by PCL, for which USBR was not responsible. PCL also caused delay to the work at Level 3A by removing its access road along L–Line to the back half of the Parking Structure and not providing another means of access prior to completing the Level 3 foundation work. In addition, much of the time required for resolution of the Level 3A transition is due to PCL failing to provide the required survey information.

PCL did not submit time impact evaluations for changes to the level 3A footings or the level 3A transition during contract performance or at any time thereafter. The total amount of direct costs paid to PCL for the Level 3A footing modifications was $89,266.00 and for the Level 3A transition was $167,899.00.

## Vehicle Ramp

At the center of the Parking Structure, located between the east and west transmission towers and between column lines 9 and 10, is a ramp which allows vehicle access to the various levels between the front and rear of the parking structure, known as the "vehicle ramp." PCL alleges that the vehicle ramp design provided in the contract drawings and specifications was lacking in detail and inadequate for performance of the contract. By letter dated May 29, 1992, PCL informed USBR that the vehicle ramp as designed was "vague and/or [does] not represent the actual field conditions that are being encountered on the job site." To support this allegation and in an effort to obtain the information it needed to proceed with construction of the vehicle ramp, PCL provided USBR with a list of the twenty-five RFI previously submitted relating to the vehicle ramp. Nineteen of these RFI appear to have received late responses and five had received no response as of the May 29, 1992 letter. PCL also informed USBR that it had expended over 300 man-hours attempting to research and draft the vehicle ramp area.

The government supplemented the original vehicle ramp drawings as necessary to facilitate construction pursuant to clause 00850, 1.02 (additional or revised drawings), of the contract. Supplemental drawings for the vehicle ramp were sent to PCL on August 21, 1992, October 16, 1992 and April 8, 1993. As noted in the August 21, 1992 letter, "[t]hese supplemental detail drawings are transmitted to you pursuant to the provisions of specifications section 00850 1.02." The April 8, 1993 letter specifically states "[t]hese drawings are provided as informational drawings to facilitate responses to Requests for Information (RFI's) and to assist you in the preparation of concrete placement and concrete reinforcement drawings. They are not intended to replace existing specifications drawings."

PCL initiated CRX 94 for changes included in the October 16, 1992, transmittal of drawings. PCL submitted a cost proposal for part of CRX 94, specifically the rock excavation portion, which was revised on February 9, 1994. Bilateral modification 67

resolved CRX 94, with PCL reserving the right to pursue a delay claim later.

After excavation began in the vehicle ramp area, it was determined that a change in the ramp foundation would be required. The minimum footing embedment for the outside radius wall footing was not present. Therefore, additional rock anchorage was required. PCL assigned CRX 97 to this change and submitted a cost proposal on July 29, 1993. Bilateral modification 48 resolved CRX 97, with PCL reserving the right to pursue a critical path time impact claim later.

PCL submitted a second cost proposal, CRX 130, to incorporate the cost for the additional rebar rock anchors at the outboard vehicle ramp beam. Bilateral modification 89 resolved CRX 130, with PCL reserving the right to pursue a critical path time impact claim later. PCL submitted still another cost proposal, this time for CRX 169, to recover the costs associated with USBR's April 8, 1993 letter which responded to RFI 1070 through 1073 and provided informational drawings to facilitate responses to the RFI. PCL revised its cost proposal to include costs for the concrete portion of CRX 94.1. During a meeting on July 11, 1995, an agreement was reached on PCL's portion of CRX 169 for the costs associated with the vehicle ramp site work. A draft copy of CRX 169, outlining USBR's review, was transmitted to PCL by letter dated July 18, 1995. The record does not contain any evidence that PCL responded to USBR's efforts to resolve CRX 169, or that a modification was issued reflective of the issues covered in CRX 169.

As was demonstrated at trial, the actual changes to the vehicle ramp were not major structural changes.[17] Although the court was trying liability and not quantum, the cost of the changes involved is one of the elements which may be relevant to assessing the significance and scope of the changes. The total direct cost to PCL of the vehicle ramp changes was approximately $25,000.00. PCL's real complaint is not that the design of the ramp was somehow defective, but that the vehicle ramp drawings were "vague and unbuildable" at the time of contract award. Although perhaps not commendable drawings, the record does not support the conclusion that the original vehicle ramp design drawings could not produce a functioning vehicle ramp. PCL produced a number of questions, but USBR was able to produce additional in-house drawings with clarifications premised on the original drawings and with changes required due to differing site conditions. It is the conclusion of the court that although the plaintiff did demonstrate that there were problems associated with the original vehicle ramp drawings provided with the contract, USBR was not responsible for PCL's difficulties in using the design drawings, because USBR used the exact same drawings to provide supplemental drawings as anticipated in Clause 00950.102 of the contract. Moreover, PCL never presented a time impact evaluation.

### Pedestrian Ramp

The design of the Parking Structure included a pedestrian ramp on the east side of the structure, between the main structure and the east side transmission tower on one side, and the east rock face of the canyon on the other. Subsequent to the award of the contract, USBR redesigned the pedestrian

---

17. Testimony at trial, which incorporated a comparison of the original contract drawings with the final revised drawings, indicated that there were no major structural changes to the vehicle ramp in general. In fact, the majority of footings for the foundation of the vehicle ramp were unaltered, and the most significant change in the foundation was that a caisson was removed from the foundation design because rock was encountered that was sufficient to support the span for the vehicle ramp in that area. The notice of this caisson removal was given prior to PCL undertaking any drilling upon discovery of rock sufficient to support the vehicle ramp in that area, and a decision was made by USBR and URS to place a pad footing into rock similar to the other footings for the vehicle ramp. Another change was that the span for that area was shortened for the same reason that rock was encountered that could support that area of the vehicle ramp more readily than originally anticipated by the designers. In addition, a small door on the vehicle ramp was altered to allow access to a room, two floor drain locations were moved, a wall was removed altogether, and another wall was designated to be thicker by two inches. The conclusion by the Bureau, therefore, was that the changes were not significant, and had little direct cost, as was reflected in the subsequent modifications. After a review of the trial testimony and the record, the court agrees. Time evaluations for delay/impact costs were never submitted.

ramp on the east side of the Parking Structure, including the ramp's foundation system encompassing the placement and foundation footings. PCL notified USBR on April 2, 1992 that the existing rock conditions at the pedestrian ramp area on the east side of the parking structure were different than those shown in section B on drawing C3.1. Section B on drawing C3.1 showed the excavation line as the "existing surface" which was a discrepancy from the topography shown on drawing C1.2. Although contract drawing C3.1 depicted the pedestrian ramp as fitting in between the east transmission tower and the "existing rock," this was not an error in the topographical information depicted on drawing C1.2. That drawing was accurate.[18] The use of the words "existing surface" was a labeling error—USBR has acknowledged that it should have read "excavated surface." This aspect of drawing C3.1 was, admittedly, in conflict with the topographic information contained on Drawing C1.2. The pedestrian ramp change was not caused by a topographic error.

Despite the discrepancy, however, PCL should not have been surprised to learn that excavation was required in the area of the pedestrian ramp. An examination of Drawing C1.2, which contains accurate topographic information for that area, should have alerted PCL to the need for excavation to accommodate the pedestrian ramp. In fact, the evidence demonstrates that PCL Civil (PCL's excavation subcontractor) intended and planned to excavate in the area of the pedestrian ramp.

As early as March 11, 1992, it was noted in a coordination meeting between PCL and USBR that Drawing C1.2 indicated a rock cut behind the tower to accommodate the pedestrian ramp and that USBR might revise the pedestrian ramp so that no excavation would be necessary. PCL was required to provide survey data for the pedestrian ramp area and this data was then given to TPP on approximately April 7–8, 1992. TPP was requested to redesign the pedestrian ramp to alleviate the need for excavation. A proposed revision to the pedestrian ramp design was prepared by URS and transmitted on April 29, 1992.

Preliminary layout drawings of the revised pedestrian ramp were provided to PCL's field superintendent, Mr. Owenby, on July 9, 1992. The initial excavation for the ramp began on July 29, 1992, and an additional survey was performed to determine if there was sufficient clearance for the revised ramp dimensions. Final pedestrian ramp drawings were then transmitted to PCL by letter dated August 13, 1992.[19] The government ac-

18. PCL claims that USBR failed to ensure that accurate topographic information was presented in the contract package. In accordance with TPP's contract, USBR was to furnish TPP with a copy of "existing topography." USBR provided copies of three topographic maps, one at a 1" = 20' scale and the other two at 1" = 50'. Later, TPP requested additional information to clarify/correct apparent differences between the ½0 map and the ½0 maps. USBR provided TPP with additional information specific to the areas in question which satisfied TPP and the issue was resolved. Mr. Rodda and Mr. Lee both testified that USBR provided TPP with the topographic information requested and that the topographic information presented in the contract was accurate. Contract paragraph 01045, 1.04 provides:

SITE CONDITIONS: All maps and drawings of existing topography were prepared by the Government for use in the design. Before beginning work, the Contractor shall compare actual site conditions and topography with the requirements of the drawings, and shall verify all existing conditions and dimensions. Should any discrepancy be found, report same immediately to the Contracting Officer before

proceeding with the work. Data and information shown and indicated are as accurate as could be obtained but are not guaranteed.

In order to comply with its contractual obligation, at the beginning of the job, PCL's surveying subcontractor (Radig Engineering) performed a topographic survey of the site. Upon completion of Radig's survey, PCL notified USBR that they had done the topographic survey and it had not encountered any area of topographic discrepancies for the job site. In addition, PCL did not submit any RFI or CRXs to USBR alleging discrepancies between the Radig survey and the topographic information presented in the contract package. Moreover, PCL did not present evidence in this case that PCL's earlier confirmation to the Bureau of the accuracy of the contract topography was in error.

19. PCL's post trial brief states that PCL did not receive the final ramp redesign drawings until October 16, 1992. Although the transmittal of October 16, 1992, provided formal drawings by drawing numbers for incorporation into the contract drawing set, it noted that these drawings had previously been provided by letter dated August 13, 1992.

knowledged in this letter that the drawings constituted "changes in the work which will require an adjustment under the contract."

PCL began construction of the pedestrian ramp footings on December 20, 1993, over a year after PCL received the revised drawings of August 13, 1992, or ten months after the "final revised drawings." In addition, the government noted that PCL's baseline schedule activity 32460, which was the first pedestrian ramp activity, had 169 days of total float with a late start of February 5, 1993, six months after receipt of the revised pedestrian ramp drawings.

PCL initiated CRX 56 for the revised structural work at the pedestrian ramp and CRX 56.1 for excavation changes based upon USBR's August 13, 1992 design. PCL also initiated CRX 96 for the additional footing anchorage for the pedestrian ramp footing near the 9–Line.

PCL transmitted its initial cost proposal for CRX 96 on March 12, 1993, and its revised cost proposal on June 30, 1993. Neither of these proposals included a time impact evaluation. Bilateral modification 43 resolved CRX 96, and PCL reserved the right to present a time impact evaluation later for delay/impact costs. No such evaluation has ever been presented.

PCL transmitted its initial cost proposal for CRX 56 on October 23, 1993, with revised proposals on July 25, 1994, September 22, 1994, and November 2, 1994. None of these proposals included a time impact evaluation. Bilateral modification 111 resolved CRX 56, and PCL reserved the right to present a time impact evaluation later for delay/impact costs. No such evaluation has ever been presented.

PCL transmitted its initial cost proposal for CRX 56.1 on January 25, 1993, and a revised proposal on September 2, 1994. This CRX was not resolved because Mr. Eudy's transmittal dated November 2, 1994, noted "[r]ock excavation portion excluded and time extension to be addressed later." The total amount paid to PCL for the direct costs of the pedestrian ramp changes, except for the credit due for the decrease in excavation, was $130,017.00.

### *Triangular Bridge*

The design of the Parking Structure included a "triangular bridge" to be constructed at the southwest corner of the Parking Structure, to provide vehicle access to and from the Parking Structure. As depicted in the contract documents, this triangular bridge was to be supported by sixteen caissons. During PCL's period of contract performance USBR redesigned the triangular bridge including its foundations.

Contrary to PCL's allegation, this redesign of the structural foundation of the triangular roadway section between the roadway realignment bridge and the parking structure access road was completed prior to award on September 5, 1991. This is evident from the differences between drawing C4.1, dated November 15, 1987, and drawing C4.1A and C4.1B, dated May 1, 1991, which show that the bridge was redesigned from being supported by spread footings to caissons.

In April 1992, PCL excavated a ramp access into the triangular bridge location. Once PCL excavated down to gain access to the triangular bridge area, a twenty-foot portion of the old historic rock wall, the integrity of which the Bureau had strict requirements to maintain, was undercut by PCL and collapsed. In early May 1992, PCL raised the issue of redesign due to the presence of additional fill. Before any redesign could be initiated, however, USBR directed PCL to perform the contractually-specified exploratory drilling in that area. In June 1992, PCL used an air track drill to confirm that the rock was in excess of thirty feet deep, confirming the need for redesign.

The triangular bridge was subsequently redesigned to use four, forty-two-inch caissons in lieu of sixteen, eighteen-inch caissons. PCL was provided coordinates and approximate bottom elevations for the caissons on September 18, 1992. PCL performed the exploratory drilling on October 14 through 19, 1992, and provided the drilling results to construct the caissons on October 21, 1992. Construction of the caissons began on October 22, 1992, and was completed on November 7, 1992.

PCL assigned CRX 83 for the remobilization and demobilization of the subcontractor's drilling equipment and submitted a cost proposal, which was negotiated and resolved, with a reservation of a critical path time impact claim, in modification 22. PCL also assigned CRX 98 for the change to four, forty-two-inch caissons from sixteen, eighteen-inch caissons. This change was included with CRX 189 and resolved, with reservation, in modification 132.

On November 23, 1992, USBR provided PCL the revised drawings for the redesigned triangular bridge. Even though its caisson construction was already complete, PCL initiated CRX 112 for changes to the drawings. PCL transmitted a cost proposal for $180,184.00 on October 22, 1993. USBR estimated that it was entitled to a $53,889.00 credit as a result of the simplified design, which eliminated twelve caissons. CRX 112 remains unresolved.

PCL's baseline schedule activity 31290 had 229 days of total float with a late start date of April 23, 1993, five months after receipt of the revised triangular bridge drawings. PCL has not provided any type of time impact or schedule delay evaluation to support allegations of delay or disruption caused by the triangular bridge redesign.

It is apparent to the court after extensive testimony that the triangular bridge redesign was not a significant impediment to PCL. At trial, the government presented credible evidence suggesting that the revised caisson configuration was substantially easier for PCL to construct than the original design.[20] The total direct costs paid to PCL for the triangular bridge change (primarily remobilization of the drilling subcontractor) was $6,419.00. Moreover, the evidence presented did not establish that the original caisson configuration would not have been "constructible." This is an example of a redesign that occurred to facilitate the construction operation, not because of any differing site condition or imperfection in the original design. The depth of the caissons was always intended to be determined following the field determination of location of bedrock, as was required in the contract.

*Tower Crane*

PCL planned to use a tower crane for the excavation and construction of the Visitor Center. PCL's plan provided for four weeks to install the tower crane (two weeks to excavate the crane location, and two weeks to place the foundation and erect the crane.) PCL's pre-bid schedule also indicated a duration of four weeks for "excavation at tower crane location" and a duration of one week for "set tower crane." PCL's conditionally approved baseline schedule indicates a duration of five days for "excavate crane foundation" and a duration of ten days for "crane foundation/set crane." The baseline schedule indicates the earliest possible finish date for the installation of the tower crane to be December 10, 1991, and the latest finish date, without extending the schedule, to be February 24, 1992.

The baseline schedule further indicates that the installation of the tower crane had a total float of at least forty working days. The tower crane installation was actually completed by PCL on February 19, 1992. It was demonstrated at trial that because PCL completed the tower crane installation prior to the scheduled late finish date, the tower crane installation did not affect PCL's scheduled project completion date.

PCL argues that in preparing for the tower crane foundation "PCL planned to cut this [rock] bench at the elevation of the lowest level of the [Visitor Center], the 'mechanical level,' in order to help insure the safety of the [Visitor Center] as excavation and construction for the building progressed." The evidence clearly shows, however, that the tower crane foundation was originally proposed by PCL to be located at an elevation of 1202, and not at the mechanical level elevation, which is 1186. Mr. Eudy described the later proposal to excavate to mechanical level for the tower crane foundation as necessary because "additional excavation depth is being proposed for safety reasons." This statement of "additional excavation depth" along with other evidence presented at trial indi-

---

**20.** Moreover, Mr. Caruso's analysis shows that the triangular bridge redesign did not extend PCL's project completion because the triangular bridge work was never on PCL's critical path.

cates that PCL's original plan was actually to locate the tower crane foundation well above the mechanical level.[21]

PCL's structural engineer for the tower crane foundation design recommended, on December 4, 1991, that consideration be given to excavating the tower crane pad to elevation 1184 due to concerns about the stability of the rock knob. However, on December 13, 1991, PCL's geotechnical consultant, HLA,[22] developed a method for stabilizing the rock knob which allowed the actual tower crane foundation to be constructed at its originally planned elevation of 1202. Under the provisions of the contract, PCL was not free to excavate rock indiscriminately, but rather was limited to indicated lines and grades. The contract further required the rock knob at the tower crane location to be maintained at approximately elevation 1202.

PCL never initiated a CRX and never submitted a time impact evaluation for anything related to the tower crane installation. The tower crane installation was not addressed in PCL's REA. Further, PCL's Summary Level Schedule Analysis identifies a five-week delay to the completion of the construction of the tower crane foundation and attributes that delay to PCL.

### Block 1 Rock Outcropping

On the Nevada side of the Colorado River, immediately downstream from the Hoover Dam and immediately prior to the Visitor Center, north and east of the elevator shaft in the Visitors Center, is a rock outcropping known as "Block 1." Due to faults in the joints of this rock and its attachment to the block of rock on which PCL was to construct the Visitor Center, the contract required PCL to perform rock anchoring and rock bolting on Block 1 prior to performing any excavation in the area. These reinforcement requirements were added to the contract between the time of the Frontier–Kemper elevator shaft contract and the award of PCL's contract because of concerns about rock stability which arose during the Frontier–Kemper contract.

On February 28, 1992, USBR required a change in the Block 1 anchor requirements, which involved a reduction in the number of vertical rock anchors from fifteen to six, but added seventeen horizontal rebar rock bolts in the face of Block 1. The changed work was required to be accomplished prior to excavation on the river side of the box girder bridge, rather than prior to performing any rock excavation at the visitor center, as was originally required. USBR's letter of February 28, 1992 also requested that "if the performance of this change should become critical to the progress of the work, please inform this office in order that an undefinitized modification can be issued to allow you to proceed." There was no evidence presented at trial that any notification was ever provided by PCL.[23]

The Block 1 rock anchor work was completed on March 18, 1992. Rock excavation under the box girder bridge was not completed by PCL until May 1992. This excavation work at the bridge, not any "restrictions" imposed by the block 1 change, controlled the completion of the Visitor Center excavation on the river side of the bridge.

Contract modification 29 for the Block 1 change was executed on April 28, 1993. PCL has never submitted a time impact evaluation for the block 1 change. PCL's April 1994 REA did not contain an evaluation of Block

---

21. Mr. Eudy testified that at the time PCL bid the job, the location for the tower crane was unknown. Mr. Eudy also concurred that PCL does not allege that the tower crane installation involves a government-caused delay to PCL's progress of work, and according to PCL's baseline schedule, the tower crane installation was completed ahead of schedule.

22. The court notes that PCL chose to hire and rely on HLA after PCL encountered subsurface conditions different from those depicted in the contract that PCL now blames upon HLA's failure to adhere to "standards of care." PCL retained HLA to perform geotechnical investigation and geologic foundation consulting for the tower crane and did not indicate any lack of confidence in HLA's ability or dissatisfaction with HLA's work.

23. PCL's summary logic diagram and 120–day fragnets fail to include activities to represent the Block 1 rock anchor work and the associated original contract restriction on rock excavation at the visitor center. PCL's baseline schedule indicates that the Block 1 work had forty-one working days of total float.

1. The Block 1 CRX (CRX 8) does not appear to be addressed in Joseph Kellogg's expert report. The total amount of direct costs paid to PCL for the Block 1 modification was $2,196.00.

### Visitor Center Elevator Shaft Ring Beam

The design of the Visitor Center required the installation of two fifty-passenger elevators that were to be installed in a twenty-foot diameter concrete shaft which extended from the level of the highway down to the bottom of the Hoover Dam. The elevator shaft had been excavated under a prior contract. PCL constructed the upper part of the elevator shaft, which was supported by a circular concrete ring footing, known as the "Ring Beam." The Ring Beam was depicted on drawing S5.5, revision A. The Ring Beam was eventually redesigned because of overbreak in the rock near the top of the elevator shaft concrete lining placed by the elevator shaft contractor after PCL's contract was awarded. The redesign of the Ring Beam has been described by PCL as a "major change" affecting the completion of the Visitor Center.

In June 1990, Frontier–Kemper Constructors, Inc. and USBR entered into Contract No. 0–CC–30–08240 for the "Elevator Shaft & Appurtenant Structures" for the "Hoover Visitor Facilities." This contract required the excavation of the elevator shaft through the rock to the bottom of the dam from a base elevation of approximately sixty feet to an elevation of 1180 feet, and placing a concrete liner in this excavated portion of the shaft. Frontier–Kemper proposed, and the government accepted, a seven meter diameter V-mole to excavate the elevator shaft. Excavation beyond the seven meter diameter was required to install the V-mole within the collar area. Construction began approximately in August 1990.

The USBR construction engineer, Mr. Delp, reported to Denver in a letter prepared by Mr. Bader that Frontier–Kemper's foreshaft excavation for the elevator shaft contract was completed as of February 14, 1991. Excess rock removal or "overbreak" occurred in this area of the shaft on or before February 14, 1991. PCL contends that USBR knew or should have known at that time, on or about February 19, 1991, whether there was overbreak and the extent of any overbreak at the top of the shaft. Frontier–Kemper replaced the excess rock removed due to overbreak with extra concrete poured at the top of the elevator shaft lining. As a result, the concrete at the top of the elevator shaft was wider than had been originally designed, and the concrete extended into the area where PCL's Contract indicated rock.

Moreover, due to the rock excavation overbreak, the Ring Beam could not be constructed as depicted in the contract design drawings and specifications because the Ring Beam was designed to rest on rock surrounding the lower shaft concrete liner. It could not rest on the liner concrete itself, because the liner was not designed to bear the weight of the Ring Beam and the upper part of the elevator shaft which was to be supported by the Ring Beam. The rock excavation at the top of the elevator shaft resulted in the redesign of the Ring Beam to avoid contact with the shaft liner concrete.

USBR and its design agents did not begin planning work on the Ring Beam redesign until September 1991. However, one of the problems in redesigning the Ring Beam was that PCL used the top of the shaft for debris storage. In early 1992, USBR personnel advised PCL that the cover on the excavated tour elevator shaft located within the Visitor Center was not designed to carry excavated material. A new cover was redesigned for the shaft to allow for storage of debris at that location and for further construction activities.

PCL has alleged that USBR knew of the rock overbreak at the shaft collar prior to the bidding for PCL's contract and failed to correct the problem. The testimony cited by the plaintiff does not support PCL's allegation upon a review of the sequence of events. The solicitation was finally amended on August 7, 1991. Bids were received by USBR on August 13, 1991. The contract was awarded on September 5, 1991. The first evidence in the record that the Bureau had identified the as-built condition of the shaft collar area was on September 23, 1991, after reviewing the preliminary as-built sketch of

the shaft collar area prepared by Mr. Bader. Mr. Bader's sketch was transmitted to URS for its use in preparing preliminary design concepts for revisions to the Ring Beam. URS sent USBR potential alternatives for modifying the Ring Beam. Frontier–Kemper then removed the head tower hoist over the shaft collar area and a final as-built survey was possible. The evidence before the court does not appear to offer an exact date for Frontier–Kemper's completion of activity on the site. However, there is evidence to indicate that they were on site after October 7, 1991. Frontier–Kemper submitted the as-built survey to USBR October 29, 1991. The survey information needed to redesign the Ring Beam was then transmitted to URS and TPP on November 27, 1991.

PCL is critical of the time it took USBR to provide the redesign for the Ring Beam and alleges "that PCL's work on the Ring Beam rebar was on hold...." PCL further alleges that it could do "no work toward constructing the Ring Beam or any part of the upper portion of the elevator shaft until USBR provided the revised Ring Beam design." However, upon receipt of the redesign, the site was not ready for PCL to begin the work because the installation of the spreader beams within the existing shaft by subcontractor J. Wallace Enterprises was still in progress.

According to PCL's original baseline schedule, two key items, the box girder bridge installation and the theater level excavation, needed to be completed prior to beginning work on the Ring Beam. During the first six months of the project at the Visitor Center, PCL worked on the installation of the box girder bridge and excavation of the escalator area and Visitor Center theater level, not completing theater level excavation until May 1992. Excavation for the box girder bridge and theater level was totally independent of the redesign of the Ring Beam, and during this excavation PCL proposed to construct a temporary cover over the shaft top. The top of the elevator shaft then served as storage area for muck during PCL's excavation. The shaft top collar area

stopped being used as a storage area once PCL completed theater level excavation. Completion of the theater level excavation was dependent upon completion of the installation of the box girder bridge. PCL failed to provide any testimony or other evidence that any delays in completing the box girder bridge and theater level excavation were the result of the Ring Beam redesign.

PCL also has alleged that it performed work out of sequence because of the Ring Beam change, specifically, a change in the installation of structural steel spreader beams within the existing shaft. The installation of the structural steel spreader beams was planned by PCL to be completed once PCL had finished with the theater level excavation. This sequence was confirmed by PCL's superintendent, Rex Owenby, during the weekly coordination meetings.

The installation of the shaft steel by J. Wallace Enterprises was completed prior to completion of the Ring Beam. After completion of the spreader beam installation, PCL then constructed the Ring Beam starting on September 11, 1992. After completing the Ring Beam on October 9, 1992, PCL's next planned schedule activity was to place concrete for shaft A.[24] Shaft A was completed by December 1992, however, shaft A then sat idle for four months as work continued on shaft B. This indicates to the court that the redesign of the Ring Beam did not impact the critical path for the Visitor Center construction, as the need to complete efforts at the Ring Beam and shaft A location evidently was displaced by activities at shaft B and in the main/theater area of the Visitor Center.

The Ring Beam was not on the critical path of PCL's original baseline schedule; moreover, the redesign of the Ring Beam was not on the critical path of the actual Visitor Center construction. PCL's original baseline schedule showed fifty-six working days of positive float for the construction of the Ring Beam. PCL never provided any updates to the baseline schedule that demonstrated that the Ring Beam was ever on the critical path of the Visitor Center. The critical path for the Visitor Center appears to

---

**24.** Shaft A was the Visitor Center tour elevator shaft that incorporated the Ring Beam. Shaft B was the main/theater area shaft in the main body of the Visitor Center.

have been shaft B, according to PCL's original schedule and based on the as-built schedule of the work.

Unilateral modification 11, dated June 30, 1992, directed PCL to proceed with the construction of the Ring Beam. PCL assigned CRX 43 for the change. PCL submitted its cost proposal for CRX 43.1 (for the rock interface portion only) on December 2, 1992, and subsequently revised this proposal on March 12, 1993. PCL submitted a cost proposal for CRX 43.2 (for the concrete portion) on January 6, 1993, and a revised proposal on April 14, 1993. PCL submitted a cost proposal for CRX 43.3 (for the rebar portion) on December 2, 1992, and revised proposals on April 6, 1993 and July 23, 1993. PCL did not include any time impact evaluations in any of its cost proposals or any other submittals to USBR regarding the Ring Beam.

Bilateral modification 45 was executed on October 7, 1993, for all costs associated with the change except for delay costs which were reserved, but never pursued. The total direct costs to PCL of the Ring Beam change appears to have been $120,000.00.

### Box Girder Bridge

As part of its construction of the Visitor Center, PCL was required to construct a new "box girder bridge" structure for U.S. Highway 93 adjacent to the highway entrance to the Visitor Center. The new roadway structure was to be constructed primarily of pre-stressed, precast concrete box girders. At the western end of the bridge, the two-span structure was to be supported by the eastern abutment of the existing roadway realignment bridge constructed by Frehner for USBR. The center and eastern abutments of the box girder bridge were to be reinforced concrete piers constructed by PCL. PCL also was required under the contract to perform the design of the box girder elements of the bridge. Before the box girders could be fabricated and delivered to the site for installation, PCL was required to perform the design and obtain USBR's approval of the box girder design calculations and shop and erection drawings.

PCL alleges that "PCL was not aware when it prepared and submitted its concrete placement drawings that the Contract design drawings for the Box Girder Bridge were inadequate for performance of the Contract." The change to the center pier of the bridge made by USBR had no effect upon PCL's concrete placement drawing. Modification 5 comprises a change to the center pier involving only the addition of foundation anchor bars and additional reinforcing steel. The additional work was all associated with the reinforcing steel drawing, because reinforcing steel is not to be shown on concrete placement drawings. The original concrete placement drawing for the center pier of the bridge, submitted by PCL on November 21, 1991, was approved by USBR on April 2, 1992, with no requirement for resubmittal.[25]

On March 28, 1992, blasting operations by McCaw's Drilling, the subcontractor to PCL Civil's subcontractor, resulted in damage to the temporary bridge structure that spanned the excavation for the box girder bridge center pier. On March 30, 1992, PCL engaged the services of engineering consultants to assist in reviewing and stabilizing the condition of the damaged bridge abutment. This process was completed on April 3, 1992. PCL describes the delay to the center pier work caused by PCL's blasting damage to the temporary bridge abutment as follows: "schedule impact from repairing the temporary bridge was considered to be minimal." Despite PCL's litigation posture before this court that this delay was insignificant, the record before the court shows that PCL assessed fourteen calendar days of liquidated damages against its excavation subcontractor. Moreover, PCL states in its post-trial brief that "[c]osts associated with this damage totaled $122,907.05." PCL, itself, evidently viewed the impact of the blast damage as significant in time and cost, even in contemporaneous submissions PCL's current attempts to persuade the court otherwise are unavailing. Moreover, the contract provides

---

**25.** PCL attempts to argue that USBR's approval of the concrete placement drawings hindered efforts to construct the center pier. It is apparent, however, that if the contractor was still blasting rock at that location as of March 28, 1992, the construction schedule had not yet progressed to framing and pouring the center pier.

that "no matter the cause or the preconditions, the Contractor shall be solely responsible for all blasting damage and injury."

PCL also appears to allege that USBR impeded PCL's rock excavation efforts following the blasting damage: "As a result of this blasting damage the USBR directed PCL to change their excavation methods at the [Visitors Center]: PCL's use of blasting was more restricted, and PCL had to use mechanical excavation methods when working near structures." The parties' Joint Stipulations of Fact, however, indicates that during construction USBR reviewed and approved all blasting plans that were submitted for the construction of the Visitor Center and Parking Structure. It appears that any claim arising from this change in means and methods following blasting damage may arise from USBR's adjustment to compensate for a differing site condition (i.e., "unexpected faults in the rock").

Modification 5 directed PCL to proceed with the changed work on the center pier of the roadway bridge. This change order was definitized by bilateral modification 7, which provided for an equitable adjustment of $13,865.00 and no adjustment in the time required for performance of the contract, with a full release and no reservation of rights.

### Visitor Center Escalator

The part of the site known as the "escalator area" lies immediately north of U.S. Highway 93 and the Visitor Center, where two escalators were to be constructed to access the ticketing area of the Visitor Center and to reduce pedestrian traffic from going across the highway. The escalator area was important to PCL's construction plan because PCL planned to use the area as a ramp to provide access under the highway to the Visitor Center, thereby avoiding interference with traffic on the Highway. To accomplish the necessary access for excavation purposes, PCL planned to perform some rock excavation for the escalator foundation

and then to cover temporarily the rock with fill to create an access ramp for construction efforts on the Visitor Center.

PCL submitted RFI S–14 to USBR on November 12, 1991 stating that the contract drawings showed a wellway width of five feet and eight inches and that PCL's subcontractor required a rough opening of four feet and six inches for installation of the escalators. PCL asked for confirmation that the escalators would be thirty-two inches wide so that rough opening sizes could be revised. USBR responded on January 29, 1992, confirmed the thirty-two inches width, and stated the applicable drawings would be revised to reflect rough opening widths of four feet and six inches.

USBR transmitted revised drawings to PCL on April 27, 1992, which were acknowledged by PCL on April 29, 1992.[26] PCL assigned CRX 19 to this change. By letter dated June 25, 1992, PCL notified USBR that PCL believed that the actual rock line was in excess of twenty feet below the escalator, not ten feet as PCL believed was indicated in the drawings. On June 29, 1992, USBR acknowledged PCL's letter, which appeared to allege a differing site condition, and requested survey data to substantiate the actual rock line claimed by PCL. USBR's letters dated July 17, 1992, August 5, 1992 and September 29, 1992, all stated that the survey data provided by PCL did not support an alleged differing site condition or redesign. The original contract drawings S5.14 and S5.15 showed that the escalator was founded on both rock and fill, and the relevant drawing specifically indicates an "approx. exist. rock line."

USBR transmitted revised escalator drawings to PCL by letter dated June 28, 1993, which provided for foundation of the escalator exclusively upon fill material. This was done in order to provide for uninterrupted work in that area even if PCL's unsubstantiated claim of a differing site condition was true. PCL assigned CRX 226 to this change

26. In early 1992, at the suggestion of TPP, the design of the escalator area was changed to make the escalator narrower in order to widen the walkway adjacent to the top of the escalator and provide greater access to the handicapped

elevator in that area. The USBR issued revised drawings for this change on April 27, 1992, and PCL issued CRX 19 to track the costs of this change. This CRX was resolved by Modification 128 in May 1995.

and requested a unilateral modification. Unilateral Modification 044 was issued to PCL August 25, 1993, directing PCL to proceed with the changes to the escalator foundation. The modification had limitations on cost and time and also requested a cost proposal within thirty days of receipt.

After USBR transmitted the revised drawings, PCL sent USBR RFI 1289, which stated, "[d]ue to location of existing rock at the escalator area, the spread footing detail shown on dwgs. S5.14A and S5.15A is not necessary for the entire wall." This fact suggests to the court that PCL's earlier claim of a differing site condition was not accurate because part of the wall was founded upon rock as originally designed. Therefore, a major requested redesign was not necessary.

PCL transmitted its proposed cost for CRX 19 by letter dated November 11, 1992. This cost proposal was for the concrete and rebar work related to the escalator, but also included the additional cost for stairway PS2 and Rooms P–102B and P–103 in the Parking Structure. The cost proposal for this CRX was revised on November 20, 1992 and again on September 22, 1994, without time impact evaluations being included with these proposals. An agreement for the escalator change was reached and all costs associated with this change were included in Modification 128, except for any potential time and cost impacts, which were reserved by the release clause, but which required a CPM delay analysis (which PCL never provided.)

PCL separately transmitted its proposed cost for CRX 19.1 by letter dated November 11, 1992. This cost proposal was for the rock excavation portion of the escalator change, but also included the additional cost for excavation work related to stairs SP2 and SP3 in the parking structure. The cost proposal for the CRX 19.1 was revised on March 16, 1993 and again on April 5, 1994. There were no time impact evaluations included with these proposals. Modification 87 resolved all as-

pects of this CRX, except for potential time and cost impacts, which were reserved by the release clause, but which required a CPM delay analysis (never provided by PCL.) The total amount of direct costs paid to PCL for the escalator modifications was $50,000.00.

*Visitor Center Mechanical Level Grade Beam*

One feature of the foundation system for the Visitor Center was a "grade beam." The grade beam was located at the top of the architectural feature known as the "V-cut," in the rock at the river side of the Visitor Center. The purpose of the grade beam was to support the suspended slab at the mechanical level of the Visitor Center, which also was partially slab-on-grade. The grade beam supported steel beams, which in turn supported the suspended portion of the mechanical level of the floor. During construction, the shape of the V-cut was changed in order to make it compatible with differing rock conditions on the site. Consequently because of this differing site condition, the grade beam had to be redesigned so that its shape would be compatible with the new V-cut.[27]

USBR requested on July 13, 1992, that PCL lay out the grade beam and advise if the existing rock profile would not accommodate the beam. PCL alleges that on July 16, 1992 it informed USBR that "the grade beam could not be constructed according to the configuration shown on the contract documents." The record before the court, however, stated that "this area will be monitored daily with the Bureau's inspectors, as this work progresses. Any deviations will be noted as they are encountered." In fact, PCL was required to notify the Bureau as problems arose.

PCL did not provide lay out information for the grade beam at least until October 6–7, 1992. On October 9 and 20, 1992, USBR provided PCL with the information necessary to construct the relocated grade beam.[28]

27. It is noteworthy that despite the complications asserted by PCL, all CRXs related to the V-cut provided reductions in work and credits to the government, other than CRX 93 and CRX 93.1 for the grade beam. CRX 528 also involves a credit to the government of $72,460.00 for a

reduction in pre-cast panel work, which was caused by a reduction in V-cut excavation.

28. PCL attempts to suggest that there was a three month delay attributable to USBR, from July until October, however PCL's failure to pro-

Contrary to PCL's factual allegation, PCL did not have to "restart the process of preparing submittal drawings...." PCL submitted its initial concrete placement drawing for the grade beam on October 26, 1992. PCL then revised and resubmitted the drawing on November 9, 1992, and the grade beam was placed on November 18, 1992.

Subsequent to the placement of the grade beam, it was not utilized until the erection of structural steel began in May 1993, a full six months later. Therefore, the revision to the grade beam did not impact the structural steel erection as alleged by PCL. Rather, the start of structural steel erection was controlled by PCL's late completion of the shaft B concrete at the exhibit level, for which PCL has not blamed USBR.

On October 9, 1992, PCL submitted CRX 93 for the change to the grade beam; this CRX was canceled and superseded by CRX 93.1 on October 20, 1992. This CRX has never been resolved. PCL initiated CRX 93.1 on October 20, 1992, for changes related to the termination of the VC grade beam at the edge of the structural steel column baseplate, as directed by USBR's response to PCL's RFI S–206. This CRX was initiated in the amount of $12,831.00 and remains open and unresolved.

### Changes to Visitor Center Mechanical, Electrical and Plumbing Work

PCL alleges that USBR also made extensive changes [29] to the mechanical, electrical, and plumbing systems in the Visitor Center as demonstrated by the fact that:

> Sixty-three percent of the mechanical drawings, and 83% of the electrical drawings, were revised after Contract award. In addition, 17% of the electrical drawings were added after the bid period.

The USBR executed over thirty-five contract modifications relating to the Visitor Center's mechanical electrical and plumbing systems. These include changes to piping, drains, ductwork, ventilation fans and other HVAC components, elevators, additional electrical circuits, lighting, fire detection and control.[30]

Electrical work in the Visitor Center was performed concurrently with framing, drywall, and finish work on the Visitor Center theater level. According to defendant's expert, Mr. Caruso, USBR was responsible for ninety-one days of impact to PCL's completion date for delays to these activities without consideration for delays and disruptions to unchanged work. According to Mr. Caruso, the CRXs referenced by PCL in its factual allegations pertaining to the mechanical, electrical, and plumbing systems in the Visitor Center account for 103 days of delay attributable to USBR. However, PCL has never submitted a time impact evaluation to demonstrate that the imposition of these contract changes impacted PCL's ongoing construction operation, delayed the completion of the project, or otherwise entitled PCL to additional compensation for delays under the changes clause of the contract.

There was testimony at trial that indicated some of the difficulties in the Visitor Center (and Parking Structure) regarding mechanical, electrical and plumbing could have been mitigated by PCL if it had prepared coordination drawings as required by the contract. PCL was required to prepare coordination drawings to avoid interferences with other equipment or the building construction, especially between Divisions 15 and 16 of the contract (which covered the mechanical and electrical requirements.) This responsibility for coordination was not to be delegated to any subcontractor.

PCL failed to comply with these contract requirements. This was evidenced by the fact that PCL transmitted its first coordina-

vide lay-out information is partly to blame for a delay, if any.

29. The court notes that although these changes occurred after the contract was bid, USBR had the right under the contract to provide PCL with additional clarifications and details during construction as necessary by issuing clarifications and supplemental drawings. Moreover, Modification 3 was an administrative modification to

revise the qualification requirements for the turntable manufacturer and installer at PCL's request.

30. Many of the CRXs contained in these thirty-five modifications were not significant in nature. Approximately thirty were for under $5,000.00, with fifteen for under $1,000.00, three were no cost changes, and four were credits to USBR.

tion drawing on October 29, 1992—a year into the project—and it was only one drawing for the mechanical level underground. The second coordination drawing submittal was in December 1992. The submittal included "blue-line" drawings that were impossible to read. It was not until well into 1993 before PCL provided legible coordination drawings; however, PCL did not provide coordination drawings that were contractually compliant. The contract mandated that these drawings were to be submitted "before beginning any phase of work." In addition to lack of timeliness for providing coordination drawings to USBR, PCL also delegated this coordination function to its subcontractors, in conflict with contract requirements.

### Static and Catastrophic Grounding

PCL contends that the contract drawings were incomplete and defective because a design for a catastrophic grounding system, as opposed to a static grounding system, was not included in the contract at time of contract award. Prior to contract award, USBR and TPP recognized as a concern the absence of an adequate ground system for the structures. At the time of award, the contract included a design for ordinary static electrical grounding of the buildings to comply with national electrical codes.[31] However, the contract did not include a "catastrophic" grounding system capable of safeguarding the structures from the unusual electrical hazards posed by the high-tension power lines crossing the site, such as the possibility that a line might break and land on one of the structures.

The catastrophic grounding system was not determined to be included until after construction had begun. USBR subsequently required PCL to install a catastrophic grounding system pursuant to the changes clause of PCL's contract. During contract performance, USBR's Denver Design Office, electrical section, reevaluated the catastrophic potential at the Hoover Dam and determined that adding a catastrophic grounding system would be prudent in the unlikely

event of a catastrophic failure of a transmission line. This decision was relayed then to the project office at Hoover and ultimately added to PCL's contract. The redesign of this system was completed in November 1992 and transmitted to PCL by unilateral Contract Modification 20 which directed PCL to proceed with furnishing and installing grounding mats at the Visitor Center and Parking Structure and connecting them to the existing Hoover power plant grounding system.

After transmittal of Modification 20, PCL assigned CRX 113 to this change. Meetings between PCL and USBR clarified the required work and CRX 113 was canceled and replaced by CRXs 113.1, 113.2, and 113.3. Bilateral Modification 25 was issued on April 5, 1993, rescinding Modification 20 to increase the cost limitation amount and provide for provisional payments to PCL.

PCL contends that "[t]he omission of the catastrophic grounding system from the original Contract drawings did impact PCL's excavation early in the project." Mr. Bader stated in his testimony: "I remember that the Bureau very early on—there was a problem with grounding. They had not shown the grounding in the bid documents." Mr. Briggs continued by stating: "As I recall, they tried to force us to do it under the contract, and it ended up not being in the contract. That relates to the excavation in regards to there was a grid that had to be dug in. So there was something changed right off the bat as far as the excavation went." This testimony by Mr. Briggs is contradicted by government witnesses indicating that the additional grounding mat was embedded in the concrete after the excavation was complete and before the concrete was finally poured. Mr. Eudy did indicate that some of the grounding at the Parking Structure had to be installed before slab-on-grade was placed; however, he did not testify that the grounding change affected the progress of the excavation. The USBR did acknowledge at trial that the addition of the

---

31. Issues related to static grounding were resolved at the time of bid and included in PCL's contract at time of award. Grounding details are shown on at least eight contract drawings.

For example, drawing C5.1 states: "All steel structures shall be connected to the grounding system...."

grounding systems increased the cost of construction and materials. However, Mr. Bader suggested that "there was no impact to the field activities ... that were going on concurrent with the installation of the new grounding system."

On site, PCL did not complete the placement of aggregate base course and reinforcing steel for the first Parking Structure level 3A slab-on-grade placement until June 3, 1993. Concurrently, during the last two days PCL was placing aggregate base and reinforcing steel, the ground cable and connections for the first level 3A slab-on-grade were installed, with a two-man crew working three hours on June 2 and 3, 1993. PCL made the first Parking Structure level 3A slab-on-grade placement on June 4, 1993. Moreover, PCL's expert report prepared by Mr. Kellogg fails to establish any impact because the alleged delay period in the report ends in March 1993 and PCL's work was not ready to accept the grounding installation until over two months later. The total amount of direct costs paid to PCL for the grounding system modifications was $268,484.00.

### Change Requests and Modifications

PCL suggests that the number of CRXs that were generated by PCL during the project demonstrates a "severely defective" contract package. During the course of this complex project, USBR initiated changes to the contract by requesting cost proposals from PCL, or directed PCL by unilateral modification to proceed with changes. When this happened, PCL would initiate a "CRX" ("change request extra"), which ascended in number throughout the job. PCL itself also requested changes to the contract via CRXs sent to USBR. PCL even used CRXs to track changes between PCL and its subcontractors.

PCL maintained a CRX log during the performance of the construction work. The CRX log lists the CRXs by number, provides a description of the CRX, and the date it was initiated. There were a total of 535 CRXs issued during the course of the project. Of the 535 CRXs, only 335 were considered to have some degree of merit and action was taken upon them. The other 200 CRXs (almost forty percent of all CRXs) were either canceled by PCL, abandoned by PCL without further action, or, in a small number, disagreement continued and no action was taken. From a financial perspective, USBR's 335 changes were not significant: of the 335 CRXs, sixty (eighteen percent) were for less than $1,000.00, 122 (thirty-six percent) CRXs were for less than $2,500.00, and 226 (sixty seven percent) CRXs were for less than $10,000.00. All told only nine CRXs (three percent) were for over $100,000.00.

PCL states that PCL issued 167 CRXs from October 1991 through December 1992 during the start of the project. A review of PCL's CRX Log shows, however, that CRX 167 was issued on April 8, 1993, and that CRX 126 was the last CRX issued in December 1992. Of the 126 CRXs that were actually issued during this period, PCL's own log shows that thirty of them (or one of every four CRXs) were canceled by PCL. Moreover, these allegations by PCL, focusing on the number of CRXs, is not dispositive. For example, CRX 1 and CRX 2, which were assigned to changes for temporary power and telephone service, were requested by PCL for its own ease of operation.

In addition, PCL alleges that "the USBR took an unreasonably long time to issue Contract modifications after receiving CRX proposals from PCL." PCL illustrates this concern about the length of time to issue modifications: "In the redesign of the L-line drag tie, for example, USBR did not execute a Contract modification for the changed work until 1.5 years after PCL submitted its initial cost proposals." (Emphasis in original.) It should be noted that during the course of trial, the court often found that a delay ensued following any change by either party and was caused by both USBR and PCL at various times.

The very example that PCL points to in order to demonstrate government lag in handling a CRX and subsequent Modification, was compounded by PCL actions. Modification 12 directed PCL to construct the revised drag tie on July 2, 1992. PCL later elected to split the drag tie change into three separate CRXs: CRX 44.0 for PCL Civil's excavation, CRX 44.1 for concrete, and CRX 44.2 for the rebar portion of the work, thereby

increasing the work involved in processing CRXs in this manner. Although PCL's allegations of major impacts and job perturbations alleged by PCL were not well supported or corroborated in the record before the court, the task was complicated in part by the complex paperwork trail generated in the CRX process. Using the allegation regarding the drag tie, relied upon by PCL as an example, PCL submitted seven proposals and revisions related to this single CRX. In addition, it took three different proposed modifications, Modifications 33, 68 and 85, each of which was thought by USBR to reflect agreement with PCL, before PCL finally executed Modification 85. Other examples are CRX 3.1 and 5.0, for which PCL submitted five different cost proposals for each; CRX 161.1, for which PCL submitted six different cost proposals; and CRXs 74.0, 133.0, 152.0, 420.0, and 447.0, for which PCL submitted four different costs proposals for each.

Finally, although there are a number of unresolved change orders for which USBR recognizes contractual liability, those costs are offset by provisional payments already made by USBR. USBR issued a number of modifications that gave PCL provisional payments, estimated by USBR, for completed work and subject to PCL's later substantiation of its costs via a cost proposal, which has never occurred.[32] Ultimately, even if PCL disagrees that it has already been paid more than PCL is owed for unresolved CRXs, PCL has never submitted a contractual claim seeking payment for unresolved CRXs.

### Completion Dates and Scheduling

PCL's contract required construction of the Visitor Center to be completed by July 15, 1993 and construction of the Parking Structure to be completed by February 15, 1992. PCL's baseline schedule was conditionally approved by USBR on August 15, 1994. This conditionally approved baseline scheduled projected that PCL would complete both the Visitor Center and the Park-

ing Structure on July 15, 1993. The USBR never withheld a progress payment from PCL on the grounds that PCL failed to provide schedule information.

The contract required PCL to submit a Summary Logic Diagram schedule and a 120–day "fragnet" schedule within thirty days after contract award. The Summary Logic Diagram is a schedule which "demonstrates the Contractor's construction assumptions used in its bidding process" and which serves as a "general guide to the entire contract scope of work," showing "major construction and/or installation activities; all contract milestones; and all submittals, approvals, fabrication, testing, and delivery of key and long lead-time acquisition activities." The 120–day fragnet was a schedule for the first 120 days of the job, scheduled at the level of detail to be included in PCL's "detailed logic diagram." The contract also required PCL to submit a "Detailed Logic Diagram" for USBR's approval, within forty-five days after receipt of the Notice to Proceed. This Detailed Logic Diagram, which was a prerequisite for USBR's approval of PCL's "baseline schedule," was to show the "required sequence and interdependence of activities" and present "a coordinated plan for complete performance of the work." Following USBR's approval of the Detailed Logic Diagram, PCL was to submit a "mathematical analysis" and a "baseline schedule."

After contract award, and prior to being granted site access, PCL began its efforts to comply with contract requirements for schedules and other information to be given to USBR. PCL submitted its Summary Logic Diagram and 120–day fragnet on October 10, 1991. The USBR sent a letter notifying the contractor to proceed the next day. Although there is some confusion in the record, according to the joint stipulation submitted by the parties, USBR gave PCL its Notice to Proceed on October 21, 1991, and PCL acknowledged its Notice to Proceed on October

---

**32.** PCL was paid a total of $846,000.00 in provisional payments for Modifications 21, 24, 44, 52, 72, and 81. PCL also alleges that: "In other instances, PCL has *never* received a Contract modification for revised work. For example, PCL performed $179,440.00 in additional work

for CRX 133 for the revised level 3A transition, but has not received a Contract modification for this work." (Emphasis in original.) This allegation is problematic because PCL did, in fact, receive $120,000.00 in provisional payments for CRX 133 in Modification 81.

22, 1991.[33] The summary logic diagram and 120–day fragnets were incomplete and USBR requested that PCL provide additional information to complete the submittal. The USBR received supplemental information from PCL to finally complete the submittal on October 28, 1991.

PCL submitted its next scheduling item, the detailed logic diagram, on January 28, 1992, about eight weeks late. Again, PCL's submittal was incomplete, and PCL furnished supplemental information on February 6, 1992. Even upon receipt of this supplemental information, PCL's detailed logic diagram was incomplete and failed to conform to numerous requirements of Section H.10 of the contract. Accordingly, it was disapproved by USBR on February 10, 1992.

PCL submitted a revised detailed logic diagram on February 26, 1992, sixteen days after its receipt of disapproval.[34] However, this resubmittal was rushed by PCL, and PCL's scheduling engineer, Aaron Lysne, informed USBR that he knew that he had not had enough time to do a "good job" on the resubmittal. USBR disapproved PCL's detailed logic diagram on March 24, 1992, because the second resubmittal failed to conform to numerous requirements of Contract Clause H.10, including many items which had been pointed out to PCL previously.

PCL resubmitted its third detailed logic diagram six weeks later on May 8, 1992, again late, this time by about a month. This resubmittal was conditionally approved, subject to comments, on June 15, 1992. Even though PCL's third submittal of its detailed logic diagram was approved, PCL was still required to make substantial revisions to it for resubmittal along with PCL's baseline schedule.

The contract required that PCL revise and resubmit its detailed logic diagram with the submittal of its baseline schedule within thirty calendar days after receipt of approval of the detailed logic diagram. PCL resubmitted its detailed logic diagram and its baseline schedule on July 24, 1992, about two weeks late. The USBR conditionally approved PCL's baseline schedule, subject to comments, on or after August 14, 1992.

PCL's baseline schedule failed to conform to the contract requirements in a number of material respects, including PCL's failure to incorporate the specified USBR review times for submittals; PCL's failure to incorporate the specified lead time for concrete placements; PCL's failure to provide a resource-leveled baseline; and PCL's failure to meet the specified funding constraints. All of these difficulties suggest that individual work activities, and the entire project, could have been performed in less time if PCL had not omitted these various schedules. It is evident that the requirement to submit numerous and various schedules was included as a critical element of the construction project, and the failure to undertake these tasks had consequences for the scheduled completion of these endeavors, as PCL subsequently learned, and as the scheduling experts testified to at trial.

PCL submitted its revised baseline schedule on September 2, 1992, which became the conditionally-approved baseline schedule. Although this schedule was conditionally approved, it did not conform to the contract requirements concerning resource leveling and funding constraints, among other items.[35]

Upon approval, the baseline schedule superceded PCL's summary logic diagram and 120–day fragnets in their entirety. Also upon approval of the baseline schedule, PCL

---

**33.** This submittal was five days late and inadequate. Due to the late submittal, USBR was entitled to reduce the time allowed for completion of the entire project by one calendar day for each calendar day of delay in this submission, at no cost to USBR.

**34.** The contract allowed PCL fourteen calendar days after its receipt of the disapproval to revise and resubmit its Detailed Logic Diagram.

**35.** PCL did not produce this conditionally-approved baseline schedule until one year after the contract was awarded, with the award having occurred on September 5, 1991. The contract anticipated that PCL would produce a contractually compliant baseline schedule within 120 calendar days of notice to proceed, or by approximately the end of February 1992. PCL missed this due date for the baseline schedule by over six months. There is also evidence that PCL never updated its 120–day fragnets.

was required to update the baseline schedule in order to make it current with the actual work that had taken place, and was planned to take place, using the data that was contained in the latest updated 120–day fragnets. PCL was then required to update the schedule again every month thereafter.

PCL failed to satisfy these requirements of the contract: PCL made one unsuccessful attempt to update its baseline schedule and this was not until a period from January to September of 1993. Otherwise, PCL simply used the existing activities contained in its baseline schedule, without making the required revisions to the schedule to represent the actual progress of the work, changed work, added work, or PCL's updated plan to finish the job.[36] Even PCL's progress update report for January 5, 1995, over three years into the job, indicated that the schedule is only used and not updated: "Actual dates have been added to existing baseline activities and mathematical analysis performed...."[37]

Clause H. 10 also required that, upon approval of the baseline schedule, PCL would prepare a single time impact evaluation for all modifications issued after notice to proceed and prior to approval of the baseline schedule. This time impact evaluation was to be submitted with the first progress update. PCL indicated to USBR throughout the job that this required time impact evaluation would be submitted. Despite this, PCL never provided the required time impact evaluation.

Among the purposes of time impact evaluations is to determine whether a time extension or reduction for contract completion dates is justified. During the term of the contract, PCL appears to have attempted to perform two, and perhaps a third, time impact evaluations.[38] Only one was ever submitted to USBR. The time impact evaluation

submitted by PCL was for the backslope excavation change on behalf of the subcontractor PCL Civil at the Parking Structure. As discussed above in the section of the opinion addressing the backslope, this time impact evaluation did not attempt to justify a time extension to the contract, was incomplete, and did not conform to the contract requirements.

PCL alleges that "[a]n independent part of PCL's main schedule, the concrete placement schedule identified the timing of individual concrete placements." This is an accurate statement as to what the contract required for the concrete placement schedule, nevertheless, PCL did not produce such a schedule. First, the concrete placement schedule produced by PCL did not identify individual placements, but rather, in many cases, identified multiple placements by a single "pour number" such as a group of footings or columns. In addition, PCL did not submit even this concrete placement schedule until August 1992. The contract required that PCL submit its concrete placement schedule at least 120 days prior to the first concrete placement. PCL's August 1992 placement schedule indicated placement dates in December 1991. The concrete placement schedule was disapproved by USBR on the grounds that it was not compliant and not useful for construction purposes. PCL did not make a further attempt to get approval of a concrete placement schedule. In August 1993, PCL promised that it would submit a concrete placement schedule "soon," but did not submit a schedule to USBR.

PCL suggests that it "could not possibly prepare an accurate concrete placement schedule until it first had received from USBR the final designs for the concrete elements to be constructed." However, the contract required PCL to produce a concrete placement schedule based upon the contract

---

**36.** PCL incorrectly states that it "updated" the 120–day fragnets every month. However, rather than updating the fragnets, PCL appears to have used the existing activities.

**37.** In addition to the statusing of existing activities, the contract requires that the updating process include appropriate changes in logic and schedule.

**38.** Apparently, a computer disk that allegedly contained a contemporaneous time impact evaluation for the Ring Beam change at the Visitor Center was located in PCL's records during discovery in this case. Neither the contents of the computer disk, nor any ring beam evaluation were ever provided to USBR.

as it existed at the time of development of the schedule and the contract anticipated the necessity of updating the concrete placement schedule if changes were made to concrete elements. Moreover, the logic of this allegation is troubling because it implies that even the slightest change to any concrete element would affect the entire schedule for concrete placements.[39]

Relying on the use of "two-week look-ahead schedules," PCL alleges that "PCL and USBR used these schedules to manage the job and construct the project, and USBR made progress payments to PCL on the basis of these schedules." However, it appears to the court that this allegation is inaccurate because the PCL project manager testified that PCL and USBR had difficulties in scheduling staff and field personnel due to the lack of a long-range planning tool. In addition, USBR never made a single progress payment based upon PCL's two-week look-ahead schedules; rather, all progress payments were based upon the statused 120-day fragnets or the statused baseline schedule.

### Contractor Claims and Termination for Default

In April 1994, PCL submitted an uncertified Request for Equitable Adjustment (REA), claiming entitlement to recover $23,229,471.00 and to a schedule extension of 363 days because of delays and disruptions arising from alleged defective contract drawings and specifications, differing site conditions, time required for resolutions of RFI, and time impacts due to contract changes. On February 24, 1995, USBR notified PCL that it had evaluated the REA and requested that PCL participate in a fact-finding session regarding preparation of an as-built schedule

in order to agree upon responsibility for critical delays to the project. PCL interpreted this as a denial of the REA in its entirety.

In a letter dated March 14, 1995, the contracting officer stated that an assessment of liquidated damages would be made against PCL when "responsibilities for time associated with delays are made." The contracting officer also stated that liquidated damages would then be assessed against PCL for those delays which are "not found to be the responsibility of the Government...." Less than three months later, on June 9, 1995, the contracting officer issued to PCL a Certificate of Substantial Completion certifying that the contract was substantially complete as of May 11, 1995. PCL was notified that the project was considered to be substantially complete except for the results of the joint inspection on May 12, 1995, and the "deficient items noted and listed during the [previous] joint inspections." The USBR began using the Visitor Center and Parking Structure on May 12, 1995 and has continued to do so since that date. The USBR opened the facilities for tourism on June 21, 1995.

Despite not having completed all of the previously listed deficiencies, PCL requested the final acceptance inspection to be held on August 25, 1995. PCL's request was contrary to the terms of the contract, which required PCL to request final acceptance only when all contract work was considered to be complete. Therefore, USBR rejected PCL's request. PCL withdrew its request for a final acceptance inspection and outlined a procedure to handle the remaining deficiency items, requesting a consolidated deficiency listing. USBR provided PCL with a consolidated deficiency listing and concurred with PCL's suggested procedure for resolving the deficiency items. USBR also reminded PCL

---

**39.** Citing Mr. Eudy's testimony, PCL claims that "[t]he number of Contract modifications and their administration simply made compliance with the Contract's schedule requirements essentially impossible." Foremost, this is a mischaracterization of the cited testimony, in which Mr. Eudy discussed PCL's management of the job, but did not address contract modifications or scheduling requirements. PCL's construction manager responded to questions from his counsel as follows: "Q: Was PCL's loss of control over the job site apparent to PCL immediately when it began work? A: No. Q: How did it

become apparent to PCL? A: It kind of evolved as an issue and then another issue, and it just kept evolving and becoming a bigger and bigger issue." In addition, the court is troubled by this inference that even if PCL did not efficiently handle the administration of change orders and did not comply with the contract's scheduling requirements, there was no contractual requirement to comply with and satisfy the contract scheduling requirements. It appears that PCL chose to ignore numerous scheduling aspects of the project, although they did spend considerable effort on administering CRXs.

of its obligation to provide a written certification in accordance with contract section 01700 1.10.A. PCL never provided the required written certification.

PCL and some of its subcontractors remained on site performing under the contract until November 1995. At trial, the government indicated that most of the items on the deficiency lists in exhibit 2147 remain outstanding to this day.

PCL filed a breach of contract claim on July 25, 1995 with USBR's contracting officer in the amount of $31,040,071.00. At approximately the same time, USBR notified PCL that it was retaining money from PCL pursuant to USBR's interpretation of the contract: "[C]ontinued withholding of funds is necessary for the protection of the Government's interest in accrued liquidated damages, outstanding required submittals, and credits due the Government for changes and/or reductions in work." PCL requested release of the retainage on August 4, 1995. The USBR denied the request for release of the retainage on August 22, 1995 and acknowledged the continued retainage of monies for the protection of the government. On September 21, 1995, the contracting officer issued her final decision denying the breach of contract claim in its entirety.

On November 22, 1995, PCL submitted a certified claim in the amount of $1,351,838.00 for monies retained by USBR. PCL notified USBR that it had performed the contract and was entitled to the retained money. In addition, PCL stated it would perform no additional work as it believed that the work requested was outside the scope of the contract and USBR's withholding of funds was contrary to contract requirements.[40] PCL's letter of November 22, 1995, stated "PCL will therefore perform no additional work related to the contract; and, PCL is advising its subcontractors that any work performed for the Bureau on this contract will be at their own risk."

On January 23, 1996, the contracting officer responded to PCL's election to stop work in November 1995 and denied PCL's claim

for monies withheld in its entirety. The USBR took exception to PCL's statement that work under the contract was complete and interpreted PCL's November 22, 1995 letter as an "express and unequivocal repudiation" of PCL's remaining contractual obligations. In addition, USBR informed PCL that a failure by PCL to respond within ten days of the letter would result in a demand upon sureties to complete any remaining work.

On March 6, 1996, the contracting officer notified PCL that the government was terminating the contract for default based on PCL's alleged breach of contract:

> The contract, which is dated September 5, 1991, is terminated for default because of PCL's breach of the contract. On November 22, 1995, PCL provided an express and unequivocal repudiation of the contract by notifying the government that PCL would perform no additional work related to the contract. My letter of January 23, 1996 advised PCL of the consequences of such action and gave PCL 10 days to reconsider its repudiation of the contract. PCL has not responded to the January 23, 1996, letter and has not continued performance of the contract.
>
> Accordingly, I find PCL's failure to perform is not excusable and that PCL's right to proceed further under the contract is hereby terminated.

USBR notified the sureties that PCL was terminated for default.

In making the termination decision, the contracting officer testified that she considered the relevant factors required by FAR § 49.402–3, but did not prepare a detailed written analysis that enumerated consideration of the regulatory factors. The contracting officer did sign a document entitled "Justification for Termination of Default," in which she discussed various events throughout contract performance and concluded that the termination for default was proper. The contracting officer did not conclude that a termination for convenience, in lieu of a ter-

---

40. The USBR has admitted that the retained funds represent "payments due under the contract." PCL submitted a certified claim in the amount of $1,351,838.00 for monies retained by USBR.

mination for default, was appropriate, rather the contracting officer noted:

> PCL has taken the stance that substantial completion is final completion, the Bureau has breached the contract, and therefore, they are not required to perform, which is not in accordance with the contract.... In a January 23, 1996 letter I informed PCL they were in breach of contract and gave them 10 days to reconsider their position and stated the consequences of such actions.... As of this date, PCL has not responded. It is not practical to issue a show cause or cure notice, therefore the only recourse is to immediately terminate for default....

The contracting officer's March 6, 1996 letter terminated the contract for default.

On March 26, 1996, the contracting officer notified PCL of the assessment of liquidated damages in the amount of $1,285,00.00 due to USBR's decision that PCL had not "provided support demonstrating entitlement to delays." The liquidated damages letter did not assign responsibility for delay either to PCL or to USBR, nor extend the completion date of the contract beyond the two days provided for in Modification 26. The letter did state that the amount was a "preliminary assessment" and that "[i]f it is found at a future date that PCL is entitled to excusable delays the above amount will be offset according-ly." [41] The letter, however, did not identify itself as a final decision and did not inform PCL of its right to appeal pursuant to the Contract Disputes Act.

Any additional work that has been performed constituted either work by subcontractors in accordance with the terms of their contracts with PCL, or minor repairs completed by USBR's own forces. The work remaining when PCL stopped work on the project included concrete repairs, work at the theaters that was not performed, and completion of the heating and ventilating system.[42] Also, there were plumbing leaks and other warranty items that USBR addressed following PCL's refusal to honor the warranty clause of the contract. USBR received only a portion of the as-built drawings that were required, which are necessary to maintain a building, for trouble-shooting, changing of equipment, to ascertain how the building was assembled, and to determine the location of building components. The USBR also did not receive Standard Operating Procedures which are important for operation and maintenance of systems installed by PCL; therefore, USBR had to develop its own procedure manuals.

PCL filed a complaint in this court following the contracting officer's decision to deny the breach of contract claim, and filed a second complaint following the imposition of liquidated damages. The two complaints were consolidated. The trial on liability took place in segments which totaled approximately twelve weeks, followed by post-trial briefs and closing arguments. The trial also was interspersed with good faith and, at times, creative attempts at settlement, which unfortunately were inconclusive prior to the completion of the trial.

### DISCUSSION

The court enjoys the benefit of a considerable record, created during the course of pretrial proceedings and a lengthy trial, and through post-trial filings. The availability of extensive exhibits and testimony adduced from witnesses on behalf of PCL and USBR, and numerous expert witnesses, has allowed the court to address this fact-laden dispute and to make the factual and credibility determinations required to resolve the dispute before the court. The lengthy transcript, voluminous exhibits and the weighty post-trial filings required extensive study and re-

---

**41.** The contracting officer also testified that USBR had not determined the extent to which USBR was responsible for delays at the time she assessed liquidated damages, that as of that date she had no opinion as to the extent of PCL's responsibility although acknowledging that PCL caused some delays, and that as of that date she knew that there were USBR-caused delays as well.

**42.** In addition, aspects of PCL's contract administration duties were never performed, for example, provision of a credit by PCL for excavation not performed at PS2 stairway and a credit by PCL for work not performed at the expansion joints at the box girder bridge.

view by the court since many of the exhibits relied on by the parties were only referenced briefly during the trial. The factual complexity and the legal intricacies of this case were ably handled by the litigants on both sides, which in turn enabled the court to analyze the mass of material and to become well-versed in the pertinent legal and factual matters. In general, for the purposes of examining the issues before the court, the physical evidence (documents including, but not limited to, the contract, charts, pictures, graphs, reports, meeting minutes, inspection notes, diaries and drawings) were extremely helpful to further explain and expand on the testimony of witnesses, including a number of the witnesses whose testimony was laden with issues of credibility including professional and personal bias, memory-loss, contradictory statements, and lack of responsiveness.

As noted above, the plaintiff's first complaint in Case No. 95–666C asserts breach of contract premised upon fraud in the inducement and misrepresentation by the government (Counts I, II and IV), breach of contract premised upon superior knowledge by the government (Counts III and VI), breach of contract arising from a breach of warranty by the government (Count V), breach of contract stemming from hindrance and delay by the government (Count VII), cardinal change (Count VIII), and illegal contract (Count IX). Again, as noted above, PCL's second complaint in Case No. 96–442C, filed July 23, 1996, alleges breach of contract, based upon failure to pay (Counts I, II and VIII) and improper assessment of liquidated damages (Count VIII); improper termination for default (Counts III to VI); and the illegal assessment of liquidated damages (Count VII). The complaint also requests the conversion of the termination for default to a termination for convenience, based upon the improper termination counts (Counts IV to VI).

PCL's allegations in the two complaints stem from three different time periods during the course of the planning, construction, and completion of the Hoover Dam Visitor Center and Parking Structure: the preaward design and bidding process, the construction process, and the project close-out. The court will address each of PCL's allegations that

arise from these various phases of the project in a chronological order, thereby deciding the counts in Case No. 95–666C (focusing on preaward, bidding and construction) and then the counts in Case No. 96–442C (focusing on close-out, default termination, liquidated damages, and retainage).

PCL's brief states that "any argument by USBR that PCL contributed to job delays should be rejected by this Court due to an absence of proof." In the absence of proof that the plaintiff's job delays were for an unreasonable length of time and were caused by the government, there can be no finding of liability. *See Mega Constr. Co., Inc. v. United States,* 29 Fed.Cl. 396, 424–25 (1993); *see also William A. Smith Contracting Co. v. United States,* 155 Ct.Cl. 1, 9–10, 292 F.2d 847, 852 (1961) (discussing several cases). "It is incumbent upon the plaintiffs to show the nature and extent of the various delays for which damages are claimed and to connect them to some act of commission or omission on defendant's part." *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 200, 351 F.2d 956, 969 (1965). Plaintiff, therefore, bears this burden of proof.

## I. Counts I, II and IV (Case No. 95–666C)

The court first addresses PCL's causes of action that rely primarily upon preaward events. PCL offers a number of legal theories related to the preaward events in Counts I, II and IV. PCL's misrepresentation causes of action are premised upon the contention that USBR fraudulently induced PCL into bidding on the contract, knowing that PCL would encounter many "hidden" design defects and differing site conditions, which USBR was not inclined to correct prior to award because of USBR's haste to begin the construction process. PCL alleges that: (1) funding shortages prevented USBR (and therefore TPP, URS and HLA) from performing geologic and topographic investigations according to "industry standards;" and (2) USBR's review of the design package either failed to identify, or identified but took no action to correct, "severe defects" in the contract package as awarded.

PCL claims that USBR breached an implied contract by failing to issue a complete and coordinated bid package, and by failing to meet certain standards of care during the design of the project. PCL, however, has not cited a case, or any binding authority, that the government is bound by an implied contract to formulate and assemble its construction projects in a pristine and perfect fashion and that failure to do so can lead to breach of the contract. The cases cited by the plaintiff refer to the government's obligation to consider competitive bids fairly or to act in good faith during contract performance. In fact, many contracts involve performance difficulties, requiring revision of the specifications and redesign efforts, without resulting in a breach of contract.

Even if an obligation to assemble a close-to-flawless bid package existed, PCL would still face the burden of demonstrating that USBR breached such a duty and acted in bad faith. Agency employees are presumed to act in good faith, and a claimant must present "well-nigh irrefragable proof" of bad faith to overcome that presumption. *T & M Distrib., Inc. v. United States*, 185 F.3d 1279, 1285 (Fed.Cir.1999); *McEachern v. OPM*, 776 F.2d 1539, 1544 (Fed.Cir.1985); *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 198, 543 F.2d 1298, 1301–02 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977). Agency employees are presumed to discharge their official duties properly and fairly, in good faith and in accordance with law and applicable regulations. *See Bracy v. Gramley*, 520 U.S. 899, 909, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997); *Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 795 (Fed.Cir.1993) (citing *Parsons v. United States*, 229 Ct.Cl. 335, 339, 670 F.2d 164, 166 (1982)).

Moreover, the clear, express, terms of the contract itself, into which PCL entered with the government, provided for all of the events that PCL now offers to support its misrepresentation and fraud claims. PCL presents an argument in its misrepresentation claims that USBR was bound by either a preaward contract or by the executed contract itself, to certain standards of care primarily related to geologic investigation,

structural design and contract administration procedures. It is the breach of these supposed contract requirements that forms the basis for several of the breach of contract counts in PCL's complaint.

Interpretation of a government contract is a matter of law. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir.1996) (citing *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir. 1985)); *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 386, 351 F.2d 972, 974 (1965). The language of the contract must be given the meaning that would be derived from the contract by a "reasonably intelligent person acquainted with the contemporaneous circumstances." *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed.Cir.1999) (quoting *Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. at 388, 351 F.2d at 975); *see Cray Research, Inc. v. United States*, 44 Fed.Cl. 327, 329–30 (1999).

When interpreting the language of a contract, a court must give a reasonable meaning to all parts of the contract and not render portions of the contract meaningless. *Fortec Constructors v. United States*, 760 F.2d at 1292 (citing *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir. 1983)). To ascertain the intentions of the parties, the contract should be construed in its entirety "so as to harmonize and give meaning to all its provisions." *Thanet Corp. v. United States*, 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979) (citing *ITT Arctic Servs., Inc. v. United States*, 207 Ct.Cl. 743, 751–52, 524 F.2d 680, 684 (1975); *Northwest Marine Iron Works v. United States*, 203 Ct.Cl. 629, 637, 493 F.2d 652, 657 (1974)). One of the cardinal rules of contract interpretation is that:

> [A]n interpretation which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, or superfluous; nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible.

*Hol–Gar Mfg. Corp. v. United States*, 169 Ct.Cl. at 395, 351 F.2d at 979; *accord United*

*States v. Johnson Controls, Inc.,* 713 F.2d at 1555.

The principal objective of contract interpretation is determining the intent of the parties at the time the contract was signed. *Winstar Corp. v. United States,* 64 F.3d 1531, 1540 (Fed.Cir.1995) (en banc), *aff'd,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). This analysis, however, focuses upon the parties' jointly held intent. The subjective, unexpressed intent of one party, or a post-hoc "interpretation" of what a bidder is said to have believed when entering into a certain type of contract (especially when offered by a third-party "expert"), is irrelevant for interpreting the contract. *See Andersen Consulting v. United States,* 959 F.2d 929, 934 (Fed.Cir.1992); *Highway Prods., Inc. v. United States,* 208 Ct.Cl. 926, 947, 530 F.2d 911, 922 (1976); *Dana Corp. v. United States,* 200 Ct.Cl. 200, 214, 470 F.2d 1032, 1040 (1972).

Contract interpretation begins with the plain language of the agreement. *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996); *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed. Cir.1991). Courts will not read ambiguity into a contract provision as long as the contract as a whole or the interpretation of the contract language provides an unambiguous meaning. *See International Transducer Corp. v. United States,* 30 Fed.Cl. 522, 530 (1994), *aff'd,* 48 F.3d 1235 (Fed.Cir.1995) (table). Whenever possible, courts look to a "plain language" or "plain meaning" interpretation of contractual documents. *Aleman Food Servs., Inc. v. United States,* 994 F.2d 819, 822 (Fed.Cir.1993); *Gould, Inc. v. United States,* 935 F.2d at 1274; *see also Hills Materials Co. v. Rice,* 982 F.2d 514, 516 (Fed.Cir.1992) ("Wherever possible, words of a contract should be given their ordinary and common meaning.") (citing *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. at 390, 351 F.2d at 972). The ordinary meaning of the language in contractual documents governs, and not a party's subjective but unexpressed intent. *Andersen Consulting v. United States,* 959 F.2d at 934; *International Transducer Corp. v. United States,* 30 Fed.

Cl. at 526–27. "Reasonableness is the standard." *Id.* at 527.

A contract may be said to be ambiguous if it is "susceptible to more than one reasonable interpretation...." *Metric Constructors, Inc. v. NASA,* 169 F.3d at 751; *see Blinderman Constr. Co. v. United States,* 17 Cl.Ct. 860, 863 (1989). If a contract's "provisions are clear and unambiguous, they must be given their plain and ordinary meaning." *Alaska Lumber & Pulp Co. v. Madigan,* 2 F.3d 389, 392 (Fed.Cir.1993). Thus, " '[w]here a contract is amenable to only one reasonable construction upon its face, it would not be appropriate to strain the language of other contractual provisions to create an ambiguity.' " *Bishop Eng'g Co. v. United States,* 180 Ct.Cl. 411, 416 (1967) (quoting *Jansen v. United States,* 170 Ct.Cl. 346, 356, 344 F.2d 363, 370 (1965)). Moreover, the mere fact that the parties disagree upon the meaning of a contract does not render the language ambiguous. *Metric Constructors, Inc. v. NASA,* 169 F.3d at 751; *Community Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1578 (Fed.Cir.1993).

When a disagreement regarding the meaning of the words in a contract is presented to the court, the court must determine first whether an ambiguity in the words or terms exists. *John C. Grimberg Co. v. United States,* 7 Cl.Ct. 452, 456, *aff'd,* 785 F.2d 325 (Fed.Cir.1985) (table). If an ambiguity is immediately apparent, it is referred to as a patent ambiguity, and the plaintiff is under a duty to seek clarification before submitting a bid. *Triax Pac., Inc. v. West,* 130 F.3d 1469, 1474–75 (Fed.Cir.1997); *Newsom v. United States,* 230 Ct.Cl. 301, 303, 676 F.2d 647, 650 (1982). Only if the court decides that the ambiguity was not patent does the court consider whether the non-drafting party's interpretation was reasonable. *Fort Vancouver Plywood Co. v. United States,* 860 F.2d 409, 414 (Fed.Cir.1988) (citing *United States v. Turner Constr. Co.,* 819 F.2d 283, 286 (Fed.Cir.1987)). Although a potential contractor has a responsibility to inquire about a significant patent discrepancy, omission or conflict in the provisions, the contractor is not normally required to seek clarification of "any and all ambiguities, doubts, or

possible differences in interpretation." *WPC Enters., Inc. v. United States,* 163 Ct.Cl. 1, 6, 323 F.2d 874, 877 (1963). If a plaintiff such as the one before the court does not inquire about a patent ambiguity, then the ambiguity will be construed against the nondrafter. *Triax Pac., Inc. v. West,* 130 F.3d at 1474–75; *Beacon Constr. Co. v. United States,* 161 Ct.Cl. 1, 7, 314 F.2d 501, 504 (1963).

In the event the court determines that the ambiguity in the contract was not patent, then "the contract is construed against its drafter if the interpretation advanced by the nondrafter is reasonable." *Fort Vancouver Plywood Co. v. United States,* 860 F.2d at 414; *see Metric Constructors, Inc. v. NASA,* 169 F.3d at 751. The alternative interpretation, however, must be within the "zone of reasonableness." *WPC Enters., Inc. v. United States,* 163 Ct.Cl. at 6, 323 F.2d at 877.

When the problem was obvious or actually perceived by the contractor, the contractor must bring the problem to the government's attention, prior to contract award, in order to allow the government to correct the problem. Failure to do so precludes the contract from being interpreted in the contractor's favor, regardless of the reasonableness of the contractor's interpretation. *Interstate Gen. Gov't Contractors, Inc. v. Stone,* 980 F.2d 1433, 1434–35 (Fed.Cir. 1992); *see Chris Berg, Inc. v. United States,* 197 Ct.Cl. 503, 514–15, 455 F.2d 1037, 1044–45 (1972); *Beacon Constr. Co. v. United States,* 161 Ct.Cl. at 6–7, 314 F.2d at 504. This rule serves two purposes. First, it protects the integrity of government procurement by ensuring that all bidders bid upon the basis of the same terms and specifications, and that no contractor takes advantage of a government drafting error. Second, it promotes the efficient administration of government contracts by encouraging contractors to raise potential problems before the fact, and generally requires less time and effort, thereby reducing the likelihood of extra-cost claims on the project and expensive and time-consuming litigation. *Newsom v. United States,* 230 Ct.Cl. at 303, 676 F.2d at 649, 651; *accord Interwest Constr. v. Brown,* 29 F.3d 611, 616 (Fed.Cir.1994); *see also*

*S.O.G. of Arkansas v. United States,* 212 Ct.Cl. 125, 130–31, 546 F.2d 367, 370 (1976). "The rule that a contractor, before bidding, should attempt to have the Government resolve a patent ambiguity in the contract's terms is a major device of preventative hygiene...." *S.O.G. of Arkansas v. United States,* 212 Ct.Cl. at 131, 546 F.2d at 370–71.

Moreover, even if the ambiguity was latent and not perceived by the contractor, the contractor can prevail only if it can establish that at the time it bid the contract it actually interpreted the provision at issue in the manner it asserts. *See Fruin–Colnon Corp. v. United States,* 912 F.2d 1426, 1430–32 (Fed.Cir.1990); *see also Lear Siegler Management Servs. Corp. v. United States,* 867 F.2d 600, 603 (Fed.Cir.1989).

Should the court find it necessary to examine evidence outside of the four corners of the contract to aid its interpretation, the conduct of the parties prior to the onset of dispute is entitled to "great weight." *General Warehouse Two, Inc. v. United States,* 181 Ct.Cl. 180, 187, 389 F.2d 1016, 1020 (1967). Trade practice can be used to interpret a contract, but only if the contract is ambiguous. *George Hyman Constr. Co. v. United States,* 215 Ct.Cl. 70, 81, 564 F.2d 939, 945 (1977). "Neither a contractor's belief nor contrary customary practice, however, can make an unambiguous contract provision ambiguous, or justify a departure from its terms." *R.B. Wright Constr. Co. v. United States,* 919 F.2d 1569, 1572 (Fed.Cir.1990); *accord Metric Constructors, Inc. v. NASA,* 169 F.3d at 751. Courts allow evidence of trade meaning, usage and custom to explain or define contract language, although such evidence may not be used to vary or contradict contract language. *See George Hyman Constr. Co. v. United States,* 832 F.2d 574, 581 (Fed.Cir.1987); *W.G. Cornell Co. v. United States,* 179 Ct.Cl. 651, 669–70, 376 F.2d 299, 311 (1967); *see also Astro–Space Lab., Inc. v. United States,* 200 Ct.Cl. 282, 294 n. 6, 470 F.2d 1003, 1009 n. 6 (1972) (allowing evidence of technical publications and their trade nomenclature to demonstrate technical terms and established industrial meaning). A basic tenet of modern contract law is that

the introduction of evidence on trade meaning, usage and custom is "an acceptable aid in interpreting contract terms." *Tibshraeny Bros. Constr., Inc. v. United States,* 6 Cl.Ct. 463, 470 (1984) (citing *Gholson, Byars & Holmes Constr. Co. v. United States,* 173 Ct.Cl. 374, 395, 351 F.2d 987, 999 (1965)). "[T]rade usage or custom may show that language which appears on its face to be perfectly clear and unambiguous has, in fact, a meaning different from its ordinary meaning." *Gholson, Byars & Holmes Constr. Co. v. United States,* 173 Ct.Cl. at 395, 351 F.2d at 999 (citations omitted).

With these principles in mind, it is evident that the terms of PCL's contract with USBR are not ambiguous and that the contract itself provided (1) that the drawings would need to be supplemented during construction, (2) that imperfections in the design or contract package would arise and cause problems which would require PCL to assist in their resolution, and, (3) that a bilaterally agreed upon mechanism existed for PCL to substantiate, and to be compensated for, costs incurred as a result of contract changes and design discrepancies. In short, PCL's contract with USBR anticipated the types of events that occurred during this project, and provided the means for PCL to redress any issues as they arose.

PCL has not availed itself in full of the agreed-upon method for resolving its problems and claiming additional monies under the contract, but instead has attempted to claim damages by arguing breach of contract. PCL did abide by the contractual procedure when it pursued change orders and negotiated modifications for direct costs of changes to the contract. It was only after PCL had completed a substantial part of the contractual process and had to substantiate any delay or impact costs related to the changes already the subject of bilateral contract modifications, that PCL chose to abandon that process and instead pursued a breach of contract claim.[43]

PCL asserts that it relied to its detriment upon certain USBR "misrepresentations" in and concerning the contract. "In order for a contractor to prevail on a claim of misrepresentation, the contractor must show that the Government made an erroneous representation of a material fact that the contractor honestly and reasonably relied on to the contractor's detriment." *T. Brown Constructors, Inc. v. Pena,* 132 F.3d 724, 729 (Fed.Cir.1997); *see Roseburg Lumber Co. v. Madigan,* 978 F.2d 660, 667 (Fed.Cir.1992); *Summit Timber Co. v. United States,* 230 Ct.Cl. 434, 677 F.2d 852, 857 (1982); *Morrison–Knudsen Co. v. United States,* 170 Ct.Cl. 712, 719, 345 F.2d 535, 543 (1965); Restatement (Second) of Contracts § 164 cmt. a (1979). Moreover, as the United States Court of Claims has explained:

> In misrepresentation, the wrong consists of misleading the contractor by a knowingly or negligently untrue representation of fact or a failure to disclose where a duty requires disclosure.... Some degree of Government culpability—either untruth or such error as is the legal equivalent—must, however, be shown, and the plaintiff's burden of proof is not satisfied merely by proof of a variation between the subsurface conditions as stated in the contact and as encountered.

*Foster Constr. C.A. v. United States,* 193 Ct.Cl. 587, 602, 435 F.2d 873, 880–81 (1970) (citations omitted).

PCL was unable to present and prove "misrepresentations" that were in the contract or implied in the contract. First, PCL claims that a fixed price contract "implies" that a certain "standard of care" is used and must be met in the design of the project. PCL argues, without citation, that the "legal implications" of a fixed price contract are that USBR "warranted the adequacy of its drawings, and thereby represented that the project could be built using its specifications within a certain time period for a fixed price." The case law, however, suggests that in a fixed price contract the contractor is allocated the risk of performance

---

**43.** Moreover, the court notes that even after PCL had presented its breach of contract claim, it executed contract modifications 131 through 144 that used words stating USBR was released from "all liability" for claims except a time impact evaluation claim. Thirty-six CRXs were negotiated and resolved via these modifications for a total of $351,067.00.

time and cost outside of specific government-caused events that trigger the equitable adjustment mechanisms in the contract. *See McNamara Constr. of Manitoba, Ltd. v. United States,* 206 Ct.Cl. 1, 8, 509 F.2d 1166, 1169–70 (1975).

■ There are no actual representations in PCL's contract concerning an established "standard of care," nor does the phrase "standard of care" appear anywhere in PCL's contract with USBR. The issues on which PCL has focused are anticipated in the contract. The contract is laden with precise statements concerning the known geologic conditions, but also with the nature of the investigation of the conditions, that rock lines were estimated, that PCL was required to perform exploratory drilling for the caissons, that the package conveyed the general intent of the design, that the drawings would be detailed and completed during construction, and that discrepancies and omissions were anticipated to occur.

PCL also argues that the contract contained misrepresentations via the use of the word "estimated" to describe the rock contour lines contained on some of the drawings. PCL contends that this use constituted a representation that rock contour information was known and was more than an approximation. At trial, there was extensive testimony, offered by PCL, that URS used pre-dam construction topographic information to *estimate* the rock contours below the Parking Structure site on the contract drawings. This is clearly stated on the contract drawings. There was absolutely no "representation" that the "estimated" rock lines were created with exact soil borings. In fact, the contract contains ample information to the contrary, including a candid description of the geologic investigations conducted. The word "estimated" has a dictionary definition and there is nothing in the solicitation and the contract to suggest that the defendant was using the term in any way other than the normal, generally-understood meaning.

A critical element in the misrepresentation analysis, as discussed above, is proof of reliance. Even if representations had been made and were found to be relevant, PCL did not demonstrate that it was misled by those representations during proposal preparation or contract performance. PCL presented insufficient, credible evidence to demonstrate that it relied to its detriment upon these alleged "representations" concerning "standards of care." The project completion was delayed and redesigns did occur; however, this is not sufficient to establish a breach of contract claim. As the defendant noted, PCL did not even call its bid preparer as a witness. Instead PCL relies upon the general proposition that PCL's "reliance was manifest in PCL's bid, plan, schedule and offer of an FFP [firm fixed-price contract]." However, the court finds that this evidence is insufficient to demonstrate the actual reliance upon specific representations that is required to support a misrepresentation claim.

Moreover, prior to entering into a contract, if it required more information on the geologic investigation or design of the project, PCL certainly was free to inquire as to any information that was not already contained in the bid package, or to confirm, for instance, the meaning of the word "estimated." PCL, however, has not shown that the representations that it relies upon, such as the standard of care or the finality of the geologic investigations, were made or that they were inaccurate and detrimentally relied upon by PCL.

The relevant portions of the contract specifications do not validate PCL's arguments concerning bidders' expectations for a fixed price contract, standards of care for geologic investigations and design, reasonable numbers of errors in the plans, and industry standards for maladministration of construction contracts. Contrary to PCL's allegations, it was demonstrated at trial that both parties entered into a contract, and plaintiff signed a contract that virtually assured it that the design was imperfect and not "complete," that the precise parameters of the project would be finalized and adjusted during construction, and that PCL would be required to participate in resolution of discrepancies and omissions. Although the court has heard and examined the testimony of witnesses regarding standards of care, industry standards, and reasonable expectations, none of these subjects are addressed in PCL's contract.

First and foremost, however, to resolve this case, this court is directed by case law to examine the words of PCL's own contract agreement with USBR, and the "representations" therein. *See McAbee Constr., Inc. v. United States*, 97 F.3d at 1435. The following contract specifications are at the core of the issues raised by the plaintiff:

SECTION 00850—DRAWINGS

* * *

ADDITIONAL OR REVISED DRAWINGS: Except as otherwise provided in these specifications for drawings to be furnished by the Contractor, these specifications drawings will be supplemented by such additional or revised general and detail drawings as may be necessary or desirable as the work progresses; and the Contractor shall do no work without proper drawings and instructions. The additional or revised general and detail drawings furnished by the Government will show dimensions and details necessary for construction purposes more completely than are shown on these specifications drawings for all features of the work. The Contractor will be required to perform the work in accordance with the additional general and detail drawings or revisions furnished by the Government at the applicable prices bid in the schedule for such work.

* * *

SECTION 01030—COMMON PROVISIONS

* * *

QUALIFICATIONS

A. Contractor shall make sure that all subcontractors, as well as themselves, are fully qualified to execute work of this magnitude and complexity. Contractor shall have the resources to undertake full responsibility for all construction means, methods, techniques, sequences, procedures, and operations required by this project; as well as for providing the exceptional efforts specified for quality controls, field engineering, and coordination of all portions of the work.

B. The drawings and specifications are based upon such data which could reasonably be secured and contain design information which is customarily provided for the construction process. Extreme accuracy is not guaranteed, nor is perfection in these documents implied. The drawings illustrate the general arrangements and locations of the work; its materials, equipment, and structures. These specifications indicate the basic quality, purpose, standards, products, and controls required in the assembly, fabrication, and erection of the work. Together, these documents outline the design and engineering intent for a very complex project. Contractor shall expect that there may be some omissions, discrepancies, and conflicts within the design documents and with the actual field and construction conditions encountered. The contract therefore requires significant supervision and engineering efforts by the constructors in order to help resolve such issues when they arise.

C. Contractors must be skilled and experienced in the use and interpretation of construction plans and specifications. They must carefully review in detail these documents for this complex project to assure themselves that they understand these plans and specifications and find them clear of ambiguities and sufficient for their purposes. Further, Contractors must carefully examine the unique site of this project and by their own observations satisfy themselves as to the full nature of the work; the impact of its location; the character, quality, and quantity of materials and equipment required; the many difficulties likely to be encountered by actual field conditions and the nature of these contract documents and bidding provisions; and all other items which may affect the performance of the work. Contractors are required to organize, direct, and supervise the work with expert skills and attention, and to further provide extraordinary expertise in both shop and field engineering.

* * *

SECTION 01045—FIELD ENGINEERING COORDINATION

* * *

B. Documents:

1. The Contractor shall utilize the Contract Documents, submittals, shop drawings and layout drawings of the various trades to check and coordinate the work so that no interferences, or conflict between trades, will occur. This checking and coordination shall be performed and completed before any construction is commenced in each affected area.

2. The Contractor shall not delegate responsibility for this coordination to any subcontractor.

C. Verification and erection: The Contractor shall be responsible for all investigations, layouts, coordinations, techniques, and the determinations as may be necessary to properly fit, install and complete the Work required. Verification of the Contract data with field conditions is imperative. All measurements shall be taken from the plans and integrated with the actual construction/field conditions.

D. Discrepancies: In case of apparent error, discrepancy, omission, conflict, or obscurity in the Contract Documents; likewise for discrepant conditions encountered at the site or between submittals, the Contractor shall immediately refer the matter to the Contracting Officer for interpretation and/or clarification.

SITE CONDITIONS: All maps and drawings of existing topography were prepared by the Government for use in the design. Before beginning work, the Contractor shall compare actual site conditions and topography with the requirements of the drawings, and shall verify all existing conditions and dimensions. Should any discrepancy be found, report same immediately to the Contracting Officer before proceeding with the work. Data and information shown and indicated are as accurate as could be obtained but are not guaranteed.

\* \* \*

SECTION 01900—Geologic Investigations

H. Geotechnical considerations

2. Exploratory drilling and caisson excavation, history, and expected drilling conditions.—

a. General.—The parking structure and bridge approach shall be founded on competent bedrock utilizing caissons at specific locations. The caissons shall extend through existing fill into rock. Each caisson location shall be core drilled by the Contractor prior to caisson excavation to determine the elevation of the top of rock and the elevation of competent rock. The determination of the top of rock and competent rock elevations shall be by the Contracting Officer.

\* \* \*

c. Expected drilling conditions.— Loose sand to boulder-size material mixed randomly with manmade material is anticipated at the caisson sites. Loose, caving, natural, and manmade material including sand to boulder-size rock, batch-plant waste, concrete, grout, wire and other metal, timbers, etc., will be common. Two of Reclamation's borings destroyed bits and the hold locations had to be shifted to complete the holes. Voids and none to partial drilling fluid return will also be common and the holes may not drill straight. Casing shall be required through the fill into the rock sufficiently to advance and keep the holes open. These factors are expected to affect both the exploratory drilling and caisson construction, the extent depending on the method of drilling or excavation.

\* \* \*

SECTION 01900—Geologic Investigations

H. Geotechnical Considerations

8. Geologic considerations for construction. . . . The top of rock shown is interpreted and must be verified. Therefore, at any caisson depths not predetermined by the Government, the Contractor shall drill to the top of bedrock and core 20 feet beyond.

It is the finding of this court that the contract contained sufficient language to no-

tify the bidders that this project would not be immediately "constructible" upon award, and that continuous interaction and reevaluation with USBR would be required throughout construction. These terms were reiterated at the prebid conference which PCL attended. The solicitation described the prebid conference as having the following purpose: "[a]ll prospective bidders are encouraged to attend the prebid conference and site visit to acquaint themselves with the unique site constraints and the job requirements for this project." The prebid conference was transcribed and incorporated into an amendment to the solicitation.

PCL also has alleged that several deliberate misrepresentations were made by USBR representatives during the prebid conference. PCL alleges that there were misleading disclosures and/or nondisclosures concerning rock locations and problems with the specification drawings. According to plaintiff, it was not apparent that current data from the elevator shaft construction had not been considered, and the HLA report included "worthless" and incomplete boring data. Furthermore, USBR's intention to resolve open issues through contract changes allegedly was not disclosed.

PCL's contention that rock locations were "largely unknown" is apparently based upon a mischaracterization of the comments of Bill Green, the Project Geologist, made during the prebid conference and testimony. PCL implies that Mr. Green viewed the HLA report as "worthless" despite his testimony that does not support this allegation. In fact, Mr. Green confirmed that he believed that the data gathered from the six supplemental borings taken by USBR was adequate to answer the concerns he had previously raised in regard to the HLA report.[44]

PCL also contends that USBR failed to disclose at the prebid conference that "current data from the elevator shaft construction had not been considered by the designers . . . ." This statement is illustrative of the "misrepresentations" alleged against USBR

by PCL; however, this characterization made by plaintiff in the post-trial filings is not fully accurate. The only proof that PCL presented as to "current data" being obtained by USBR was that the condition of the elevator shaft was first recognized in September 1991, approximately two months after the prebid conference.

PCL finds fault with Mr. McCleary's recital of the common provisions section 01030, which states "[t]he drawing and specs are based upon such data which could reasonably be secured and contain design information which is customarily provided for the construction process. Extreme accuracy is not guaranteed, nor is perfection in these documents implied." Mr. McCleary continued reciting the common provision clause: "The contractor shall expect that there may be some omissions, discrepancies and conflicts within the design documents and with the actual field and construction conditions encountered."

PCL also charges USBR employees with purposefully withholding information at the prebid conference. But during the prebid conference, Mr. Delp clearly said that "[a]ll prospective bidders desiring explanation and interpretation of solicitation, drawings, specifications, et cetera must request [such explanations and interpretations], in writing, soon enough to allow a reply to reach all prospective bidders before the submission of their bids. Oral explanations, instructions given before the award of a contract will not be binding." During and after the prebid conference a total of 121 questions, including PCL's four prebid questions, were posed by prospective bidders, and were answered in writing by amendments. After a lengthy trial and numerous witnesses, whose credibility the court was able to observe, PCL has not supported its allegation that the government tried to hide information or made misrepresentations about this project.

---

44. PCL even alleges that the HLA report could not be removed from the prebid conference room to "prevent bidders from studying the report and realizing it was worthless." This leap of reasoning is contradicted by the fact that bidders, at the prebid conference, were specifically invited by Mr. Green to study the HLA report: "They [reports] are on the back table in the back room here. It might be a good idea, if you might like to take a look at them."

## II. Counts III and VI (Case No. 95–666C)

PCL asserts that the government had "superior knowledge" which was not available to PCL about the purported defects in the design. In order to prevail upon a claim of superior knowledge, a plaintiff must prove that it:

(1) ... undert[ook] to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

*Hercules, Inc. v. United States,* 24 F.3d 188, 196 (Fed.Cir.1994) (quoting *American Ship Bldg. Co. v. United States,* 228 Ct.Cl. 220, 225, 654 F.2d 75, 79 (1981)), *aff'd,* 516 U.S. 417, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996); *Petrochem Servs., Inc. v. United States,* 837 F.2d 1076, 1079 (Fed.Cir.1988). PCL ignores the express contractual provisions that clearly stated that the contract package was imperfect, that rock elevations were "estimated," that the contractor was to help identify discrepancies and omissions, and that contract drawings would be supplemented with necessary details during construction. The contract informed bidders that there were "defects" in the bid package, with discrepancies, omissions, and conflicts, and that the design would require additional detail and supplementation during construction.

PCL demonstrated or identified neither the prerequisite "vital" knowledge held by USBR, nor that a failure to disclose such knowledge affected PCL's performance. Although PCL alludes to USBR's general knowledge concerning the funding for the geologic investigation and design, PCL never identifies what relevant information USBR possessed that was not expressly disclosed in the bid package, or that was not readily apparent to any competent bidder from either a reading of the bid package or from the bidder's general experience.

The theory often advanced by PCL is that USBR considered the project design so fraught with defects that the project was unconstructible. PCL's source appears to be a document generated during USBR's ninety percent design review in 1987, four years prior to bid, in which the summary to the document contains the comment, "[c]onstructibility is questionable." The document in question is titled "Review of the Promontory Partnership 90 Percent Stage Hoover Dam Visitor Center Construction Specifications and Drawings." It raises numerous questions for consideration, suggests certain drawings are incomplete, and addresses multiple areas of concern which require attention. This review was conducted at a late stage of design, but clearly was not intended to review a final set of drawings and specifications. Moreover, PCL was not able to prove, and offered little evidence, that USBR officials ever considered the entire project, or even any significant part of it, to be "unconstructible" at any later, relevant time, such as the time of bid, during construction, or thereafter.

In addition, the government presented evidence at trial that the phrase "Clonstructibility is questionable" arose out of a specific concern that the design of "belled footings" for the caissons in one particular area of the project at the front half of the parking structure would require a difficult and potentially dangerous procedure for installation. This "Clonstructibility" issue was resolved with the substitution, prior to contract award, of "straight shaft" caissons. Nevertheless, PCL continues to reference this matter, and expands the import of these statements beyond actual significance and reasonable limits. PCL has not proven that USBR had "superior knowledge" that the drawings were "unconstructible" at the time of contract award or during performance.

More significantly, regardless of the inevitable obstacles USBR addressed during the design period, when the contract package was complete and awarded, the contract contained (1) fair disclosure that the design was neither perfect nor fully complete, and (2) contractual mechanisms to appropriately measure and compensate PCL for any actual effects caused by design changes or omissions, as well as for differing site conditions.

The USBR's belief or anticipation that design changes would be required during construction is not equivalent to "superior knowledge."

This case is distinguishable from the cases relied upon by PCL to urge that the government has a responsibility for full disclosure and to share design information with the ultimate constructor of the object designed. In fact, when courts have held as much, it has been because the government knew something about contract performance itself (i.e., something that the contractor did not and could not know). In *Helene Curtis Industries v. United States*, 160 Ct.Cl. 437, 312 F.2d 774 (1963), relied upon by PCL, the court found vital the government's unique knowledge, since it had sponsored the research, and that the "main ingredient ... was a recent invention, uncertain in reaction, and requiring extreme care in handling; that the more costly process of grinding would be necessary to meet the requirements of the specification, but that in their understandable ignorance the bidders would consider simple mixing adequate...." *Id.* at 444, 312 F.2d at 778.

The instant action is not analogous to the conscious omission in *Helene Curtis* because it has not been documented that the government had undisclosed vital knowledge concerning the construction of this project which the government deliberately withheld. In fact, it appears that PCL defeats its own claim by arguing just the opposite. For example, PCL presents a superior knowledge claim, yet argues that the government did not possess "vital" knowledge about rock contours. In reality, any lack of precision in the "estimated" geologic information, or lack of confidence with regard to the completeness of the design held by USBR, was amply communicated to PCL in the bid documents. PCL agreed in the contract to undertake performance of an imperfect construction design, with contract drawings that were to be supplemented and detailed during construction, and to assist USBR in identifying and resolving design discrepancies and omissions when they arose. Given these agreements, USBR's "knowledge" concerning specific potential imperfections, discrepancies and omis-

sions, and design problems cannot be characterized as "superior."

In addition, to the extent that PCL suggests there is significance to the fact that USBR built the Hoover Dam and has occupied the site for decades, and that this fact means that USBR possesses "superior knowledge" concerning the construction site, it is important to remember that a "critical element in the [superior knowledge] doctrine is that there must be a factual showing the government knew bidders were not in possession of the vital information and would not be able to learn about it before bidding." *Max Jordan Bauunternehmung v. United States*, 10 Cl.Ct. 672, 679 (1986), *aff'd*, 820 F.2d 1208 (Fed.Cir.1987). "The government is under no obligation to volunteer information that is reasonably accessible from another source." *Id.; see also H.N. Bailey & Assocs. v. United States*, 196 Ct.Cl. 166, 178, 449 F.2d 376, 382 (1971); *Western Empire Constructors, Inc. v. United States*, 20 Cl.Ct. 668, 673 (1990). For this reason, any argument by PCL that USBR's residence at Hoover Dam made geologic investigations the exclusive domain of USBR, and therefore "superior knowledge," fails. If PCL considered more exact precision in the "estimated" rock contours vital to their construction efforts, PCL was both permitted and obligated to conduct its own geologic investigation pursuant to the contract. *See Hardwick Bros. Co. II v. United States*, 36 Fed.Cl. 347, 413 (1996). It is apparent to the court that USBR's own statement at the prebid conference, that HLA's investigation "did not really accomplish anything in the way of bedrock definition[,]" should have been ample notice to PCL.

### III. Count V: (Case No. 95–666C)

PCL argues that USBR was legally obligated to present the bidders, in the solicitation, with a design that achieved a certain level of coordination and completeness; that USBR's design failed to achieve this level of completeness; that USBR's design was, accordingly, "severely defective;" and, therefore, that the government is liable for the extra costs PCL incurred performing the contract and assisting USBR in dealing with

the design issues that arose. This claim is presented by PCL as a breach of warranty of the contract. PCL argues that the "severe defects" in USBR's contract package breached an unwritten "warranty regarding accuracy of drawings and specifications."

PCL argues that USBR's contract design was "grossly inadequate" at the time of contract award, citing to progeny of *United States v. Spearin*, 248 U.S. 132, 54 Ct.Cl. 187, 39 S.Ct. 59, 63 L.Ed. 166 (1918), and contends that USBR "impliedly warrant[ed] that if the specifications are complied with, a satisfactory performance will result." PCL repeatedly contends that the package was severely defective and unconstructible. For example, PCL alleges that the "contract specification and drawings were grossly defective at the time of award," or that the "contract ... drawings ... were ... profoundly defective at the time of award," or even that the contract drawings were "severely defective" at the time of award. These characterizations by PCL, however, are contradicted by the simple fact that ten bidders submitted bids for this project and none of them identified "severe," "profound" or "gross" defects.

All ten bidders, including PCL, were provided the opportunity to question USBR if serious errors, or lack of coordination or completeness was identified. They also had the option of not bidding at all if any "profound" defects were found in their bid preparation process, and all bidders were invited to visit the site to assess the logistics of the project and to examine how the structures would be physically located upon the site.

PCL cannot credibly argue that "severe defects" existed in the bid package, when PCL appears to have been unable to detect them and did not identify them prior to entering into the contract. Instead, it is more appropriate to conclude, based on the information available, that any defects, discrepancies, omissions and conflicts which arose during construction were in fact predicted in the contract and otherwise were events typical to every construction project. Moreover, if severe defects did exist, PCL was legally obligated to identify them to USBR and, having failed to do so, plaintiff is precluded from prevailing in this litigation, as a matter of law. *See Allied Contractors, Inc. v. United States*, 180 Ct.Cl. 1057, 1064, 381 F.2d 995, 1000 (1967).

The warranty of government specifications, also sometimes referred to as the "*Spearin* doctrine," provides that if the government furnishes specifications for the production or construction of an end product and proper application of those specifications does not result in a satisfactory end product, the contractor will be compensated for its efforts to produce the end product, notwithstanding the unsatisfactory results. *United States v. Spearin*, 248 U.S. at 136–37, 39 S.Ct. 59; *see Hercules, Inc. v. United States*, 516 U.S. 417, 424–25, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996). PCL's focus on the performance of the contractor appears to try to expand the *Spearin* doctrine, which focuses on the final product of the contract, rather than on the contractor's performance. It is established in government contract law that the government warrants the performability of the design specifications it issues. *See Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed.Cir.1987); *Neal & Co., Inc. v. United States*, 36 Fed.Cl. 600, 627 (1996) (citing *United States v. Spearin*, 248 U.S. at 136–37, 39 S.Ct. 59; *Blount Bros. Corp. v. United States*, 872 F.2d 1003, 1007 (Fed.Cir.1989); *Hol–Gar Mfg. Corp. v. United States*, 175 Ct.Cl. at 525, 360 F.2d at 638). The United States Supreme Court fostered this basic precept by stating in *Spearin* that "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." *United States v. Spearin*, 248 U.S. at 136, 39 S.Ct. 59 (citations omitted). "Detailed design specifications contain an implied warranty that if they are followed, an acceptable result will be produced." *Stuyvesant Dredging Co. v. United States*, 834 F.2d at 1582 (citing *United States v. Spearin*, 248 U.S. at 132, 39 S.Ct. 59); *see also Neal & Co., Inc. v. United States*, 36 Fed.Cl. at 627 (citing *Ehlers–Noll, GmbH v. United States*, 34 Fed.Cl. 494, 499 (1995) (quoting *T.L. Roof & Assocs. Constr. Co. v. United States*, 28 Fed.Cl. 572, 578 (1993))).

■ The doctrine of an implied warranty for government design specifications, promulgated in *United States v. Spearin,* has been further defined by the United States Court of Appeals for the Federal Circuit:

> *Spearin* stands for the proposition that when the government includes detailed specifications in a contract, it impliedly warrants that (i) if the contractor follows those specifications, the resultant product will not be defective or unsafe, and (ii) if the resultant product proves defective or unsafe, the contractor will not be liable for the consequences. *Spearin,* 248 U.S. at 136–37, 39 S.Ct. at 61. As with any contract-based claim, however, to recover for breach of warranty, a plaintiff must allege and prove (1) that a valid warranty existed, (2) the warranty was breached, and (3) plaintiff's damages were caused by the breach. *San Carlos Irrig. and Drainage Dist. v. United States,* 877 F.2d 957, 959 (Fed.Cir.1989); accord *Wunderlich Contracting Co. v. United States,* 351 F.2d 956, 968, 173 Ct.Cl. 180[, 199] (1965) (stating that a plaintiff asserting a claim for breach of an implied warranty of specifications has the "burden of establishing the fundamental facts of liability, causation, and resultant injury."). . . . [T]he implied warranty of specifications covers problems arising after performance of the underlying contract. *See Poorvu v. United States,* 420 F.2d 993, 190 Ct.Cl. 640 (1970).

*Hercules, Inc. v. United States,* 24 F.3d at 197.

■ It is also well-established that a contractor cannot prevail by showing that the specifications were less complete than it would have preferred. The courts and boards of contract appeals have repeatedly rejected the notion that the government is liable for difficulties encountered by a contractor because performance specifications supplied by the government were insufficiently detailed to enable the contractor to perform the contract in an efficient or profitable manner. *See, e.g., Sylvania Elec. Prods., Inc. v. United States,* 198 Ct.Cl. 106, 115–17, 458 F.2d 994, 999–1000 (1972); *Shuey Aircraft, Inc. v. United States,* 3 Cl. Ct. 243, 244–45 (1983); *Northwest Marine,*

*Inc.,* A.S.B.C.A. No. 43502, 94–1 B.C.A. (CCH) ¶ 26,521 at 131,998–99 (1993), *recon. denied,* 94–2 B.C.A. (CCH) ¶ 26,798 at 133,-262–63 (1994); *Service Eng'g Co.,* A.S.B.C.A. No. 40273, 92–3 B.C.A. (CCH) ¶ 25,122 at 125,240–41 (1992).

■ The *Spearin* doctrine has been discussed and clarified over the years, often with the words "design" and "performance" specifications used to differentiate between contracts for which the specifications warranty does and does not apply. *See Stuyvesant Dredging Co. v. United States,* 834 F.2d at 1582; *J.D. Hedin Constr. Co. v. United States,* 171 Ct.Cl. 70, 76–77, 347 F.2d 235, 241 (1965); *Utility Contractors, Inc. v. United States,* 8 Cl.Ct. 42, 50–51 (1985), *aff'd,* 790 F.2d 90 (Fed.Cir.), *cert. denied,* 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 53 (1986). The warranty applies only to "design specifications" because only by utilizing specifications in that category does the government deny the contractor's discretion and require that work be done in a certain way. When the government imposes such a requirement and the contractor complies, the government is bound to accept what its requirements produce. "Design specifications explicitly state how the contract is to be performed and permit no deviations. Performance specifications, on the other hand, specify the results to be obtained, and leave it to the contractor to determine how to achieve those results." *Stuyvesant Dredging Co. v. United States,* 834 F.2d at 1582.

Thus, whether the specifications in the instant action were design or performance specifications is critically important for an understanding of the existence of any "warranty" claims and the parties' respective rights and obligations. The United States Court of Appeals for the Federal Circuit spoke to this issue, as follows:

> Performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection." . . . Design specifications, on the other hand, describe in precise detail the materials to be

employed and the manner in which the work is to be performed. The contractor has no discretion to deviate from the specifications, but is "required to follow them as one would a road map."

*Blake Constr., Co. v. United States,* 987 F.2d 743, 745 (Fed.Cir.) (quoting *J.L. Simmons Co. v. United States,* 188 Ct.Cl. 684, 412 F.2d 1360 (1969)), *cert. denied,* 510 U.S. 963, 114 S.Ct. 438, 126 L.Ed.2d 372 (1993).

Many government specifications, however, include both design and performance provisions. *Blake Constr. Co. v. United States,* 987 F.2d at 746. Thus, when a contractor alleges a violation of the *Spearin* warranty, it is helpful to identify the specific provisions at issue in light of the contractor's allegations; determine if these provisions are performance specifications (for which the contractor had discretion to determine how to perform), or design specifications (for which the contractor had no such discretion); and then determine if the problems alleged by the contractor were caused by the design specifications, or by factors unrelated to whether the specification was impossible to perform (such as the way the contractor exercised its discretion under the performance specifications, in terms of allocation of resources, scheduling or management.) *See id.; Dillingham Constr., N.A., Inc. v. United States,* 33 Fed.Cl. 495, 500–02 (1995), *aff'd,* 91 F.3d 167 (Fed.Cir.1996) (table); *Concrete Placing Co. v. United States,* 25 Cl.Ct. 369, 374–76, *aff'd,* 985 F.2d 585 (Fed.Cir.1992) (table); *Aleutian Constructors v. United States,* 24 Cl.Ct. 372, 378–81 (1991); *Transtechnology Corp. v. United States,* 22 Cl.Ct. 349, 367–69 (1990); *Norwood Mfg., Inc. v. United States,* 21 Cl.Ct. 300, 308–09 (1990), *aff'd,* 930 F.2d 38 (Fed.Cir.1991) (table).

 As the United States Court of Appeals for the Federal Circuit has noted, contractors typically are granted at least some discretion even when specifications are largely of the design variety, and the labels "design" and "performance," while helpful to some degree, are merely labels. It is the contract's provisions, and the amount of discretion that the contract affords the contractor that govern whether the contractor can recover for problems that occurred during performance. *See Blake Constr. Co. v. United States,* 987 F.2d at 746. The fact the specifications provided some details concerning how the work was to be performed does not convert what would otherwise be a performance specification into a design specification. *See, e.g., Penguin Indus., Inc. v. United States,* 209 Ct.Cl. 121, 123–25, 530 F.2d 934, 937 (1976) (noting that the specifications were "detailed"); *Aleutian Constructors v. United States,* 24 Cl.Ct. at 390; *Norwood Mfg., Inc. v. United States,* 21 Cl.Ct. at 308–09.

 Thus, where a specification does not tell a contractor how to perform a specific task, that part of the specifications can be a performance specification even if the rest of the specifications are design specifications. *See Penguin Indus., Inc. v. United States,* 209 Ct.Cl. at 123–25, 530 F.2d at 937. In *Penguin,* the contractor argued that the specifications were design specifications and that they were defective because they failed to explain how two components were to be glued together. The United States Court of Claims rejected this notion and upheld the termination for default, stating that "selection of the method of applying the glue was left to the manufacturer" and that, accordingly, the government's "data package was not defective...." *Id.* at 124–25, 530 F.2d at 936. In comparison to the current action, the facts in *Penguin* were much more favorable for the contractor, as the contract was a straight-forward supply contract for a simple device without the necessity for a process of interaction between Penguin and the government during performance. PCL's contract, however, was for the construction of complex buildings at a challenging and unique site and the contract explicitly provided that the design intent would be further developed, adjusted, and/or completed during construction.

 It is evident to the court that the portions of PCL's contract at issue were performance specifications, or a mix of design and performance specifications, but not exclusively design specifications, which carry with them an actionable implied warranty. The contract required PCL to perform some design work itself including permanent fea-

tures such as the theater turntable in the visitor center. Many specification and drawing provisions demonstrate that PCL was permitted and expected to exercise its discretion and judgment in designing and building substantial portions of the project. For example, the contract states:

Contractor shall have the resources to undertake full responsibility for all construction means, methods, techniques, sequences, procedures, and operations required by this project; as well as for providing the exceptional efforts specified for quality controls, field engineering, and coordination of all portions of the work.

The specifications should have conveyed to any experienced bidder that the contractor would exercise considerable discretion in the construction of this project.

PCL continually refers to what it calls "the [Firm Fixed Price] FFP, build-to-design" contract, and alleges that the Invitation for Bids did not indicate that the "design was incomplete" or the "engineering was incomplete." In fact, PCL was contractually responsible for the design and/or engineering of significant portions and elements of the work. For example, the defendant provided a comprehensive list to the contractor of design and engineering obligations in the contract:

1. The Common Provisions of the contract, section 01030, specify the general requirements for engineering and designs to be performed by the contractor.

2. The Field Engineering section of the contract, section 01045, specifies the requirements for coordination, integration, interference checks, and rearrangements to be performed by the contractor.

3. The Submittals section of the contract, section 01340, covers the requirements for certain submittals which were to be certified by a registered professional, including signing and sealing of designs.

4. Concrete formwork and falsework (Section 03100) were to be designed by PCL.

5. Shop drawings for concrete reinforcement (Section 03200) were to be prepared under seal of a registered professional structural engineer.

6. PCL was required to design and engineer the precast structural concrete units, including the precast, prestressed concrete box girders for the roadway bridge, and the precast concrete architectural wall panels for the visitor center.

7. PCL was required to design the metal floor and roof decks (Section 05320) at the visitor center.

8. PCL was required to design and engineer the prefabricated steel stairs (Section 05512) at the visitor center and parking structure.

9. PCL was responsible for the engineering of the handrails and railings (Section 05520) at the visitor center and parking structure.

10. PCL was required to prepare the structural design and engineering calculations for the prefabricated spiral stair (Section 05715)at the visitor center.

11. PCL was responsible for the design of the metal roofing and siding (Section 07615) at the visitor center.

12. PCL was required to design the metal framed skylights (Section 07820) at the visitor center.

13. PCL was responsible for the design of the overhead coiling doors (Section 08331) at the visitor center and parking structure.

14. PCL was responsible for the design of the monumental bronze entrances (Section 08440) at the visitor center.

15. PCL was required to design the glass and glazing (Section 08800) at both the visitor center and the parking structure.

16. PCL was responsible for the design and engineering of the glazed curtain walls (Section 08900) at both the visitor center and the parking structure.

17. PCL was required to design and engineer the glass-fiber reinforced cement (Section 09545) prefabricated column covers at the visitor center.

18. PCL was required to design and engineer the copper spire and lantern (Section 10340) on the top of the elevator tower at the visitor center.

19. PCL was responsible for the design and engineering of the window washing equipment (Section 11010) for the visitor center.

20. PCL was required to design and engineer the entire theater turntable system (Section 14700).

21. Section 15500 of the contract provided the contractor the option to design its own fire sprinkler and standpipe systems (Section 15500), rather than utilizing the design included in the contract. PCL elected to re-calculate the entire system in accordance with the specified design criteria.

22. PCL was responsible for the design and implementation of the retained excavations required under RSN D2. This work included the retained excavation required at the west transmission tower at the parking structure.

It is apparent to the court from the contract requirements outlined above that the contract never contemplated that PCL's performance could be accomplished using only the contract documents. The contract required that PCL also use numerous types of drawings and data prepared by its own forces, including coordination layout drawings, concrete placement drawings, concrete reinforcement drawings, various types of submittals including its own designs, shop drawings and layout drawings of all crafts.

In addition, the plain terms of the contract expressly provided that PCL also agreed to provide "significant supervision and engineering efforts" to assist USBR in resolving design discrepancies and omissions when they occurred. Thus, PCL promised that its construction efforts would include its own scheduling, its own submittal preparation, and its own "engineering efforts" to address design problems as they occurred. It was demonstrated at trial that the Visitor Center and Parking Structure design included in the solicitation had achieved a level of coordination and completeness, but not to the extent that PCL appears to allege it required in retrospect. In, fact the contract expressly provided that the design package conveyed only the "design and engineering intent" for the project, and that the design drawings would be supplemented and detailed as necessary to construct the final product. Thus, the contract allocated a substantial amount of discretion and responsibility to PCL to participate in resolving design problems. The contract also stated performance goals that PCL was to meet, and did not tell PCL the methods or processes to use to achieve the specified end result. Indeed, it is evident that the drawings do not contain the level of detail necessary to actually construct the project in the field. It was up to PCL to provide the precise details of how the structures were to be built (including, but not limited to, the precise routing of electrical and mechanical systems, the number and locations of individual concrete pours, the sequence of construction activities, and details of all concrete reinforcement.)

There were numerous decisions for PCL to make that required the exercise of discretion, based upon judgment and experience. "[D]esign specifications are explicit, unquestionable specifications which tell the contractor exactly how the contract is to be performed...." *Utility Contractors, Inc. v. United States*, 8 Cl.Ct. at 50–51. When, however, as in PCL's contract, "the contractor was to use its own judgment and experience in deciding how, when, where, [and] under what conditions" to perform the contract, the specifications are performance specifications. *Id.* at 51. A cursory review of USBR's specifications and drawings demonstrates that USBR did not provide a "road map" in its Invitation for Bids and contract documents telling PCL exactly how to perform the contract. Thus, the contract contained largely performance specifications. Consequently, notwithstanding PCL's frequent use of the terms "warranty" and "build to design," and its expert's concentration on "standards of care," plaintiff did not substantiate its theory that the contract was a design specification. Therefore, PCL cannot claim, and cannot recover, under a breach of warranty theory.

■ Contrary to PCL's assertions that USBR's fixed price contract carried with it assurances regarding the "standards of care" used to design the project and the degree of certainty which was implied by the term "estimated" in the drawings, there can be no

doubt that PCL assumed substantial risk pursuant to the contract, especially because the contract was largely a performance specification and it was indicated regarding the design provided that supplementation was required. Although this contract, along with any contract that contains a changes and differing site conditions clause, whether fixed-price or not, guaranteed PCL that it would be compensated for costs incurred as a result of government-directed contract changes and, for example, for material differences between the subsurface conditions depicted in the contract and encountered in the field, it is well-established that "[a]bsent unusual circumstances a 'fixed-price contractor . . . shoulders the responsibility for unexpected losses, as well as for his failure to appreciate the problems of the undertaking. . . .' " *Sperry Rand Corp. v. United States*, 201 Ct.Cl. 169, 181, 475 F.2d 1168, 1175 (1973) (quoting *Macke Co. v. United States*, 199 Ct.Cl. 552, 561, 467 F.2d 1323 (1972)); *accord, e.g., United States v. Spearin*, 248 U.S. at 136, 39 S.Ct. 59; *McNamara Constr., Ltd. v. United States*, 206 Ct.Cl. at 8–12, 509 F.2d at 1169–70; *Davies Precision Machining, Inc. v. United States*, 35 Fed.Cl. 651, 670 (1996).

■■■ This contract required the successful awardee to construct a complex set of structures in a logistically difficult site in a relatively short period of time. PCL knew this, or should have known this, when it submitted its proposal, and recognized that this project was going to be challenging. It, therefore, should have been evident to PCL that its proposal preparation demanded an especially careful evaluation of the solicitation. As the United States Court of Claims noted in *American Ship Building Co. v. United States*, 228 Ct.Cl. at 224, 654 F.2d at 78, "One expects a contractor would examine the specifications provided to determine the complexity of the contract and make inquiries where necessary in light of its own capabilities. The contractor would then make a business judgment in deciding whether it could com-

plete the contract by the due date." The same court also stated:

> Perhaps plaintiff wished the government had prominently displayed in the invitation to bid a proviso that "only knowledgeable and experienced contractors need apply." It is, however, reasonable for the government to assume that a contractor is the best judge of its competency and will exercise good judgment in deciding to bid on a contract.

*Id.* at 226, 654 F.2d at 79; *accord Lopez v. A.C. & S., Inc.*, 858 F.2d 712, 717 (Fed.Cir. 1988) ("[T]he government is entitled to presume that one who bids on a government invitation knows his own capabilities and has ascertained he will be able to produce, and at what cost. . . ."), *cert. denied sub nom., Eagle–Picher Indus., Inc. v. United States*, 491 U.S. 904, 109 S.Ct. 3185, 105 L.Ed.2d 694 (1989); *Crouse–Hinds Sepco Corp.*, D.O.T.C.A.B. Nos. 1027, 1112, 82–2 B.C.A. (CCH) ¶ 15,865 at 78,691, *recons. denied*, 83–1 B.C.A. (CCH) ¶ 16,136 (1982), *aff'd*, 714 F.2d 161 (Fed.Cir.1983) (table). PCL is an experienced construction contractor. PCL cannot be allowed to argue that a lack of experience working on federal government contracts or working for USBR uniquely impacted its ability to prepare a well-informed bid. Moreover, this assertion provides no grounds for relief, as "[a] Government contractor, regardless of its size, locality or experience, is bound to understand the complexities and consequences of its undertaking." *Tony Downs Foods Co. v. United States*, 209 Ct.Cl. 31, 42–43, 530 F.2d 367, 374 (1976); *accord American Ship Bldg. Co. v. United States*, 228 Ct.Cl. at 224–26, 654 F.2d at 78–80; *Hardwick Bros. Co. II v. United States*, 36 Fed.Cl. 347, 379, 394–95, 412–13 (1996); *Servidone Constr. Corp. v. United States*, 19 Cl.Ct. 346, 373–74 (1990), *aff'd*, 931 F.2d 860 (Fed.Cir.1991); *Intercontinental Mfg. Co. v. United States*, 4 Cl.Ct. 591, 599–600 (1984).

Thus, with regard to whether USBR's design was defective,[45] and not as detailed and complete as PCL would have preferred, the

---

**45.** Despite PCL's repeated use of the phrase "severely defective" to describe the entire contract package, plaintiff has failed to identify more than a few items in the drawings that were inaccurate at the time the contract was bid. The bulk of these constituted inaccuracies in an estimated rock line.

level of detail and completeness was readily ascertainable by a bidder performing a detailed bid estimate, as PCL did. Therefore, PCL "took a calculated risk, the unfortunate consequence of which it must now bear alone." *Natus Corp. v. United States,* 178 Ct.Cl. 1, 12, 371 F.2d 450, 457 (1967); *accord, e.g., Dot Sys., Inc. v. United States,* 231 Ct.Cl. 765, 768, 1982 WL 25218 (1982).

Here, PCL's contractual responsibilities included coordinating and implementing a large array of tasks related to the construction of the project, the preparation of a large number of contract submissions and schedules, documentation of construction activities, oversight and inspection, and quality control to ensure that its work was contractually compliant. PCL was obligated to perform these activities at a complex and difficult site within a specified time frame. Moreover, PCL was explicitly informed that its obligations would be governed by a contract package containing estimated information, that the contract package was imperfect, and that the contract package would be supplemented and refined as necessary during construction. All of these facts were fully disclosed to PCL during the bid preparation period in USBR's specifications and drawings that were part of the solicitation, and these facts were reiterated for all bidders at USBR's prebid conference. After reviewing the extensive evidence presented at trial through the witnesses and the voluminous exhibits, the court finds that the plaintiff's claim for breach of warranty is unsupported.

## IV. Count VII: (Case No. 95-666C)

PCL also presents a "breach of contract" claim based upon USBR's alleged hindrance of PCL's construction progress. This requires PCL to prove that USBR did, in fact, "hinder" PCL's ability to finish the project by PCL's planned completion date. Pursuant to the contract as awarded, the Visitor Center was to be completed on July 15, 1993, and the Parking Structure on February 15, 1994. In its certified claim, PCL made no explicit claim for delay in light of its request for a total cost recovery and its assignment of blame for all of its delays to USBR. PCL, therefore, did not show a cause and effect relationship between USBR's contract changes and PCL's increased costs.

PCL claims that USBR is responsible for all of PCL's project delay, or the approximately twenty-three month period that represents the difference between the original contract completion date and the date of substantial completion.[46] In short, PCL's hindrance/delay claim is presented as a total cost claim. PCL has not presented an analysis to demonstrate that delays it encountered were due to government hindrance or that, in fact, such hindrance extended project completion, because PCL apparently has not performed and certainly has presented no in-depth critical path analysis.[47]

PCL has never submitted a detailed delay/impact claim to the court. PCL has argued that a delay analysis of this project is either unnecessary, impossible, or not relevant, but that the government caused

---

**46.** This is refuted, or at least rebutted (and then not countered by PCL), by the defendant's schedule analysis that was performed on this job and shared with PCL prior to when PCL certified that USBR was responsible for all project delays. The defendant's analysis indicates that USBR is responsible for somewhat more than three months of PCL's project delay. It is also in direct conflict with PCL's own delay analysis, which indicates that USBR was responsible for all project delay. Throughout the case, the defendant has not denied that it owes plaintiff money for project delays caused by delays to the work, however the defendant has vehemently maintained that it is not responsible for all plaintiff's alleged damages due to delay.

**47.** For example, during the trial, PCL either did not establish the effects, if any, of USBR's design

change at the vehicle ramp. The testimony indicated that the vehicle ramp changes were not substantial in terms of cost, and that there may not have been any delay to PCL's completion of the project. Rather than confront these issues, PCL has offered unsupported allegations of a "vague and unbuildable" design and "perturbation" to other aspects of the work. This begs the question, however, because the government cannot be found liable for breach of contract arising in whole or in part out of the vehicle ramp changes if they did not cause meaningful impact on PCL's construction operation. PCL's failure of such specific proof precludes a finding of breach of contract because plaintiff has not offered the court a means to isolate relevant, government-caused delays. *Servidone Constr. Corp. v. United States,* 19 Cl.Ct. at 373-74.

delays are part of their claims of "severely defective" drawings, cardinal change, hindrance, and breach of contract. The government has a duty not to act in a way that will hinder or delay the contractor's performance. *Malone v. United States*, 849 F.2d 1441, 1445 (Fcd.Cir.1988); *SMS Data Prods. Group, Inc. v. United States*, 17 Cl.Ct. 1, 6 (1989) ("The Government has an implied obligation to refrain from willfully or negligently interfering with a contractor's performance."). In order for the government to be found liable for hindrance, however, a plaintiff must demonstrate that the government caused the plaintiff a compensable injury. *See Servidone Constr. Corp. v. United States*, 931 F.2d at 861; *Boyajian v. United States*, 191 Ct.Cl. 233, 239–47, 423 F.2d 1231, 1235 (1970). The government cannot be held liable for breach of contract, or any other related or unrelated cause of action that relies upon "severe defects" in the contract drawings, cardinal changes to the contract, or government hindrance of performance, unless and until PCL proves that the alleged defects, changes, or hindrance had an impeding effect upon PCL's construction operation. PCL failed to offer such proof at trial.

▪ In order to recover for an alleged compensable delay, whether or not the delay is caused by hindrance, a contractor must demonstrate: (1) the extent of the delay with a reasonable degree of accuracy; (2) that the delay proximately was caused solely by the government's actions; and (3) that the delay caused specific, quantifiable injury to the contractor. *See Servidone Constr. Corp. v. United States*, 931 F.2d at 861; *see also William F. Klingensmith, Inc. v. United States*, 731 F.2d 805, 809 (Fed.Cir.1984); *Blinderman Constr. Co. v. United States*, 695 F.2d 552, 559 (Fed.Cir.1982). The burden of establishing these factors falls squarely upon the contractor. *William F. Klingensmith, Inc. v. United States*, 731 F.2d at 809; *Avedon Corp. v. United States*, 15 Cl.Ct. 648, 653 (1988). Moreover, "[o]nly if the delay was caused *solely* by the government will the contractor be entitled to both an extension of time within which to perform, and recovery of excess costs associated with the delay." *Weaver–Bailey Contractors, Inc. v. United States*, 19 Cl.Ct. 474, 476 (1990) (emphasis in original) (citing *William F. Klingensmith, Inc. v. United States*, 731 F.2d at 809), *reconsid. denied*, 20 Cl.Ct. 158 (1990); *G.M. Shupe, Inc. v. United States*, 5 Cl.Ct. 662, 700 (1984); *see also Blinderman Constr. Co. v. United States*, 695 F.2d at 559. The contractor must show that the government was the "sole proximate cause" of the delay and that no concurrent cause would have equally delayed the contract, regardless of the government's action or inaction. *Merritt–Chapman & Scott Corp. v. United States*, 208 Ct.Cl. 639, 650, 528 F.2d 1392, 1397–98 (1976); *Avedon Corp. v. United States*, 15 Cl.Ct. at 653, 659 (recovery denied "because concurrent delays rendered the [government-caused] delay ... irrelevant"). Moreover, "the court [will] award delay damages only for the unreasonable portion of a government-caused delay." *Mega Constr. Co., Inc. v. United States*, 29 Fed.Cl. 396, 425 (1993) (quoting *Wilner v. United States*, 26 Cl.Ct. 260, 263 (1992), *rev'd on other grounds*, 24 F.3d 1397 (Fed.Cir.1994) (en banc)).

▪ If both parties contribute to a delay, neither can recover damages from the other, "unless there is in the proof a clear apportionment of the delay and expense attributable to each party." *William F. Klingensmith, Inc. v. United States*, 731 F.2d at 809 (quoting *Blinderman Constr. Co. v. United States*, 695 F.2d at 559).

▪ One established way to document delay is through the use of Critical Path Method (CPM) schedules and an analysis of the effects, if any, of government-caused events upon the critical path of the project. However, in order to properly demonstrate delay to a project, the CPM schedule must be kept current to reflect any delays as they occur. *Fortec Constructors v. United States*, 8 Cl.Ct. 490, 505 (1985), *aff'd*, 804 F.2d 141 (Fed.Cir.1986). "The required nexus between the government delay and a contractor's failure to complete performance at some unspecified earlier date cannot be shown merely by hypothetical, after-the-fact projection." *Interstate Gen. Gov't Contractors, Inc. v. West*, 12 F.3d 1053, 1060 (Fed.Cir. 1993). Part of understanding that an activity belongs on the critical path of a project is

**802**

also an understanding of how that activity affects the other activities. *Wilner v. United States*, 26 Cl.Ct. at 262–63; *see Mega Constr. Co., Inc. v. United States*, 29 Fed.Cl. at 424. PCL never provided USBR or this court with a critical path analysis of the alleged government-caused hindrance and its effect upon the critical path of this project. Indeed, PCL appears never to have prepared, and certainly never to have offered, a legitimate critical path analysis, and has even chosen to reject and to ignore the "summary-level delay analysis" by Peterson Consulting that it did have prepared. "A general statement that disruption or impact occurred, absent any showing through use of updated CPM schedules, Logs or credible and specific data or testimony, will not suffice to meet the plaintiff's burden." *Preston–Brady, Co., Inc.,* V.A.B.C.A. Nos. 1892, 1991, 2555, 87–1 B.C.A. (CCH) ¶ 19,649 at 99,520 (1987).

■ PCL alleges a breach of contract claim and not a delay claim. Although breach of contract claims and delay claims are distinct, the type of proof required to establish either claim based upon government "hindrance" and "perturbations" includes much similar evidence, otherwise contractors could avoid the admittedly demanding burden of proof for delay claims by simply arguing "hindrance" resulting in easy and numerous breach of contract claims. In the present case, the testimony

at trial by USBR employees and the government's expert sufficiently rebutted the plaintiff's hindrance and breach of contract case. Although Mr. Caruso's testimony was considered sufficient to rebut the plaintiff's allegations of hindrance to the extent of breach of contract,[48] the specifics as to the amount of delay were not embraced in total by the court based on the testimony and evidence offered. Nor does the court need to reach such a conclusion for the purposes of this opinion.

The expert reports and the fact witness did demonstrate to the court that there was some hindrance by the government, but also that there was culpability for delay on the part of PCL. The fact that PCL has neglected this conclusion undermines its breach of contract claim, which states "through no fault of PCL, the facilities were not complete until May 11, 1995, at a cost to PCL of more than $61,000,000." At trial, the government presented ample evidence of PCL's own errors and delays to demonstrate the error in PCL's argument that all of its performance problems were attributable to the government, and to demonstrate the fact that PCL committed a number of errors on the job that impacted its work.[49]

For example, at the Visitor Center, quite a number of column foundations required additional work to correct PCL's errors in over excavation, top-of-concrete elevations, and/or

---

48. The court does note that the significance of Mr. Caruso's report was its ability to cohesively tie together events in a manner that rebutted the plaintiff's case. There were flaws in the report that were demonstrated by the plaintiff, yet, there was ample evidence presented to suggest PCL had not suffered a delay or hindrance to the extent of a breach of contract at the hands of USBR. This conclusion was also established by the other USBR, and even PCL, fact witnesses in the case who were present on the site during construction. In other words, the testimony at trial of fact witnesses buttressed the analysis and conclusions of the defendant's expert report; however, the absolute conclusions are not adopted by the court and are reserved for any claim that PCL may elect to bring for a delay claim. Moreover, Mr. Barba's testimony as an "independent expert" was of minimal impact and significance to the court, because of the relationship between Mr. Caruso and Mr. Barba and in part because the court did not elect to adopt in whole the findings of Mr. Caruso's re-

port. PCL suggests that Mr. Caruso's "methodology" in performing his analysis did not measure "disruption" (that is, the effect of contract changes or delay upon work that did not affect project completion.) However, even if PCL's criticisms are valid, PCL's records simply do not substantiate any appreciable amount of government-caused disruption because the plaintiff did not prepare a disruption analysis.

49. There also was evidence presented that, in addition to specific errors and problems that PCL caused itself, PCL had management problems which contributed to PCL's own difficulties. Throughout the project, PCL continually made major changes in District Offices responsible for the project, Vice Presidents in charge, Project Managers, Field Superintendents, and responsible engineering and supervision personnel. There also is some evidence in the record that dissatisfaction of PCL's workmen and PCL's supervisors was a major problem and of serious concern to PCL management.

alignment of anchor bolts for the structural steel columns. In addition, structural steel at the Visitor Center was erected in violation of the tolerances specified in the contract. This required additional time and cost to perform corrective work on the structural steel building frame. Moreover, after over excavating rock at the mechanical level of the Visitor Center, PCL was forced to perform corrective work before completing the mechanical level concrete. In March and April, 1992, PCL experienced additional delays at the Visitor Center which exceeded one month in duration. These were caused by PCL's blasting damage to its temporary bridge abutment.

At the Parking Structure, PCL excavated and constructed the caisson at building line intersection 10–G.4, almost a foot away from the required centerline location, thereby forcing PCL to incur additional costs in performing corrective work to remedy the error, which was caused by PCL's poor surveying. PCL also incurred additional costs and time resulting from an incident in which a PCL crane encroached upon a high-voltage transmission line at the parking structure, nearly killing two workmen. Furthermore, PCL had to take corrective action to bring its caisson subcontractor Anderson Drilling's operations into compliance with the safety requirements of the contract. PCL incurred additional costs and time due to this temporary shut-down of the subcontractor's operations. As was also demonstrated at trial, PCL incurred about a month of delay and additional costs resulting from the catastrophic failure of PCL's falsework supporting the first parking structure Level 3A suspended deck concrete placement. PCL was required by the contract to construct and obtain government approval of the Parking Structure "mock-up" prior to placing any architectural exposed concrete at the Parking Structure, however, PCL did not produce an approved mock-up until early in 1993.

PCL made a large number of submittals during the job which were not in conformance with the contract requirements, and, accordingly, were rejected by USBR. In addition, PCL incurred additional time and cost as a result of concrete placements which did not conform to the tolerances contained in the contract. For these placements, some of PCL's reinforcing steel shop drawings and other types of shop drawings were rejected by the government as being of unacceptable quality. Moreover, PCL did not effectively begin its submittal of concrete placement drawings until December of 1992, over a year into the job.

Furthermore, on November 29, 1994, PCL prepared an internal document that substantiated ten separate delays incurred by PCL due to its structural steel erection subcontractor, J. Wallace Enterprises, none of which are attributable to any action or inaction of the government. PCL determined that these contractor-caused delays amounted to 182 calendar days of lost time at the Visitor Center. Some of PCL's subcontractors are also of the opinion that PCL, and not the government, was responsible for some of their delays. As of February 28, 1992, McCaw's Drilling USA, Inc., PCL's second-tier excavation subcontractor, determined that actions and/or inactions of PCL, and not the government, had delayed McCaw's excavations work by fifty-three working days.

Ultimately, PCL's Request for Equitable Adjustment (REA) is also inconsistent with PCL's allegation that all project delays were USBR's fault. The REA applied to the period from notice to proceed, October 22, 1991, to August 2, 1993, a period of 640 calendar days. For these 640 calendar days, PCL alleges that USBR caused delays of 363 calendar days for the parking structure and 205 calendar days for the visitor center. This leaves respective balances of 277 and 435 days of delay, which, even under PCL's REA, were not the government's fault. Moreover, PCL's "Summary Level Schedule Analysis," which was prepared for PCL in June 1995, concludes that PCL is responsible for three months of project delay.

PCL also failed to complete the Close-Out provisions of the contract and left the job in September, 1995, with contract work and punchlist work unperformed. PCL notified the government in November 1995 that it would perform no further work related to the contract.

In sum, PCL did not demonstrate that its project delay was caused exclusively or even predominantly by the government, nor did PCL distinguish between government and contractor caused delay. In the absence of this proof, USBR cannot be held liable for delay/impact costs, for "hindering" PCL, and therefore for "breach of contract" related to PCL's additional time performing the project.

## V. Count VIII (Case NO. 95–666C)

PCL asserts in Count VIII that USBR's imposition of a series of contract changes amounted to a "cardinal change" to PCL's contract. PCL asserts that it is entitled to relief because there was a change in its "means and methods" of building virtually the exact same structures as designed and that, therefore, USBR precluded PCL from using the means and methods that PCL reasonably and originally anticipated for contract performance.

 It is well-settled that a cardinal change "occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for." *AT & T Communications, Inc. v. WilTel, Inc.,* 1 F.3d 1201, 1205 (Fed.Cir.1993) (quoting *Allied Materials & Equip. Co. v. United States,* 215 Ct.Cl. 406, 569 F.2d 562, 563–65 (1978)); *accord S.J. Groves & Sons Co. v. United States,* 228 Ct.Cl. 598, 602, 661 F.2d 170, 173 (1981); *Air–A–Plane Corp. v. United States,* 187 Ct. Cl. 269, 275, 408 F.2d 1030, 1033 (1969). Consequently, a "[p]laintiff has no right to complain if the project it ultimately constructed was essentially the same as the one it contracted to construct." *Aragona Constr. Co. v. United States,* 165 Ct.Cl. 382, 391, 1964 WL 8634 (1964). This doctrine is created " 'to provide a breach remedy for contractors who are directed by the government to perform work which is not within the general scope of the contract' " and exceeds the scope of the contract's changes clause. *General Dynamics Corp. v. United States,* 218 Ct.Cl. 40, 49, 585 F.2d 457, 462 (1978) (quoting *Edward R. Marden Corp. v. United States,* 194 Ct.Cl. 799, 808, 442 F.2d 364, 369 (1971)),

*see AT & T Communications, Inc. v. WilTel, Inc.,* 1 F.3d at 1205. "A modification generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's changes clause." *AT & T Communications, Inc. v. WilTel, Inc.,* 1 F.3d at 1205. The government cannot impose obligations on a contractor which far exceed those contemplated in their contract. *Alliant Techsystems, Inc. v. United States,* 178 F.3d 1260, 1276 (Fed.Cir.) *reh'g denied,* 186 F.3d 1379 (1999).

 Cases that have found cardinal changes "have involved changes that altered the nature of the thing constructed." *Aragona Constr. Co. v. United States,* 165 Ct.Cl. at 391; *accord Saddler v. United States,* 152 Ct.Cl. 557, 564, 287 F.2d 411, 415 (1961); *see also Keco Indus., Inc. v. United States,* 176 Ct.Cl. 983, 990–91, 364 F.2d 838, 847–48 (1966); *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. at 194, 351 F.2d at 966. "Each case must be analyzed on its own facts and in light of its own circumstances, giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole." *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. at 194, 351 F.2d at 966 (citing *Saddler v. United States,* 152 Ct.Cl. at 561, 287 F.2d at 413, 414). Moreover, the contractor must prove facts with specificity that support its allegations that a cardinal change occurred. *See S.J. Groves & Sons Co. v. United States,* 228 Ct.Cl. at 604, 661 F.2d at 174 (contractor failed to make "a clear showing of cardinal change"); *Paragon Energy Corp. v. United States,* 229 Ct.Cl. 524, 527, 1981 WL 22045 (1981) (contractor's "conclusory assertion" that a cardinal change had occurred found insufficient to meet its burden).

PCL has alleged "substantial changes" to PCL's duties and the physical features of the project, along with descriptions concerning the difficulty and duration of its effort, in an attempt to show that a cardinal change occurred. PCL claims that the "physical changes" to the project, primarily changes to the foundation of the Parking Structure, constituted a cardinal change. One of PCL's

own employees, their construction manager, however, directly contradicted this position at trial by stating that there was not a "dramatic change in the use and function of the building or the size of the building" actually built compared to the building PCL had originally contracted to build. Even PCL's expert conceded at trial that the physical nature of the project was not "cardinally changed" and that change to the physical facilities is the relevant inquiry. PCL's contention that reconfigurations of the drag tie, nine of forty-one level 3A footings, a transition wall, and the pedestrian ramp footings constituted a different "nature" of work than required in the original contract was not supported at trial.

The contract itself explicitly provided that discrepancies, omissions, conflicts and design changes would, or likely, would arise, and that the parties would address such issues during contract performance. This concept was part of the fundamental nature of this contract, and generated part of PCL's duties under the contract. The fact that there were discrepancies, omissions, and incomplete contract drawings requiring additional work is consistent with, and not a deviation from, the "nature" of PCL's contract.

PCL also contends that USBR "substantially changed PCL's duties under the contract causing a cardinal change." However, the "changed" duties that PCL cites to support this argument were required by the contract, and fit the description of assisting USBR in resolving discrepancies and omissions when they were identified. At the backslope, PCL indicates that it "undertook track drilling" and test site excavation. PCL was performing precisely what is required for a differing site condition—determining the extent that the rock differed from that depicted in the contract drawings. The government's request to PCL to lay out a proposed location for the drag tie to aid in redesign was required by PCL's contract, as PCL agreed to "help [USBR] resolve such issues when they arise." PCL claimed a differing site condition at the escalator, and had the obligation to substantiate its claim. In fact, there was no differing site condition at the escalator. PCL performed "addition-al" exploratory drilling at the triangular bridge, but this was not a different duty because PCL was already obligated under the contract to perform exploratory drilling as directed by the government. PCL cannot make a showing that changes in its "duties" occurred, or that PCL's duties changed so much that a cardinal change occurred.

In *Wunderlich Contracting Co. v. United States*, the court held that, despite the fact that "plaintiffs' performance has been lengthier and costlier that anticipated[,]" no cardinal change occurred because the hospital plaintiff constructed remained basically the same. 173 Ct.Cl. at 195, 351 F.2d at 966; *accord Melville Energy Sys., Inc. v. United States*, 33 Fed.Cl. 616, 619 (1995) (even where the contractor was required to perform work that was "unnecessary" and "wasteful," "it could be done without using extraordinary means and without changing the nature of the work" and, therefore, was not a cardinal change). Although PCL alleges that it incurred substantial overruns, such an allegation does not support the charge of a cardinal change.

PCL suggests that it need not demonstrate that the "end item" it built was different than that for which it bargained. However, in *Aragona Construction Company*, the contractor also relied upon a multitude of changes to urge a cardinal change. The court rejected that claim, holding that:

> Plaintiff contracted to build a reinforced concrete hospital building on a certain site at Fort Howard, Maryland, and that is exactly what it built. The hospital, when it was completed, was in the same location, looked the same, had the same number of rooms and floors and the same facilities as the one shown on the original plans and specifications. Apart from the substitution of materials, it differed not at all from the building that had been contemplated when the contract was awarded.

165 Ct.Cl. at 391.

PCL asserts that the court should consider the totality of the circumstances, including the type of contract involved, the increase in the cost of completing the contract, the number of changes made, whether the object constructed is the same as originally bar-

gained for, the timing of the changes, and effect of the changes. PCL has not demonstrated that the changes constituted cardinal changes or that 356 changes is necessarily an inordinate number of changes or accumulatively constituted a cardinal change to a contract of this magnitude. *See Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. at 191, 351 F.2d 956 ("Although the plans and specifications, as modified and refined did in fact contain a large number of errors which eventually had to be corrected, it cannot be said that the cumulative effect or extent of these errors was either unreasonable or abnormal for a project of such encompassing scope and complexity."). In addition, courts must look beyond simple arithmetic when assessing a cardinal change claim. *See S.J. Groves & Sons Co. v. United States*, 228 Ct.Cl. at 602, 661 F.2d at 173 (a fundamental change to the project resulting in a $6 million change to a $2 million contract was not a cardinal change). In sum, PCL has not demonstrated that the contract changes, which were in part even triggered by PCL's own performance difficulties, amounted to a cardinal change. Moreover, PCL has failed to demonstrate with specificity that its increased costs actually were the result of the government's change orders.

## VI. Count IX (Case No. 95–666C)

In its post-trial brief, the plaintiff contends that:

Count IX of PCL's Complaint alleges that the Contract's inclusion of FFP [Firm Fixed Price] provisions violated FAR §§ 16.103(a) and 16.202–2 because the uncertainties related to the Contract's performance were not identifiable or capable of bearing reasonable cost estimates at the time of the award. The facts proven at trial establish that such a violation occurred.

The defendant argues that this court does not have jurisdiction because such a claim was not presented to USBR contracting officer. Although minimally stated in the introductory section on Breach of Contract in PCL's Claim submitted to the contracting officer, the plaintiff stated: "An FFP contract, however, is appropriate only when

Contract drawings are accurate and the Contract can be performed as bid. As a result, USBR breached the Contract through a fraud in the inducement." There are also at least two other brief references to the FFP Contract choice. Therefore, the court finds that it may exercise jurisdiction over this issue at this time. Certainly, more explicit articulation is to be desired, but the court is reluctant after so many weeks of trial to return this issue to the contracting officer when it can be disposed of in this opinion and the contracting officer was sufficiently apprized of the issue in the claim presented. *See* 41 U.S.C. § 605(a–c) (1988); *see also Paragon Energy Corp. v. United States*, 227 Ct.Cl. 176, 184, 645 F.2d 966, 971 (1981).

The determination of contract type is largely discretionary with the agency. 48 C.F.R. §§ 16.102(b), 16.104 (1990). As our courts have often noted, "[e]ffective contracting demands broad discretion." *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 958–59 (Fed.Cir.1993) (citations omitted). "[T]o prevail on the merits, plaintiff must demonstrate that *'the relevant actions* of the procurement officials involved *lacked a rational or reasonable basis.'*" *Action Mfg. Co. v. United States*, 10 Cl.Ct. 474, 478 (1986) (emphasis in original) (quoting *F. Alderete Gen. Contractors, Inc. v. United States*, 4 Cl.Ct. 482, 493 (1984); and citing *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971); *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983)).

In an opinion filed on June 24, 1998, *PCL Construction Services, Inc. v. United States*, 41 Fed.Cl. 242 (1998), this court addressed and denied the defendant's motion to dismiss Count IX of plaintiff's Complaint. In the words of that opinion:

In Count IX, the plaintiff alleges that the underlying construction contract was illegal in that the government violated provisions of the FAR which address the type of contract to be used in a procurement. The plaintiff contends that the degree of risk and uncertainty in this procurement should have led to the award of a cost-reimbursement contract to PCL, rather than a firm-fixed-price type of contract.

The portion of the FAR relied on by the plaintiff ("Part 16—Types of Contracts") indicates that the FAR provides "guidance" for selection by the contracting officer, in his or her discretion, on the appropriate form of contract. 48 C.F.R. § 16.000 (1990). In addition, FAR Part 36, which was not noted by the plaintiff, specifically addresses construction contracts, and provides that firm-fixed-price contracts generally shall be used for construction contracts. 48 C.F.R. § 36.207(a) (1990). Moreover, with regard to the award of a firm-fixed-price contract for the "Boulder Canyon Project," plaintiff failed to raise its objections prior to award of the contract, despite an opportunity to do so. Any objection to the choice of contract type should have been raised prior to submission of bids, and, certainly, prior to contract completion.

*Id.* at 262–63.

 In addition to the wording of FAR § 36.207 and the contracting officer's general discretion to make operational choices, the contracting officer is directed, under certain circumstances, regarding the appropriate type of competitive procedure he or she should select, which also may direct the choice of contract type. According to the statutes, a contracting officer:

(A) shall solicit sealed bids if—

(i) time permits the solicitation, submission, and evaluation of sealed bids;

(ii) the award will be made on the basis of price and other price-related factors;

(iii) it is not necessary to conduct discussions. with the responding sources about their bids; and

(iv) there is a reasonable expectation of receiving more than one sealed bid. . . .

41 U.S.C. 253(a)(2)(A) (1988). If all of the elements listed in section 253(a)(2)(A) are met, the contracting officer is directed to use sealed bidding. *See Knoll N. Am., Inc.* Comp. Gen. Dec. B–250234, 93–1 CPD ¶ 26 at 5 (1993); *Defense Logistics Agency,* Comp. Gen. Dec. B–227055.2, 87–2 CPD ¶ 365 at 2–3 (1987). Finally, an agency's decision to use sealed bidding will be upheld unless it is unreasonable. *See also Eagle Fire Inc.,*

Comp. Gen Dec. B–257951, 94–2 CPD ¶ 214 at 7 (1994). A consequence of the agency's decision to use sealed bidding is that it must issue a firm fixed price contract. *See* 48 C.F.R. § 14.104 (1990).

In this case, USBR chose to award this contract after soliciting sealed bids. This choice appears to have been the correct one. First, the agency had time to permit a solicitation and evaluation using sealed bids. Given the length of time necessary to develop the design and obtain construction approvals and funding, it would be difficult to argue that time constraints did not permit USBR to solicit construction of the Visitor Center and Parking Structure utilizing sealed bids. Second, the award was to be made on the basis of price and other related factors, primarily, the lump sum price of construction followed by unit prices for specific items. Third, there was no need to conduct discussions with the responding sources. The primary determinations to be made were responsiveness and responsibility. Finally, considering the high profile nature of the contract, USBR had a reasonable expectation, and did receive, more than one sealed bid. Thus, because the four elements in section 253(a)(2)(A) were met, USBR was directed by the statute to solicit sealed bids, and by FAR 14.104 to issue a firm fixed price contract.

 Finally, the solicitation and contract made no secret of the variables to be encountered by the contractor selected which would require design efforts and likely modifications using the changes clause procedures. If plaintiff believed that these variables were so uncertain that it was improper to use an FFP contract, and that the scope of the contract, was, therefore, ambiguous; it had a duty to inquire as to the true nature of the contract before submitting a bid. *See Triax Pac., Inc. v. West,* 130 F.3d at 1474–75; *see also Ryan Co. v. United States,* 43 Fed.Cl. 646, 654 (1999) ("[W]hen a solicitation presents conflicting signals, a contractor is under an affirmative duty to call the ambiguity to the attention of the contracting official."). Moreover, the contractor is assumed to understand the risks inherent in the type of contract it signs at the time of execution.

Among the distinguishing characteristics between the various types of contracts is the degree of risk allocated to the contractor. In addition, even if the plaintiff had an argument regarding the choice of contract type, when a statutory or regulatory restriction is designed for the protection and benefit of the government and the taxpayers, a contract made in violation of that restriction and relied on by the government is binding upon the contractor unless repudiated by the government. The plaintiff cannot gain an advantage from regulations not designed for its benefit. *See National Elec. Lab. v. United States,* 148 Ct.Cl. 308, 314, 180 F.Supp. 337, 340–41 (1960). The solicitation clearly identified the contract to be awarded as an FFP contract. PCL willingly bid on an FFP contract, and willingly signed an FFP contract, thereby assuming the risks attendant to an FFP contract. PCL did not inquire into or object to the form of the contract when bidding on or accepting the contract. At this late date, plaintiff should not be heard to raise a breach of contract claim based on USBR's chosen contract type to which the plaintiff agreed. *See Beacon Constr. Co. v. United States,* 161 Ct.Cl. at 7, 314 F.2d at 504 (1963); *see also S.J. Amoroso Constr. Co. v. United States,* 12 F.3d 1072, 1076 (Fed.Cir. 1993).

## VII. Claims in Case No. 96–442C

PCL claims that USBR's action to terminate the contract was improper for a number of reasons. First, PCL claims that USBR had accepted the project at the time of the termination and had begun to occupy the premises. Second, PCL claims that the contract could not be terminated for default after the contract was deemed substantially complete. Finally, PCL claims that the contracting officer abused her discretion in terminating PCL for default.

 A default termination is a remedy to which the Government should not lightly resort. *Decker & Co. v. West,* 76 F.3d 1573, 1580 (Fed.Cir.1996). "[W]hether [a] default termination is proper depends upon the facts and circumstances of each case." *Olson Plumbing & Heating Co. v. United States,* 221 Ct.Cl. 197, 204, 602 F.2d 950, 955

(1979); *see also J.D. Hedin Constr. Co. v. United States,* 187 Ct.Cl. at 57, 408 F.2d at 431 ("[D]efault-termination is a drastic sanction, which should be imposed (or sustained) only for good grounds and on solid evidence." (citation omitted)); *Libertatia Assocs., Inc. v. United States,* 46 Fed.Cl. 702, 705 (2000); *CJP Contractors, Inc. v. United States,* 45 Fed.Cl. 343, 371 (1999). "[T]he government may not use default as a pretext for terminating a contract for reasons unrelated to performance; instead, there must be a nexus between the government's decision to terminate for default and the contractor's performance." *McDonnell Douglas Corp. v. United States,* 182 F.3d 1319, 1329 (Fed.Cir.1999), *cert. denied,* — U.S. —, 120 S.Ct. 1831, 146 L.Ed.2d 775 (2000). The contractor's performance can be examined with an eye to fundamental elements of performance such as contract specifications, contract schedule, and price. *See id.* The government bears the burden of proof with respect to the issue of whether a termination for default was justified. *Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 765 (Fed.Cir.1987).

The termination for default clause, FAR § 52.249–10(a) (contained in PCL's contract at I.2.24), provides the government with the power to terminate the contract for default without reference to any time or degree-of-completion limitation:

If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed.

48 C.F.R. § 52.249–10(a) (1990) (Fixed–Price Construction). It has been found that abandoning work on a contract without correcting deficiencies in a punch list justifies a default termination. *See M.C. & D. Capital Corp. v. United States,* 948 F.2d 1251, 1256 (Fed.Cir. 1991); *G.A. Karnavas Painting Co.,* V.A.C.A.B. No. 992, 72–1 B.C.A. ¶ 9369, 1972 WL 1605 (1972) ("Correction of the punch list items in this case is established as a contrac-

tual obligation of Appellant, and termination of the Appellant's right to proceed with the work by the Contracting Officer was legally correct and proper upon Appellant's failure or refusal to perform during the time it was allowed for completion, which the Board finds to have been reasonable under the circumstances.").

 It is clear that plaintiff's conduct clearly justified a termination for default for the portion of uncompleted work. PCL unequivocally refused to complete any further work on the project, though there was remaining work to be done, and, thereby, defaulted upon that part of the work when it sent its abandonment letter to Carolyn Tempel, the contracting officer, on November 22, 1995. In that letter, the contractor stated that "PCL will therefore perform no additional work related to the contract; and, PCL is advising its subcontractors that any work performed for the Bureau on this contract will be at their own risk." The termination clause itself clearly states that the government can terminate for default upon a contractor's refusal to complete the work agreed to under the contract.

 There was an anticipatory breach and repudiation of this separable part of PCL's contract. The United States Court of Appeals for the Federal Circuit has stated: " 'When one party to [a] . . . contract absolutely refuses to perform his contract, and before the time arrives for performance distinctly and unqualifiedly communicates that refusal to the other party, that other party can, if he choose, treat that refusal as a breach and commence an action at once therefor.' " *United States v. Dekonty Corp.*, 922 F.2d 826, 828 (Fed.Cir.1991) (quoting *Dingley v. Oler*, 117 U.S. 490, 499–500, 6 S.Ct. 850, 29 L.Ed. 984 (1886)). Consistent with this concept, the Federal Circuit also has noted that "a contracting officer may terminate a contract for anticipatory breach in the event of a 'positive, definite, unconditional, and unequivocal manifestation of intent . . . on the part of the contractor . . . not to render the promised performance when the time fixed . . . by the contract shall arrive . . . .' " *United States v. Dekonty Corp.*, 922 F.2d at 828 (citing *Cascade Pac. Int'l v.*

*United States*, 773 F.2d 287, 293 (Fed.Cir. 1985)); *see also Tretchick v. Department of Transp.*, 109 F.3d 749, 752 (Fed.Cir.1997) (citing *United States v. Dekonty*, 922 F.2d at 828, for the doctrine of anticipatory repudiation); *Best Foam Fabricators, Inc. v. United States*, 38 Fed.Cl. 627, 637 (1997). PCL clearly indicated that it did not intend to complete the remaining portion of the work. The termination clause permits the government to terminate a non-performing contractor for default, and there is no dispute that PCL had not completed all the deliverables under the contract. Even PCL acknowledges that it had not completed all the items on the one-hundred-item punch list, and PCL certainly had not completed the other items on the deficiency lists to which it had previously agreed and which it was contractually bound to perform. Thus, the facts justify the contracting officer's decision to terminate the separable portion of the contract for default.

 PCL attempts to avoid this default determination by arguing that USBR constructively accepted the project as complete when it took possession and began use of the facility without completing the work to be done. It is true that accepted performance cannot be subject to a termination for default. *See Sentell Bros., Inc.*, D.O.T.C.A.B. No. 1824, 89–3 B.C.A. (CCH) ¶ 21,904 at 110,225 (1989); *Ahern Painting Contractor's, Inc.*, G.S.B.C.A. Nos.1972, 8368, 90–1 B.C.A. (CCH) 22,291 (1989); *see also Decker & Co. v. West*, 76 F.3d 1573, 1582 (Fed.Cir.1996) (remarking that acceptance of a project by the government is binding on all parties). However, courts have repeatedly found that government possession and use is not akin to acceptance. *See M.C. & D. Capital Corp. v. United States*, 948 F.2d at 1255; *Tyler Constr. Co.*, A.S.B.C.A. No. 39365, 91–1 B.C.A. ¶ 23,646, 1990 WL 262103 (1990) (noting that use and possession do not equal acceptance); *DeRalco, Inc.*, A.S.B.C.A. No. 41063, 91–1 B.C.A. ¶ 23,576 (1991) (stating that acceptance does not occur until procedures in the contract are followed). The government's use and possession of the project in *M.C. & D. Capital Corp.* did not prevent the government from terminating

the contractor for failure to comply with the requirements of the contract, including failure to comply with the contract closeout provisions. *M.C. & D. Capital Corp. v. United States,* 948 F.2d at 1255–56.

It is clear that USBR never accepted the project as complete, nor did PCL complete all of the necessary procedures for acceptance. PCL did request that a final acceptance inspection be held on August 25, 1995, although the deficiencies on the punch list had not been completed. PCL's request was contrary to the terms of the contract, which required PCL to request final acceptance only when all contract work was considered to be complete. Consequently, USBR denied PCL's request.

PCL withdrew its request for a final acceptance inspection, outlined a procedure to handle remaining deficiencies, and requested a consolidated deficiency listing. USBR provided PCL with a consolidated deficiency listing and concurred with PCL's suggested procedure for resolving the deficiency items. USBR also reminded PCL of its obligation to provide a written certification in accordance with contract section 01700 1.10.A. PCL never provided the required written certification. With a substantial number of deficiencies uncorrected, PCL never returned to the site after receipt of the consolidated deficiency listing. Although some of PCL's subcontractors addressed certain remaining deficiency items after PCL's withdrawal, all work ceased in November 1995 at PCL's direction. Thereafter, USBR terminated PCL for default. Because USBR never accepted the project as complete and PCL did not fulfill its obligations necessary to entitle it to such a determination, plaintiff's argument fails. The termination for default did not occur after acceptance because there was none.

▇▇▇ PCL's second argument regarding the propriety of the termination for default asks the court to adopt a rule that a construction contractor cannot be terminated for default after in fact substantially completing the contract. It is true that some cases in the Board of Contract Appeals have allowed a construction contractor to avoid a termination for default because it had substantially performed the contract. *See Metzger Tow-*

*ing, Inc.,* E.N.G.B.C.A. No. 5862, 94–2 B.C.A. (CCH) ¶ 26,651 (1994); *Wolfe Constr. Co.,* E.N.G.B.C.A. Nos. 3607–3611, 3853, 4752, 84–3 B.C.A. (CCH) ¶ 17,701 at 88,329 (1984); *Cosmos Eng'rs, Inc.,* A.S.B.C.A. No. 19780, 77–2 B.C.A. (CCH) ¶ 12,713 at 61,710–11 (1977); *Edward S. Good, Jr.,* A.S.B.C.A. No. 10514, 66–1 B.C.A. (CCH) ¶ 5362 at 25,157 (1966). The doctrine of substantial performance, however:

> [s]hould not be carried to the point where the non-defaulting party is compelled to accept a measure of performance substantially less than had been bargained for. Substantial performance "is never properly invoked unless the promisee has obtained to all intents and purposes all benefits which he reasonably anticipated receiving under the contract."

*Blinderman Constr. Co. Inc. v. United States,* 39 Fed.Cl. 529, 572 (citing *Franklin E. Penny Co. v. United States,* 207 Ct.Cl. 842, 857–58, 524 F.2d 668, 677 (quoting *In re Kinney Aluminum Co.,* 78 F.Supp. 565, 568 (S.D.Cal.1948)), *aff'd,* 178 F.3d 1307 (Fed.Cir. 1998) (table)); *see also M.C. & D. Capital Corp. v. United States,* 948 F.2d at 1256.

In the instant case, the legally supportable and sensible approach appears to be to simply follow the language of the FAR and the contract and to allow the government to terminate the "separable portion" of the contract, the separable portion being the uncompleted work. *See* 48 C.F.R. § 52.249–10(a) (1990). The result is to prevent the government from avoiding its obligation to pay provable monies owed on the contract, while allowing an appropriate reduction for the uncompleted work and any consequences normally associated with a default termination on that portion of the contract the plaintiff refused to perform.

This line of reasoning is consistent with *Keyser Roofing Contractors, Inc.,* which stated that the substantial completion doctrine should not prevent a contractor from receiving at least the fair value of the work performed before the termination for default except to the extent of covering the cost of the government's expenses to complete the project. *See Keyser Roofing Contractors, Inc.,* A.S.B.C.A. No. 32069, 90–3 B.C.A.

(CCH) ¶ 23,024 at 115,600, 1990 WL 132866 (1990). The contractor should be entitled to the value of the work it has performed, and the termination for default should affect only the uncompleted work, for which the contractor has not been paid.

PCL's final argument focuses on the process by which termination was carried out, once again arguing that USBR's actions were "illegal." The uncontroverted evidence in the record, in the contracting officer's termination letter and in the contracting officer's testimony at trial, is that the contracting officer, Carolyn Tempel, was convinced that, as a result of PCL's decision to abandon the contract, she was justified in terminating the contract. Although other alternatives might have been available, the record demonstrates that PCL unequivocally indicated to the contracting officer that it would perform no further work towards completion of the contract and had directed its subcontractors that they would perform any further work at their own risk. At trial, Ms. Tempel indicated that she considered a termination for convenience instead of a termination for default in consultation with the government technical staff and the department's field solicitor. Under the circumstances, the alternatives suggested by PCL—termination for convenience, placing the contract in "stop-work mode" or back charging PCL—were legitimately rejected.

PCL's arguments concerning the contracting officer's failure to weigh the factors set forth in FAR § 49.402–3(f) [50] also are unpersuasive. PCL abandoned a portion of an uncompleted contract. The first of the relevant factors set forth in FAR § 49.402–3(f) (the terms of the contract and applicable laws and regulations, and the nature of the contractor's default and excuses) support PCL's termination. The other relevant factors (urgency of completion of the project and the ability to have the uncompleted tasks completed by others), did not weigh against termination of PCL in lieu of retention. The USBR's decision, when weighed under the FAR § 49.402–3(f) factors, was reasonable.

The circumstances which arose at the end of this contract and towards the end of the REA negotiation process were regrettable. The record demonstrates that Ms. Tempel, the successor contracting officer to Mr. Shouldis, made a supportable decision to terminate the separable portion of the contract based on PCL's inappropriate decision to walk off the job and to refuse further performance. It is unfortunate, however, that the extensive work invested in the REA process to resolve this case by PCL and USBR under Ms. Tempel's predecessor contracting officer Mr. Shouldis was abandoned. One must ask, whether the case might never have gone into litigation had Mr. Shouldis, who demonstrated at trial and in available documentation, a thorough understanding of the construction project, not retired. At trial, Ms. Tempel offered sufficient evidence that she considered the termination factors properly. However, she demonstrated far less understanding than her predecessor of the complexity of the REA process.

Finally, PCL's arguments regarding the purported failure to document the termination decision also fails. The contracting officer generated a memorandum that discussed the decision to terminate PCL and explained PCL's termination in a letter to plaintiff on May 6, 1991. The contracting officer's memorandum satisfied the requirements of FAR § 49.402–5, although it was perhaps more succinct than a long-term contractor on a complex project deserved as a matter of courtesy and good agency practice.

In conclusion, USBR properly terminated the separable portion of the contract for default. The agency had a proper basis, had not accepted the project, was not barred by the substantial performance doctrine and followed the necessary procedures. As noted, however, the termination for default only affects a separable part of the contract. That part is equal to all uncompleted work at the time the contractor abandoned the job.

---

**50.** The factors include the terms of the contract, the plaintiff's decision to abandon the job, the need to complete work at the Visitor Center and Parking Structure, that the remaining work could be completed by USBR or others, that PCL was not performing other government contracts, that there was no identified impact on the ability of the contractor to liquidate guaranteed loans, progress payments or advance payments. *See* 48 C.F.R. § 49.402–3(f)(1990).

PCL also claims that USBR improperly withheld payments after what plaintiff terms substantial completion of the contract. USBR retained payments from PCL as permitted by contract clause I.5.1 (Payments under Fixed-price Construction Contracts), subparagraph (e), which provides:

> The Contracting Officer may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved. When the work is substantially complete, the Contracting Officer may retain from previously withheld funds and further progress payments that amount the Contracting Officer considers adequate for protection of the Government.

The cycle of withholding retainage started when PCL submitted invoice no. 20 dated June 2, 1993. During a partnering meeting held on May 18, 1993, USBR was informed that PCL was withholding monies from its subcontractors. Contract Clause I.5.9 (Prompt Payment for Construction Contracts) subparagraph (d) allowed the prime contractor to withhold monies from suppliers or subcontractors, provided notice was given to the supplier or subcontractor with a copy of the notice furnished to the contracting officer. Also, on May 19, 1993, PCL management informed USBR that PCL was willing to give up ten percent to protect their interest with the subcontractors and suppliers.

PCL continued to retain monies from its subcontractors on a monthly basis. By invoice no. 43, PCL requested release of USBR's accumulated retainage ($1,351,-838.00). USBR notified PCL that continued withholding of funds was necessary for protection of the government's interests in accrued liquidated damages, outstanding required submittals, and credits due the government for changes and/or reductions in the work.

PCL requested that assessment of liquidated damages be waived until such time as plaintiff was in a position to submit a time impact evaluation that might excuse some liability. The government has acknowledged in various modifications and in numerous statements at trial that plaintiff is owed some funds. Thus far, however, PCL has never submitted a time impact evaluation.

## CONCLUSION

PCL alleges that there has been a complete breach of the contract by USBR and that USBR executed an illegal contract. The court has presided over a trial on plaintiff's breach of contract claim. PCL has alleged that the failures regarding the project are the responsibility of USBR, that the contract was illegally executed and that a breach of the contract occurred in a number of ways, each discussed above. The court holds that PCL has failed to demonstrate a breach of contract. The plaintiff also asked the court to set aside the government's termination for default. The court finds that the separable, uncompleted portion of the contract was subject to a proper termination for default. Regarding the issues of liquidated damages and the amount retained by USBR, issues remain to be resolved now that plaintiff's breach claim has been resolved and the termination for default issues have been addressed. Further proceedings will be scheduled in a separate order.

**IT IS SO ORDERED.**